# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| ALEXIE PORTZ, JILL KEDROWSKI, ABIGAIL KANTOR, MARILIA ROQUE DIVERSI, and FERNANDA QUINTINO DOS SANTOS, *individually and on behalf of all those similarly situated*, | Civil No. 16-1115 (JRT/LIB) |
| Plaintiffs, | **MEMORANDUM OPINION AND ORDER GRANTING MOTION FOR A PRELIMNINARY INJUNCTION** |
| v. | |
| ST. CLOUD STATE UNIVERSITY and MINNESOTA STATE COLLEGES AND UNIVERSITIES, | |
| Defendants. | |

Donald Chance Mark, Jr. and Andrew T. James, **FAFINSKI MARK & JOHNSON, P.A.**, 775 Prairie Center Drive, Suite 400, Eden Prairie, MN 55344, for plaintiffs.

Kevin A. Finnerty, Assistant Attorney General, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Suite 900, St. Paul, MN 55101, for defendants.

Plaintiffs in this case are five student-athletes on the St. Cloud State University ("SCSU") women's tennis team. About four months ago, SCSU announced that it intended to eliminate several of its intercollegiate sports teams, including the women's tennis team, to address declines in enrollment and tuition revenue. Plaintiffs filed this case against SCSU, alleging that the elimination of the women's tennis team, if carried to fruition, would result in a violation of Title IX as well as the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs now move for a preliminary injunction to preserve

the status quo and at least prevent SCSU from eliminating the team until after the case is over.

At this stage of the case, the Court is asked to determine whether Plaintiffs have a fair chance of winning their claims. Title IX requires equal treatment of the sexes, and here, that equal treatment mandate is interpreted to require SCSU to offer a female-to-male ratio of intercollegiate athletics participation opportunities that is "substantially proportionate" to the same ratio in the student body. Because SCSU's student body is almost exactly 50 percent male and 50 percent female, the ratio in the SCSU athletics program, after SCSU enacts its cuts, must also be close to 50-50 to comply with Title IX. Plaintiffs contend that SCSU will not meet that mark, while SCSU argues the opposite, that it will have 254 women participants and 252 men participants.

But Plaintiffs have highlighted reasons to wonder whether SCSU will be able to achieve the level of female participation it desires. While SCSU states that it will add 26 women to its track team next year, Plaintiffs have put forward some evidence that student demand for the women's track team is already saturated. While SCSU states that 52 of its female participants will be two-sport athletes, SCSU arguably may be impermissibly double-counting some of its women as occupying two participation opportunities when in reality only one opportunity exists. And while SCSU argues that it can reach its roster-size goals, Plaintiffs have put forward some evidence that women's participation last year may have been lower than what SCSU has stated, suggesting again that SCSU's goals may be too ambitious because it will have to recruit even more women than anticipated.

Of course, SCSU's reorganization plan may very well be Title IX compliant.  Its expected roster sizes may prove to be accurate and its counting of athletes entirely correct.  But for the limited purposes of this motion for a preliminary injunction, the Court finds that Plaintiffs have demonstrated that they have a fair chance of succeeding on the merits of their Title IX claim, and all of the other preliminary injunction factors – irreparable harm, the balance of the hardship, and the public interest – weigh in their favor too.  The Court will therefore issue a preliminary injunction preventing SCSU from eliminating the women's tennis team while this case is pending.

## BACKGROUND

### I.   FACTUAL BACKGROUND

Defendant SCSU is a public university of higher education located in St. Cloud, Minnesota.  SCSU is a member of Defendant Minnesota State Colleges and Universities' ("MNSCU's") system of colleges.[1]  SCSU and MNSCU each receive federal funding.  SCSU's student enrollment is almost precisely one-half male and one-half female.

SCSU, like many other institutions of higher education, has witnessed declining revenue and enrollment in recent years.  SCSU's enrollment peaked in 2011 at 22,024 total students, or 19,186 if high school students are not included in the tally.  (Aff. of Lisa Foss ("Foss Aff.") ¶ 4, May 11, 2016, Docket No. 26.)  By 2016, total enrollment was

---

[1] SCSU and MNSCU are both represented by the Minnesota Attorney General's Office in this case, and the Court will refer to them together as "SCSU" for the purposes of this motion.

down to 18,859, or 14,990 excluding high school students.  (*Id.* ¶ 5.)  SCSU's revenues from tuition fell by approximately $8.6 million from 2011 to 2016.  (*Id.* ¶ 6.)

SCSU, like many other institutions of higher education, has an intercollegiate athletics department and is a member of the National Collegiate Athletic Association ("NCAA").  For the 2015-16 academic year, SCSU offered 23 varsity sports.  Its men's and women's hockey teams play at the NCAA Division I level, and the remaining SCSU sports teams compete in Division II.  In recent years, SCSU has had a significantly higher number of male sport participants than women participants – men have had anywhere from 116 to 179 more participants in recent years – despite the nearly equal sex ratio in the undergraduate student body.  (Compl. ¶¶ 68-72, Apr. 28, 2016, Docket No. 1.)

To address the declines in revenue and enrollment, SCSU's president, in December 2015, asked SCSU athletics director Heather Weems to come up with a "cost containment strategy" for the athletics department.  (Aff. of Heather Weems ("Weems Aff.") ¶ 10, May 11, 2016, Docket No. 25.)  Weems balanced what she understood to be the university's desire to offer competitive sports programming with its need to reduce costs and comply with Title IX.  (*Id.* ¶ 10-13.)  Weems ultimately arrived at a plan that included the elimination of several of the school's sports teams:  the men's and women's tennis teams, the women's Nordic skiing team, the men's cross-country running team, and the men's track team.  (*Id.* ¶ 13.)  Weems's plan also called for a number of teams – mostly men's teams – to reduce their number of participants, and for some of the women's teams to increase their numbers.  (*Id.* ¶ 16.)  Weems created the table below to

show how SCSU would alter its sports programming in next year's school year, 2016-17, from last year's school year, 2015-16:

| | NCAA Avg (Div I/II) | 2015-16 (Unofficial) | | 2016-17 (Projected) | |
|---|---|---|---|---|---|
| Women's Basketball* | 15.4 | 17 | | 18 | |
| Women's Cross Country | 12.6 | 10 | | 14 | |
| Women's Golf | 7.9 | 13 | | 12 | |
| Women's Hockey | 24.2 | 24 | | 25 | |
| Women's Nordic Skiing ^ | 13.3 | 8 | | 0 | |
| Women's Soccer | 27.3 | 30 | | 28 | |
| Women's Softball** | 20.0 | 25 | | 23 | |
| Women's Swim/Dive | 19.5 | 40 | | 40 | |
| Women's Tennis | 8.8 | 9 | | 0 | |
| Women's T&F, Indoor | 31.3 | 27 | | 38 | |
| Women's T&F, Outdoor** | 30.1 | 23 | | 38 | |
| Volleyball* | 16.2 | 20 | | 18 | |
| | | 246 | 39.7% | 254 | 50.20% |
| Unduplicated | | 213 | | 202 | |

| | | | | | |
|---|---|---|---|---|---|
| Men's Baseball** | 38.8 | 49 | | 37 | |
| Men's Basketball* | 17.3 | 15 | | 15 | |
| Men's Cross Country | 13.0 | 9 | | 0 | |
| Men's Football* | 112.2 | 102 | | 97 | |
| Men's Golf | 10.5 | 10 | | 9 | |
| Men's Hockey | 27.8 | 26 | | 27 | |
| Men's Swim/Dive | 21.2 | 37 | | 27 | |
| Men's Tennis | 10.0 | 12 | | 0 | |
| Men's T&F, Indoor | 35.5 | 33 | | 0 | |
| Men's T&F, Outdoor** | 34.5 | 29 | | 0 | |
| Men's Wrestling | 32.4 | 52 | | 40 | |
| | | 374 | 60.3% | 252 | 49.80% |
| Unduplicated | | 336 | | 252 | |

*NSIC membership requirement
**NSIC membership requires sponsorship of one of two spring sports
^Includes Alpine/Nordic

(Weems Aff., Ex. 5.)   Notably, despite cutting two women's teams in the entirety, Weems proposes that SCSU will actually **increase** the overall number of women participating in the SCSU athletics department by eight:   there were 246 women participating in 2015-16, according to Weems, but Weems states that number will rise to 254 in 2016-17.   (*Id.*)   Weems proposes that SCSU will accomplish this increase –

despite the cuts – by growing the roster size for several of the existing women's teams. Weems proposes to add one woman to the basketball team, four women to the cross-country team, one to the hockey team, and most notably, 11 women to the indoor track team and 15 more to the outdoor track team.  (*Id.*)  Weems also anticipates a decline of seven participants across the women's golf, soccer, softball, and volleyball teams, in addition to the 17 participants that will be lost due to the elimination of the women's tennis and Nordic skiing teams.  (*Id.*)  Thus, Weems anticipates an increase of 32 female participants to be offset by a decline of 24 participants to arrive at her predicted total increase of eight.  Weems's roster engineering will bring the total number of female participants to 254, and the total number of male participants to 252, for a near equal female-to-male ratio – just like the student body.  (*Id.*)

Numbers on SCSU's website, however, differ in some ways from the numbers Weems gives.  For example, the SCSU women's volleyball roster for 2015-16 lists only 15 women, while Weems's chart states the number was 20.  *See 2015 Women's Volleyball Roster*, St. Cloud State Huskies, http://www.scsuhuskies.com/roster .aspx?roster=93&path=volleyball (last visited July 7, 2016).[2]  Thus, Weems's proposed 2016-17 roster size of 18 for the women's volleyball team would require adding three women, not cutting two.  Similarly, the online roster sizes of the 2015-16 women's softball and basketball teams are one short of what Weems states.  *See 2015 Softball*

---

[2] The website http://scsuhuskies.com is "the official website of St. Cloud State Athletics." *Huskies Athletics and Recreation*, St. Cloud State University, http://www.stcloudstate.edu /scsuathletics/default.aspx (last visited July 7, 2016).

*Roster*, St. Cloud State Huskies, http://www.scsuhuskies.com/roster.aspx?roster =86&path=softball (last visited July 7, 2016).

Weems's 2015-16 numbers for the women's track team are debatable too. Weems states that 27 women participated in indoor track last year and 23 women participated in outdoor track, for a total of 50 female track participants. But the website lists only one team for women's track and field, not two, and provides only one roster with 28 women on it. *2015-16 Women's Track & Field Roster*, St. Cloud State Huskies, http://www .scsuhuskies.com/roster.aspx?path=wtrack (last visited July 7, 2016).

One could quibble with Weems's 2016-17 numbers too. For example, Weems states that SCSU will increase – in one year – the women's indoor and outdoor track teams by 11 and 15 participants, respectively – an increase of approximately 40% and 65%, respectively. But there are indications that student demand might not accommodate that increase. SCSU has, for example, already in the past resorted to advertising the women's track team on campus bulletin boards, inviting women to join. (Second Decl. of Donald Chance Mark, Jr. ("Mark Decl.") ¶ 30, May 18, 2016, Docket No. 35; *id.*, Ex. CC ("OPEN TRYOUTS!"; "TRACK & FIELD"; "ALL EVENTS NEEDED").)

On March 2, 2016, SCSU publicly announced that it planned to enact Weems's proposed cuts.

## II.    PLAINTIFFS

Plaintiff Fernanda Quintino dos Santos is a 19-year-old freshman at SCSU. (Decl. of Fernanda Quintin dos Santos ¶ 1, Apr. 29, 2016, Docket No. 13.) She was a member

of SCSU's varsity women's tennis team during her freshman year and has three more years of athletic eligibility remaining.  (*Id.* ¶ 2.)  She attends SCSU on "a partial athletic and academic scholarship" and has a "fall semester GPA" of 3.72.  (*Id.* ¶¶ 5, 13.) Dos Santos is from Brazil, where she "was ranked 2nd nationally" in 2012.  (*Id.* ¶ 3.) Dos Santos states she was offered a "nearly full-ride scholarship" at Tennessee Wesleyan College, but chose to attend SCSU because "it was the most affordable school that also had my major," which is "travel and tourism."  (*Id.* ¶¶ 4-5.)  She was also "attracted to SCSU's women's tennis team" and "would not have chosen to attend SCSU if it did not offer women's tennis."  (*Id.* ¶ 4.)  Dos Santos finished her freshman year tennis season with a 15-11 record, including a 6-1 record in singles competition.  (*Id.* ¶ 6.)  While playing tennis at SCSU, dos Santos "became extremely close with my teammates and was excited to finally become a part of a school-sponsored tennis program."  (*Id.*)  Since SCSU announced that it plans to cut its women's tennis program, dos Santos has "had trouble concentrating on my classes," "could not . . . take notes," and "lost the motivation to do the things that I used to love."  (*Id.* ¶ 9.)  Dos Santos states that "[a]s an international exchange student, I am not able to transfer schools like typical students." (*Id.* ¶ 10.)

Plaintiff Marilia Roque Diversi is a 21-year-old junior at SCSU.  (Decl. of Marilia Roque Diversi ¶ 2, Apr. 29, 2016, Docket No. 12.)  Like dos Santos, Diversi is from Brazil, and "had scholarship offers at other universities," but "chose SCSU because of the success of the tennis team and because it had the mass communications degree that I wanted to pursue."  (*Id.* ¶ 4.)  She has a 3.67 GPA and is "on a partial athletic and

academic scholarship." (*Id.* ¶ 5, 11.) Because Diversi is a junior, and because of the timing of SCSU's announcement, Diversi believes she is unlikely to be able to transfer, and her "Division II tennis career may be over" even though she retains a year of athletic eligibility. (*Id.* ¶ 9.) She always dreamed of "study[ing] abroad" – that is, studying in the United States – to "play the sport that I love"; "[h]aving that taken away was upsetting." (*Id.* ¶ 7.)

Plaintiff Jill Kedrowski is a 19-year-old freshman at SCSU and was a member of the women's tennis team this past year. (Decl. of Jill Kedrowski ¶ 2, Apr. 29, 2016, Docket No. 14.) She has three more years of athletic eligibility remaining. (*Id.*) Kedrowski "was recruited by numerous schools" including MSU-Moorhead "to play tennis, basketball, and lacrosse," but she chose SCSU because she (1) could "play **both** tennis **and** basketball" at SCSU, and (2) is "good friend[s]" with Plaintiff Alexie Portz, and wanted to go to school where she could "be doubles partners" with Portz. (*Id.* ¶ 7 (emphasis added).) Kedrowski states she would "lose credits and experience a set-back academically" if she were to transfer to play tennis elsewhere (*id.* ¶ 15-18), and she would either have to give up her collegiate career as a two-sport athlete or find another school that would let her once again play both tennis and basketball. Kedrowski is also on "a partial athletic and academic scholarship." (*Id.* ¶ 19.)

Plaintiff Abigail Kantor is a 20-year-old sophomore SCSU varsity women's tennis team member with two more years of athletic eligibility remaining. (Decl. of Abigail Kantor ¶ 2, Apr. 29, 2016, Docket No. 10.) Although Kantor "was recruited by several colleges," she "decided to attend SCSU because [she] wanted to play intercollegiate

tennis and . . . because it would allow [her] to remain close to [her] family," who live just outside of St. Cloud in Foley, Minnesota.  (*Id.* ¶¶ 3, 7.)  If Kantor were to transfer schools now, she would "have to move away from my friends and family."  (*Id.* ¶ 12.)  Kantor is attending SCSU "on a partial athletic and academic scholarship."  (*Id.* ¶ 14.)

Plaintiff Alexie Portz is a 19-year-old sophomore at SCSU and was a member of the tennis team during her freshman and sophomore years; she has two more years of athletic eligibility remaining.  (Decl. of Alexie Portz ¶ 2, Apr. 29, 2016, Docket No. 11.) When looking at colleges, Portz "was recruited by schools to play tennis, hockey, and golf," but she decided to attend SCSU in large part due to family connections at the school:  Portz's mother "played tennis at SCSU, as did [her] grandfather, Larry Sundby, who served for many years as SCSU's women's tennis coach and currently volunteers as its assistant women's tennis coach."  (*Id.* ¶ 8.)  Portz was "one of the NSIC conference leaders in singles play, finishing with a record of 15-4" in 2015-16.  (*Id.* ¶ 9.)  It would be difficult for Portz to transfer because her "family has a legacy at SCSU," and she would not be able to adequately research schools to transfer to prior to the start of tennis in the spring of 2016 because she has "already paid to study abroad in Spain in the fall of 2016."  (*Id.* ¶ 12.)  Also, Portz believes she would likely lose academic credits in a transfer, a concern to her because she currently holds a 4.0 GPA and intends to attend dental school after graduation.  (*Id.*)  Like all of the other plaintiffs, Portz attends SCSU "on a partial athletic and academic scholarship."  (*Id.* ¶ 17.)

## III.    PROCEDURAL BACKGROUND

Plaintiffs filed their complaint on April 28, 2016.  (Compl., Apr. 28, 2016, Docket No. 1.)  "Plaintiffs seek to represent a class of all current, prospective, and future female students who want to participate in varsity women's tennis at SCSU or who want to participate in varsity sports eliminated or not offered by SCSU."  (*Id.* ¶ 17.)  Plaintiffs allege that SCSU would violate the law in two respects if they eliminated the women's tennis team:   (1) SCSU would violate Title IX by denying Plaintiffs the ability to participate in an educational activity receiving federal financial assistance, and (2) SCSU would violate the Fourteenth Amendment by denying Plaintiffs equal protection of the law.  (*Id.* ¶¶ 61-78, 79-89.)  Plaintiffs brought their Fourteenth Amendment claim under 42 U.S.C. § 1983.  (*Id.* ¶¶ 79-89.)  Plaintiffs request a permanent injunction, declaratory relief, and attorneys' fees.  (*Id.* ¶¶ 53-60.)

The day after Plaintiffs filed their complaint, Plaintiffs moved the Court to grant either a temporary restraining order or a preliminary injunction.   (Mot. for TRO or Prelim. Inj., Apr. 29, 2016, Docket No. 6.)  The Court held a telephone conference with the parties on May 3, 2016, in which Plaintiffs represented that they were no longer seeking a TRO.  (*See* Minute Entry, May 3, 2016, Docket No. 20.)

Plaintiffs now seek a preliminary injunction

1. Enjoining and restraining Defendants from eliminating SCSU's interscholastic women's tennis team or any other SCSU women's team or athletic participation opportunities;

2. Enjoining and restraining Defendants from involuntarily terminating the employment of the coaches of SCSU's interscholastic women's tennis team or any other SCSU women's team;

3. Enjoining and restraining Defendants from reducing their support for SCSU's interscholastic women's tennis team or any other SCSU women's team; and

4. Enjoining and restraining Defendants from restricting or denying SCSU's interscholastic women's tennis team's access to facilities, coaching, training, or competitive opportunities, or that of any other SCSU women's team.

(Mot. for TRO or Prelim. Inj. at 1-2.)

The Court held a hearing on Plaintiffs' preliminary injunction motion on June 13, 2016. At the hearing, Plaintiffs represented that the scope of their requested preliminary injunction had narrowed from covering all women's sports at SCSU to just the women's tennis team because the women's Nordic skiing team – the other women's team facing elimination – does not object to SCSU's intention to give the team club status.

## ANALYSIS

### I.   STANDARD OF REVIEW

In deciding whether to grant a preliminary injunction, the Court weighs four factors: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict . . . ; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1036 n.2 (8th Cir. 2016) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)).

## II.     IRREPARABLE HARM

Plaintiffs face two irreparable harms.  First, "given the fleeting nature of college athletics," a plaintiff suffers an irreparable harm if he or she "los[es] the opportunity to participate in their sport of choice on a continuous and uninterrupted basis."  *Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277, 291 (D. Conn. 2009) (granting a preliminary injunction prohibiting the elimination of certain women's teams); *see also Biediger v. Quinnipiac Univ.*, 691 F.3d 85 (2d Cir. 2012) (affirming the district court's findings of fact and conclusions of law following a bench trial in the same case); *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 302 n.25 (2d Cir. 2004) (collecting cases and finding that the deprivation of the opportunity to play a sport constitutes an irreparable harm).  Here, the harm Plaintiffs will suffer is on all fours with the harm at issue in *Biediger*:  if SCSU eliminates the women's tennis team right away, and this case is not resolved in time for Plaintiffs to adequately prepare for and participate in the 2016-17 season – a very real possibility given the pace of modern day litigation – Plaintiffs would likely lose the opportunity to play at least one season of tennis at SCSU even if they later prevail in this case.  And even if Plaintiffs' do later win, the temporary elimination of the women's tennis program would harm recruiting efforts for future tennis seasons and could make it difficult for SCSU to retain or hire coaches in the near term.  Since Plaintiffs cannot wait for the long term – their time in college is limited – those effects would cost them dearly.  The threat to Plaintiffs' participation in SCSU's women's tennis team is not a harm that can be repaired later with money; it would be irreparable.

SCSU argues that SCSU's actions do not require Plaintiffs to stop playing intercollegiate tennis; Plaintiffs just can no longer play tennis **at SCSU**, and that Plaintiffs can always transfer and play somewhere else.   But the Court finds that transferring would be too costly to mitigate the irreparable nature of losing an intercollegiate sporting opportunity, not only for Plaintiffs specifically, but also generally for all plaintiffs in Plaintiffs' shoes.  Student-athletes who transfer must "break into new programs with new coaches and established rosters," increasing the possibility that their athletic development will be "stunt[ed]" just as they are on the precipice of the "highest level of amateur competition."  *Biediger*, 616 F. Supp. 2d at 292.  And then there is the cost of transferring for all students, athletics aside:  students who transfer must leave behind the professors, friends, and campuses they are familiar with to start all over again. While transferring in some instances may be the best decision for a particular student, the fact that very few students transfer and the vast majority do not proves the obvious fact that transferring is costly.

And for Plaintiffs specifically, the specter of transferring is even more daunting. Dos Santos and Diversi are international students, and transferring would require them to abandon their newly acquired familiarity with SCSU's norms, customs, and people.  For Portz, SCSU is in her blood; her grandfather was once the coach of the team she is now on, and her mother played on the team before her.  Portz would also have very little time to plan a transfer because she plans to study abroad in the fall – as many college juniors rightly do.  Kedrowski does not want to transfer because she came to SCSU specifically to play doubles tennis with Portz, and because she can play both basketball and tennis at

SCSU.  Leaving SCSU would be difficult for Kantor too, because she chose SCSU to be near her family, a proximity that no other similarly situated school can offer.  The Court finds that forcing Plaintiffs to make a Hobson's Choice between a season of tennis and their attendance at SCSU does nothing to ameliorate the irreparable harm of losing the ability to play the 2016-17 tennis season at SCSU.

Additionally, even the temporary elimination of the women's tennis team may cause Plaintiffs a second irreparable harm:  the denial of a constitutional right.  The denial of a constitutional right is a cognizable injury, *Heckler v. Mathews*, 465 U.S. 728, 738-39 (1984) (stating "unequal treatment" constitutes an injury-in-fact for Article III's purposes), and an irreparable harm, *see Elrod v. Burns*, 427 U.S. 347, 373-74 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1*, 690 F.3d 996, 1000 (8th Cir. 2012) (concluding the same).  And at least when the constitutional right at issue is protected by the Fourteenth Amendment, the denial of that right is an irreparable harm regardless of whether the plaintiff seeks redress under the Fourteenth Amendment itself or under a statute enacted via Congress's power to enforce the Fourteenth Amendment.  For example, a state's denial of a plaintiff's right to freely exercise one's religion – a First Amendment right incorporated into and protected by the Fourteenth Amendment's due process clause – is an irreparable

harm, and "[that] principle applies with equal force to the violation of RLUIPA,"[3] a statute passed under Congress's Fourteenth Amendment enforcement power, just as it does to the violation of the literal First Amendment, "because RLUIPA enforces First Amendment freedoms." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012). The same goes here: As discussed below, Plaintiffs have a fair chance of succeeding on their Title IX claim, and Congress passed Title IX pursuant to its power to enforce the Fourteenth Amendment.[4] Plaintiffs' expectation that they may be treated unequally in violation of Title IX's terms is an irreparable harm.

In sum, Plaintiffs face two irreparable harms if a preliminary injunction is not issued: an interruption in their participation in SCSU's women's tennis team, and unequal treatment.

## III.   BALANCE OF HARMS

Although Plaintiffs face irreparable harm, SCSU nonetheless argues that the balance-of-harms factor weighs in their favor because a preliminary injunction could

---

[3] RLUIPA is the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc, *et seq.*

[4] *See Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 244, 244 n.4 (1985) (analyzing a Title IX sister statute, 29 U.S.C. § 794 ("Section 504"), as though it were enacted pursuant to (i) Congress's Fourteenth Amendment enforcement power and (ii) its Article I, Section 8 spending power); *Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 (1979) (stating that Congress enacted Title IX not only "to avoid the use of federal resources to support discriminatory practices," but also "to provide individual citizens effective protection against those practices"); S. Rep. No. 94-1011, at 5 (1976) (premising Congress's passage of a statute, now codified at 42 U.S.C. § 1988, to permit the award of attorney's fees to the prevailing party in a Title IX lawsuit on Congress's power to enforce the Fourteenth Amendment).

unwind SCSU's reorganization plan, for which SCSU has a reliance interest:  a number of university administrators and employees devoted significant time to putting the plan together, and even a temporary injunction that pauses the implementation of one aspect of SCSU's plan could send SCSU back to the drawing board, imposing new costs on the school.  But Plaintiffs argue persuasively that the requested preliminary injunction would not be too administratively costly because it requires nothing more than the maintenance of the status quo, requiring only that SCSU do for one more year what it has done for the past 35 years, i.e., offer women's tennis as a sport.

Plaintiffs also argues that the preliminary injunction will not cost SCSU much money because SCSU has promised to maintain all of Plaintiffs' scholarships for the duration of their attendance at the school, SCSU will not realize any scholarship-based savings from the elimination of the women's tennis team until after Plaintiffs' graduate, transfer, or leave the school.  Plaintiffs further argue that according to their calculations, SCSU will actually see more revenue next year if they operate the women's tennis team than they would if they cut it.  According to Plaintiffs, SCSU receives approximately $90,000 in revenue from tuition and state and federal funding that is associated with the team, while the team's operating costs are only $40,745.  (*See* First Decl. of Donald Chance Mark, Jr., Ex. B at 16, Apr. 29, 2016, Docket No. 9.)  SCSU, somewhat surprisingly, does not dispute Plaintiffs' back-of-the-napkin cost estimate, but instead represented at the hearing only that the cost question was complicated.

Whatever SCSU's reliance interest is in its reorganization plan, the Court finds that the balance of the harms weighs decidedly in Plaintiffs' favor, especially in light of

the fact that continuing the tennis team for one more year will apparently cost little if anything and merely maintains the status quo.

## IV.     PROBABILITY OF SUCCESS ON THE MERITS

In the Eighth Circuit, the Court weighs the probability-of-success-on-the-merits factor in one of two slightly different ways, depending on the circumstances.  *Planned Parenthood v. Rounds*, 530 F.3d 724, 730-33 (8th Cir. 2008).   In the typical case, a movant need only show that she possesses a "fair chance of prevailing" on the merits of her claim, with the line demarcating a "fair chance" being less than 50 percent.  *See id.* But when a party alleges a statute is invalid, and seeks on that basis to preliminarily enjoin a government officer's enforcement of the statute, then the movant must show that her probability of success is at least "likely," greater than 50 percent.  *Id.*  Here, Plaintiffs do not challenge the validity of any statute, either facially or as applied; they instead allege that SCSU's proposed actions would violate Title IX and the Equal Protection Clause of the Fourteenth Amendment.   Therefore, to satisfy the probability-of-success-on-the-merits factor, Plaintiffs need only show that they have a "fair chance of prevailing" on one or both of their claims.

### A.     Title IX

Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

The United States Department of Education ("Department") interprets Title IX's provisions to extend to institutions of higher education that accept federal funds, and also to those schools' athletics programs. 34 C.F.R. § 106.41. The Department then interprets its own regulations to permit collegiate-athletics departments three different means of complying with Title IX: (1) an institution can provide "intercollegiate level participation opportunities for male and female students . . . in numbers substantially proportionate to their respective enrollments"; (2) if "the members of one sex have been and are underrepresented among intercollegiate athletes," then the institution may "show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of that sex"; or (3) if "the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion [under Prong 2]," then the institution can "demonstrate that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program." 44 Fed. Reg. 71418 (Dec. 11, 1979).[5]

In this case, the parties agree that SCSU cannot comply under either Prong 2 or 3 if it eliminates the women's tennis team because SCSU would then be neither

---

[5] When the Court applies Title IX's terms it gives deference to the United States Department of Education's interpretations, as expressed in regulations and policy interpretations. *Chanelor v. Univ. of N.D.*, 291 F.3d 1042, 1046-47 (8th Cir. 2002) (holding that the Department's 1979 policy interpretation of Title IX – the interpretation at issue here – is deserving of "*Auer*" deference).

"expan[ding]" its athletics program to respond to the interests of SCSU's women or fully and effectively accommodating SCSU women.  This case therefore hinges on Prong 1.

A university is Title IX compliant under Prong 1 only if the female-to-male ratio in its athletics program is "substantially proportionate" to the ratio in the student body.  In other words, the athletics program's female-to-male ratio need not be exactly the same as the student-body ratio, but it must be close.  While courts have not precisely determined how great the deviation need be before the ratios are no longer "substantially proportionate," they have coalesced on a few guideposts.  When the female-to-male ratio in an athletics program deviates from the ratio in the student body by 10 or more percentage points, the two ratios are very rarely substantially proportionate.  *See Pederson v. La. State Univ.*, 213 F.3d 858, 878-79 (5th Cir. 2000) (20% is unacceptable); *Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824, 829-30 (10th Cir. 1993) (10.5% is unacceptable); *Cohen v. Brown Univ.*, 991 F.2d 888, 892, 903 (1st Cir. 1993) (11.4% is unacceptable).   At the other end of the spectrum, a deviation of less than 3.5 percentage points typically keeps the ratios substantially proportionate.  *See Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 109-10 (4th Cir. 2011) (less than 3% is acceptable); *Miami Univ. Wrestling Club v. Miami Univ.*, 302 F.3d 608, 611, 615-16 (6th Cir. 2002) (less than 2% is acceptable); *Boulahanis v. Bd. of Regents*, 198 F.3d 633, 636, 638-39 (7th Cir. 1999) (less than 3.43% is acceptable).  In between, things are less clear.  *Compare Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 856-57 (9th Cir. 2014) (6.7% deviation is unacceptable), *and Biediger*, 691 F.3d at 105-08 (3.62% deviation is unacceptable), *with Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 765 (9th Cir.

1999) (discussing a case where the court permitted the entry of a consent decree where the university agreed to keep the deviation below 5%).  Despite these guideposts, there is no "magic number at which substantial proportionality is achieved," *Ollier*, 768 F.3d at 857 (quoting *Equity in Athletics*, 639 F.3d at 110), because what "substantial proportionality" requires must be determined in context of each individual case's facts, including "the institution's specific circumstances and the size of its athletics program," *id.* (quoting Letter from Norma V. Cantú, Assistant Sec'y of for Civil Rights, Office of Civil Rights, U.S. Dep't of Educ., to Colleagues (Jan. 16, 1996) ("1996 OCR Letter")).

Here, the Court need not determine at this moment what exact deviation is permissible or impermissible for SCSU because, as mentioned above, that question depends in part on the facts of the case, and those facts will likely become developed as this case progresses.  SCSU's athletics program could fall on the illegal side of Title IX with a deviation of as little as 3.5 percentage points, but it is also conceivable that SCSU could comply with a deviation of 9.9 percentage points – the Court need not and cannot decide the precise dividing line now.  But if 3.5 percentage points were the line for SCSU, then by the Court's math SCSU would not be Title IX compliant if it offered fewer than 234 female participation opportunities in 2016-17, assuming SCSU is correct that it will offer no more than 252 male participation opportunities for the year.  Thus, if

SCSU's estimate of 254 female participation opportunities for 2016-17 is too high by 20 or more, they may violate Title IX.[6]

In light of that uncertainty as to what an acceptable deviation would be in this case, the Court finds that there is a fair chance that Plaintiffs will be able to demonstrate that the female-to-male ratio in SCSU's athletics department would not be substantially proportionate to the 50-50 ratio in the student body if SCSU were to enact its reorganization plan and eliminate the women's tennis team, for two reasons. First, there are reasons to think SCSU's proposed women's roster increases for the 2016-17 year are too ambitious. Several of SCSU's 2016-17 roster-size goals are larger than the respective average Division II roster size, as reflected in Weems's chart. (*See* Weems Aff., Ex. 5.) Last year's participation numbers may have been lower in several sports than SCSU reports, indicating that SCSU has even further to go than it expects or will disclose. And student demand in some sports, particularly in the track team, may already be saturated, as indicated by SCSU's past resort to flyers and open tryouts to recruit participants, meaning SCSU may find it difficult to recruit the anticipated 26 new women to the track teams. Second, it may be that SCSU is incorrectly double-counting some participation opportunities. In order to count for Title IX purposes, a participation opportunity must be genuine and "real, not illusory." *Biediger*, 691 F.3d at 92 (quoting 1996 OCR Letter). A university may not count a track athlete as occupying two participant opportunities if his or her participation in one sport – for example outdoor track – is conditioned on

---

[6] Of course if SCSU ends up offering more than 252 male participation opportunities, then the number of female opportunities would have to increase as well.

participation in another sport or another sports season – for example indoor track. *Id.* at 99-102.   In that case, the hypothetical university would offer only one participant opportunity, not two. *See, e.g.*, *id.* (finding "no error" in the district court's discounting Quinnipiac University's reported participation numbers because the university incorrectly double- and triple-counted some female athletes).   In this case, SCSU represents to the public via its website that it has only one women's track team, not two, yet it seeks to count a number of female track athletes as occupying more than one participation opportunity.   The Court acknowledges that there are separate indoor and outdoor seasons for track competition in the NCAA, and it is of course admirable that athletes can and do play two sports.   It also may be that SCSU is accurately counting its genuine participation opportunities – but it is also possible that SCSU may be over-counting, as the website's listing of only one track team suggests.

In sum, Plaintiffs have shown that the number of female participant opportunities that SCSU will offer for the 2016-17 year may, if SCSU's reorganization plan is put into effect and the women's team is eliminated, be significantly lower than the 254 opportunities SCSU predicts.   In that case, SCSU's athletics-program ratio of women-to-men might not be substantially proportionate to the ratio in the student body, and so Plaintiffs have shown they possess a fair chance of succeeding on their Title IX claim.

### B.   Equal Protection

The Fourteenth Amendment's Equal Protection Clause prohibits a state from denying "any person within its jurisdiction the equal protection of the laws."   U.S. Const.

amend. XIV, § 1.  When challenging the government's application of a facially neutral law, a plaintiff alleging sex discrimination in violation of the Equal Protection Clause must show not only that she has been treated differently but also that she was treated differently "**because of**" her sex.  *Keevan v. Smith*, 100 F.3d 644, 647-48 (8th Cir. 1996) (emphasis added); *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) ("Proof of . . . discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.").

Here, even assuming that Plaintiffs have a probability of success in showing that SCSU is treating them differently than their similarly situated male peers, Plaintiffs have put forward nothing in their affidavits or exhibits suggesting that SCSU intends to eliminate the women's tennis team **because** it is a women's team.  Perhaps Plaintiffs will be able to produce evidence to satisfy element of the claim later on in this case, but for the purposes of this motion for a preliminary injunction, the Court finds that Plaintiffs lack a fair chance of succeeding on their equal protection claim.[7]

---

[7] Additionally, SCSU argues Plaintiffs' equal protection claim, brought under § 1983, is unlikely to succeed because it is barred by sovereign immunity.  SCSU notes that Plaintiffs brought their claims against SCSU and MNSCU directly, not against university officers as is typically required in an *Ex parte Young* action.  However, at this point the Court need not decide the sovereign immunity question because the answer would not alter any of the Court's findings – the Court is basing its issuance of a preliminary injunction on Title IX, not § 1983 or the Equal Protection Clause, and the Court already agrees Plaintiffs' equal protection claim is not likely to succeed.  But the Court does note that even if Plaintiffs' equal protection claim is barred by sovereign immunity, the same is not likely true for their Title IX claim because Congress abrogated the states' sovereign immunity with respect to claims brought under Title IX's provisions.  42 U.S.C.  2000d-7(a)(1) (stating the states "shall not be immune under the Eleventh Amendment" for violations of Title IX); *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 72 (1992) (stating that Congress abrogated the states' sovereign immunity with respect to Title IX claims).

**C.      Conclusion On Probability Of Success On The Merits**

In sum, the probability-of-success-on-the-merits factor weighs in Plaintiffs' favor because they stand a fair chance of prevailing on their Title IX claims, even if they have not made the same showing for their equal protection claim.

**V.      THE PUBLIC INTEREST**

SCSU is a public institution established by the Minnesota State Legislature and administered by public servants, and so based on the premise that its aims are to serve the public good, SCSU's decisions about its own self-government must not be disregarded by the Court.   Yet because Plaintiffs possess a fair chance of succeeding on the merits of their Title IX claim, the public interest weighs in Plaintiffs favor because the public's interest in eradicating sex discrimination is compelling.  *See Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983) (holding that an anti-racial discrimination law survives strict scrutiny because the government's interest in fighting racial discrimination is compelling).

**CONCLUSION**

The Court will issue Plaintiffs' requested preliminary injunction because all four preliminary injunction factors weigh in their favor.  Plaintiffs will suffer irreparable harm if the Court does not issue this preliminary injunction, even if they later win their case, because this case may not be resolved by the beginning of next year's tennis season, meaning Plaintiffs will likely miss a year of tennis at SCSU, the university of their

choice.  When balancing that irreparable harm with SCSU's interest in not having to delay or amend its already-decided-upon reorganization plan, the Court finds that Plaintiffs' harm weighs more heavily, especially because it is at best unclear whether one more year of women's tennis will cost SCSU much of anything.  Plaintiffs also possess a fair chance of succeeding on their Title IX claim because they have shown that the female participation numbers for 2016-17 may be lower – possibly substantially lower – than what SCSU publicly estimates.  And the public interest favors the issuance of a preliminary injunction because the eradication of impermissible sex discrimination is so compelling, and Plaintiffs stand a fair chance of succeeding on the merits of their Title IX claim.

The Court takes care to note that today's Order, and the Court's issuance of a preliminary injunction, does not mean that Plaintiffs will win or have won this case, or that SCSU is out of compliance with Title IX now or will be in the future.  It very well may be that SCSU will be able to show that its reorganization plan will meet Title IX's requirements.  But because the four preliminary injunction factors weigh in Plaintiffs' favor, the Court finds that the status quo should remain the status quo for the duration of this case, or until the Court decides otherwise.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that

1.      Plaintiffs' Motion for a Temporary Restraining Order [Docket No. 6] is **DENIED as moot**.

2.      Plaintiffs' Motion to for a Preliminary Injunction [Docket No. 6] is **GRANTED** as follows:

Until further order of the Court, St. Cloud State University ("SCSU") and Minnesota State Colleges and Universities are **PRELIMINARILY ENJOINED** from:

a.    Eliminating SCSU's interscholastic women's tennis team;

b.    Involuntarily terminating the employment of the coaches of SCSU's interscholastic women's tennis team;

c.    Reducing support for SCSU's interscholastic women's tennis team; and

d.    Restricting or denying SCSU's interscholastic women's tennis team's access to facilities, coaching, training, or competitive opportunities.

3.      This preliminary injunction is effective immediately as the Court further finds that Plaintiffs need not post a bond for the preliminary injunction to take effect because the preliminary injunction is unlikely to cost SCSU anything – SCSU may in fact see more revenue while operating instead of eliminating the women's tennis team for 2016-17 – and therefore SCSU is unlikely to sustain any "costs and damages" if it is later "found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).

DATED: July 25, 2016                    _____
at Minneapolis, Minnesota.                              JOHN R. TUNHEIM
                                                                    Chief Judge
                                                   United States District Court