## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| ALEXIE PORTZ, JILL KEDROWSKI, ABIGAIL KANTOR, MARILIA ROQUE DIVERSI, FERNANDA QUINTINO DOS SANTOS, MARIA HAUER, HALEY BOCK, KAITLYN BABICH, ANNA LINDELL, and KIERSTEN ROHDE, | Civil No. 16-1115 |
| Plaintiffs, | **MEMORANDUM OPINION AND ORDER** |
| v. | |
| ST. CLOUD STATE UNIVERSITY and MINNESOTA STATE COLLEGES AND UNIVERSITIES, | |
| Defendants. | |

Sharon L. Van Dyck, Donald C. Mark, Jr., and Andrew T. James, **FAFINSKI MARK & JOHNSON, P.A.**, 775 Prairie Center Drive, Suite 400, Eden Prairie, MN 55344, for plaintiffs.

Kevin A. Finnerty, Assistant Attorney General, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Suite 900, St. Paul, MN 55101, for defendants.

This is a putative class action brought by female student-athletes enrolled at St. Cloud State University ("SCSU"). The named plaintiffs, members of SCSU's varsity women's tennis and Nordic skiing teams, sued SCSU and its governing body, Minnesota State Colleges and Universities ("MSCU") (collectively, "SCSU"), following the school's announcement that it planned to eliminate several sports, including women's tennis and women's Nordic skiing. Plaintiffs assert claims against SCSU for violating

Title IX of the Education Amendments of 1972, 20 U.S.C. § 1621, *et. seq.*, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Four motions are presently before the Court.

First, SCSU has moved for partial summary judgment, seeking to dismiss Plaintiffs' Section 1983 claim and damages claim. The Court will grant SCSU's motion and dismiss Plaintiffs' Section 1983 claim and damages claim.

Second, Plaintiffs have moved for class certification. The Court will grant Plaintiffs' motion but will redefine the class as follows:

> All present, prospective, and future female students at St. Cloud State University who are harmed by and want to end St. Cloud State University's sex discrimination in: (1) the allocation of athletic participation opportunities; (2) the allocation of athletic financial assistance; and (3) the allocation of benefits provided to varsity athletes.

Additionally, the Court will appoint Fafinski Mark & Johnson, P.A., as class counsel.

Third, in relation to Plaintiffs' motion for class certification, SCSU moves to strike Plaintiffs' reply brief because it was filed after the scheduled deadline. The Court will deny this motion because neither the Federal Rules of Civil Procedure nor the local rules for the District of Minnesota permit a party to move to strike a belatedly filed brief.

Fourth and finally, SCSU has moved to exclude expert testimony from Dr. Donna Lopiano. The Court will grant SCSU's motion in part and deny it in part.

# BACKGROUND

## I.    FACTUAL BACKGROUND

Defendant St. Cloud State University ("SCSU") is a public university owned and operated by the State of Minnesota.  (2d Am. Compl. ("Compl.") ¶ 18, Aug. 15, 2017, Docket No. 184.)  SCSU is a member of the Minnesota State system, which is governed by a board of trustees known as the Minnesota State Colleges and Universities Board of Trustees.  (*Id.* ¶ 20.)  SCSU receives federal financial assistance and is subject to Title IX.  (*Id.* ¶ 19.)  Plaintiffs are current or former student-athletes on the women's tennis and women's Nordic skiing teams.  (*Id.* ¶¶ 8-17.)

SCSU offers a number of varsity intercollegiate sports, which are divided into a four-tier system.  (*Id.* ¶¶ 59, 67.)  Tier I consists of SCSU's Division I men's and women's ice hockey programs.  (*Id.* ¶ 67.)  Tier II consists of SCSU's Division II men's and women's basketball, football, and volleyball programs.  (*Id.*)  Tier III consists of SCSU's Division II baseball, softball, women's indoor and outdoor track & field, women's cross country, women's soccer, men's and women's swimming and diving, and men's wrestling programs.  (*Id.*)  Tier IV consists of SCSU's men's and women's golf, women's tennis, and women's Nordic skiing programs.  (*Id.*)   On March 2, 2016, SCSU announced its intent to reorganize its athletic offerings by eliminating six intercollegiate sports programs, including the women's tennis and women's Nordic skiing teams.  (*Id.* ¶ 78.)

SCSU's enrollment peaked in 2011 at 22,024 total students; excluding high school students, enrollment was 19,186.  (Aff. of Lisa Foss ("Foss Aff.") ¶ 4, May 11, 2016,

Docket No. 26.)  By 2016, total enrollment was down to 18,859; 14,990 excluding high school students.  (*Id.* ¶ 5.)  Revenues from tuition fell by approximately $8.6 million from 2011 to 2016.  (*Id.* ¶ 6.)

In December 2015, "the President's Office" asked SCSU's athletics director, Heather Weems, "to come forward with a cost containment strategy in athletics."  (First Aff. of Heather Weems ("Weems Aff.") ¶¶ 2, 10, May 11, 2016, Docket No. 25.)  Weems proposed that SCSU eliminate men's tennis, cross country, and indoor and outdoor track, as well as women's tennis and Nordic skiing.  (*Id.* ¶ 13.)  Weems's proposal also called for a number of men's teams to reduce their number of participants, and for certain women's teams to increase their levels of participation.  (*Id.* ¶ 16.)

Plaintiffs maintain that SCSU has never complied with Title IX, and eliminating the women's tennis and Nordic skiing teams would only worsen the disparity between male and female athletic opportunities.  (Compl. ¶¶ 72-75, 79.)  According to Plaintiffs, "SCSU's discrimination against females is so substantial, as a matter of law it cannot eliminate any female athletic participation opportunities unless and until it first eliminates a substantial number of male athletic participation opportunities."  (*Id.* ¶ 76.)  But, if SCSU eliminated male participation opportunities such that they equaled the number of female participation opportunities, then SCSU would lose its NCAA Division I membership.  (*Id.*)  Plaintiffs allege that the only realistic solution is for SCSU to increase women's participation opportunities.  (*Id.*)

## II.    PLAINTIFFS' CLAIMS

Title IX provides:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . .

20 U.S.C. § 1681(a). Title IX extends to athletic programs offered by institutions of higher education. *See* 34 C.F.R. § 106.41(a).

Plaintiffs have filed this case as a class action on behalf of SCSU's current, prospective, and future female students, alleging that SCSU has violated Title IX by (1) providing male students with a greater opportunity to participate in varsity intercollegiate athletics than female students; (2) providing male students with disproportionately greater athletic-related financial assistance than female students; and (3) providing male athletes with disproportionately better benefits and treatment than female athletes. (*Id.* ¶¶ 1-2.)

With regard to Plaintiffs' first allegation, Title IX requires institutions of higher education to offer equal athletic participation opportunities for male and female students. 34 C.F.R. § 106.41(c). The Department of Education's guidance provides institutions of higher education with three ways of ensuring equal athletic participation opportunities. *Title IX and Intercollegiate Athletics*, 44 Fed. Reg. 71,413, 71,418 (Dec. 11, 1979). But Plaintiffs allege that "SCSU has always provided its male students with proportionally more opportunities to participate in varsity intercollegiate athletics than it has offered its female students." (Compl. ¶ 75.) Moreover, Plaintiffs assert that if SCSU eliminates the women's tennis and women's Nordic skiing teams, the disparity between male and female participation opportunities will grow further. (*Id.* ¶¶ 105-07.)

With regard to Plaintiffs' second allegation, Title IX requires institutions of higher education to offer equal athletic-related financial assistance to male and female students. 34 C.F.R. § 160.37. SCSU offers more athletic participation opportunities for male students than female students at Tiers I and II, and Plaintiffs allege that SCSU offers more scholarships to students who participate in Tier I and II sports than those participate in Tier III and IV sports. (Compl. ¶ 70.) As a result fewer female student-athletes receive athletic-related financial assistance. (*Id.*)

Finally, with regard to Plaintiffs' third allegation, Title IX requires institutions of higher education to provide female and male student-athletes the same treatment and benefits. 34 C.F.R. § 106.41(c)(2)-(10). Plaintiffs allege that SCSU fails to provide female student-athletes with an equal allocation of benefits. (*Id.* ¶ 128.) Plaintiffs allege that the female student-athletes are provided with subpar facilities compared to those provided to male student-athletes. (*Id.* ¶¶ 130-32.) Plaintiffs also allege that SCSU fails to provide equal provision of equipment, equal scheduling of games and practice time, equal medical and training services, and equal administrative and coaching support, among other benefits. (*Id.* ¶ 35.) These requirements are often referred to as the "laundry list" requirements. (*Id.* ¶ 54 (citing 34 C.F.R. § 106.41(c)).)

Plaintiffs also allege that SCSU has engaged in sex-based discrimination in violation of the Equal Protection Clause of the United States Constitution. (*Id.* ¶¶ 2-4, 144.)

III.    **PROCEDURAL HISTORY**

Plaintiffs filed their first complaint on April 28, 2016. (First Compl., Apr. 28, 2016, Docket No. 1). Plaintiffs filed a second amended complaint on August 15, 2017. (Compl.) Plaintiffs request a permanent injunction, compensatory damages, and attorneys' fees and costs. (Compl. at 47-48.)

In July 2016, the Court granted Plaintiffs' motion for a preliminary injunction enjoining SCSU from eliminating SCSU's women's tennis team. *Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963 (D. Minn. 2016).

**DISCUSSION**

I.    **MOTION FOR SUMMARY JUDGMENT**

SCSU moves for partial summary judgment with respect to Plaintiffs' equal-protection claim and damages claim. The Court will grant SCSU's motion in its entirety.

**A. Standard of Review**

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party may not rest on

mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. *Anderson*, 477 U.S. at 256. But "[w]here the moving party fails to satisfy its burden to show initially the absence of a genuine issue concerning any material fact, summary judgment must be denied even if no opposing evidentiary matter is presented." *Foster v. Johns-Manville Sales Corp.*, 787 F.2d 390, 393 (8th Cir. 1996).

### B. Section 1983 Equal Protection Claim

The Court must decide whether SCSU is entitled to sovereign immunity under the Eleventh Amendment. Plaintiffs invoke three exceptions in an effort to overcome this hurdle. The Court will conclude that Plaintiffs' Section 1983 claim is barred by sovereign immunity.

The Eleventh Amendment bars suit against state governments brought in federal court unless the state has clearly and unequivocally waived its immunity, *Faibisch v. Univ. of Minn.*, 304 F.3d 797, 800 (8th Cir. 2002), or Congress has abrogated the states' Eleventh Amendment immunity with respect to that particular cause of action, *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54-56 (1996). The Eleventh Amendment bars suit against states and state agencies "for any kind of relief, not merely monetary damages." *Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007). Eleventh Amendment immunity extends to SCSU because it is an instrumentality of the state. *Humenansky v. Regents of Univ. of Minn.*, 152 F.3d 822, 824 (8th Cir. 1998) (internal quotation marks

omitted); *Lewis v. St. Cloud State Univ.*, No. 04-4379, 2005 WL 3134064, at *10-11 (D. Minn. Nov. 23, 2005).

First, Plaintiffs argue that Minnesota has waived its Eleventh Amendment immunity by enacting Minn. Stat. § 121A.04, which requires each education institution to "provide equal opportunity for members of both sexes to participate in its athletic program." Minn. Stat. § 121A.04, subd. 2. The test for determining whether a state has voluntarily waived its sovereign immunity is a "stringent one." *St. Charles Cty. v. Wisconsin*, 447 F.3d 1055, 1059 (8th Cir. 2006) (quoting *Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999)). "A state only waives its sovereign immunity if the State voluntarily invokes federal jurisdiction, or else if the State makes a clear declaration that it intends to submit itself to federal jurisdiction." *Id.* at 1059-60 (quoting *Coll. Sav. Bank*, 527 U.S. at 675-76).

Minn. Stat. §121A.04 does not contain a clear and unequivocal waiver of sovereign immunity. First, Minn. Stat. § 121A.04 makes no reference to "federal jurisdiction." *See St. Charles Cty.*, 447 F.3d at 1059-60. Second, Minn. Stat. § 121A.04 is contained in the chapters of the Minnesota Statutes that comprise "Education Code: Prekindergarten – Grade 12," Minn. Stat. chs. 120-129C, and not the chapters applicable to "Postsecondary Education," Minn. Stat. chs. 135A-137. It is unclear whether this statute even applies to SCSU. Finally, Plaintiffs' cited cases are inapposite. Neither *Striebel v. Minn. State High Sch. League*, 321 N.W.2d 400, 402 (Minn. 1982), nor *Mason v. Minn. State High Sch. League*, No. 03-6462, 2004 U.S. Dist. LEXIS 13865, at *9-12 (D. Minn. July 15, 2004), describe Minn. Stat. § 121A.04 as waiving sovereign

immunity. Moreover, as Plaintiffs admit, the Minnesota State High School League is a private actor. (Opp. to Mot. Summ. J. at 16, June 2, 2017, Docket No. 144.) The Court concludes that the state has not waived its sovereign immunity by enacting Minn. Stat. § 121A.04.

Second, Plaintiffs argue that SCSU has waived sovereign immunity by accepting federal funds. Plaintiffs provide no authority for the proposition that the state waives its sovereign immunity for purposes of Section 1983 claims by accepting federal funds. It is true that states waive sovereign immunity **for purposes of Title IX** when they accept federal funds. 42 U.S.C. § 2000d-7. However, this waiver does not constitute a waiver of sovereign immunity for purposes of Section 1983 claims.

Finally, Plaintiffs argue that Congress intended to abrogate sovereign immunity for equal-protection claims in enacting Title IX. To determine whether Congress has abrogated immunity, the Court employs a "two-prong analysis." *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 (8th Cir. 1999) (citing *Seminole Tribe*, 517 U.S. at 55). First, the Court must "determine whether Congress has unequivocally expressed its intent to abrogate the immunity." *Id.* Second, the Court must ascertain whether, when Congress effectuated that abrogation, it acted pursuant to a valid exercise of its power under the enforcement provision found in Section 5 of the Fourteenth Amendment. *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 364 (2001) ("The Eleventh Amendment, and the principle of state sovereignty which it embodies, are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment. As a result, . . . Congress may subject nonconsenting States to suit in federal court when it does so pursuant to a

valid exercise of its § 5 power." (cleaned up)).[1] Where Congress has failed to act pursuant to a proper exercise of its power under Section 5 of the Fourteenth Amendment, "there is no valid abrogation" of states' Eleventh Amendment immunity from private suit in federal court, and accordingly the district court will lack subject matter jurisdiction over claims relying on such abrogation. *See Alsbrook¸* 184 F.3d at 1010 (holding "that the extension of Title II of the ADA to the state was not a proper exercise of Congress's power under Section 5 of the Fourteenth Amendment," thus there was "no valid abrogation of Arkansas' Eleventh Amendment immunity from private suit in federal court and the district court lacked subject matter jurisdiction over the ADA claim.").

It is "well settled" that—absent waiver of immunity—the Eleventh Amendment bars Section 1983 claims against states or state agencies. *Murphy v. Arkansas*, 127 F.3d 750, 754 (8th Cir. 1997). Plaintiffs must thus establish that Title IX abrogated sovereign immunity with respect to equal-protection claims brought under Section 1983. In *Egerdahl v. Hibbing Community College*, the Eighth Circuit concluded that Congress did not abrogate state's sovereign immunity for equal-protection claims that are brought in suits that also allege violations of Title IX. 72 F.3d 615, 619 (8th Cir. 1995). The Eighth Circuit acknowledged that 42 U.S.C. § 200d-7(a)(1) abrogates states' Eleventh Amendment immunity from Title IX claims, but noted that the statute "does not even

---

[1] This order uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See, e.g., United States v. Reyes*, 866 F.3d 316, 321 (5th Cir. 2017); *Smith v. Kentucky*, 520 S.W.3d 340, 354 (Ky. 2017); *I.L. through Taylor v. Knox Cty. Bd. of Educ.*, 257 F. Supp. 3d 946, 960 & n.4 (E.D. Tenn. 2017).

mention the Equal Protection Clause." *Id.* The Eighth Circuit therefore concluded that Congress has not overridden states' immunity from equal-protection claims. *Id.*

Plaintiffs cite *Crawford v. Davis*, 109 F.3d 1281 (8th Cir. 1997), for the proposition that the Eleventh Amendment does not deprive courts of the authority to hear Section 1983 claims brought to redress violations of Title IX. *Crawford* did not address whether the Eleventh Amendment barred the plaintiff's Section 1983 claim but, rather, whether it barred the plaintiff's Title IX claim. *Id.* at 1283. In fact, the Eighth Circuit stated that "Ms. Crawford's other two claims may proceed against the institutional defendants under both § 1983 and Title IX . . . **unless they can demonstrate that they are entitled to qualified immunity with respect to those claims**." *Id.* at 1284 (emphasis added). After *Crawford*, the cases in this district are consistent with the Eighth Circuit's holding in *Egerdahl*. *See, e.g., Cobb v. U.S. Dep't of Educ. Office for Civil Rights*, 487 F. Supp. 2d 1049, 1055 (D. Minn. 2007) (dismissing Plaintiffs' § 1983 claim because "there [were] no individual defendants named and no agency ha[d] waived sovereign immunity").

Because the Court concludes that Plaintiffs' Section 1983 claim is barred by sovereign immunity under the Eleventh Amendment, the Court will grant SCSU's motion for summary judgment.

## C. Damages Claims

The Court must decide whether there is a genuine issue of material fact with respect to Plaintiffs' claim for damages. The Court will conclude that no genuine issue of material fact exists and, therefore, will dismiss Plaintiffs' claim for damages.

"Title IX damage actions which do not involve an institution's official policy require a showing that 'an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf [had] actual knowledge of discrimination in the recipient's programs and fail[ed] to adequately respond.'" *Roe v. St. Louis Univ.*, 746 F.3d 874, 882 (8th Cir. 2014) (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)). In order to assert a claim for damages under this standard, a plaintiff must show that the university was "(1) deliberately indifferent (2) to known acts of discrimination (3) which occurred under its control." *Id.* (quoting *Ostrander v. Duggan*, 341 F.3d 745, 750 (8th Cir. 2003)).

The Court must first decide whether Plaintiffs' claims stem from SCSU's official policy. If Plaintiff's claims do not involve an official policy, the Court must undertake the *Gebser* analysis. Plaintiffs argue that "SCSU's athletic offering policy and practice, including its official menu of intercollegiate sports teams available for student participation," constitutes an official policy. (Opp. to Mot. Summ. J. at 25.)

The Eighth Circuit's holding in *Grandson v. University of Minnesota* counsels against a finding that the athletic programming constitutes an official policy. 272 F.3d 568, 575-576 (8th Cir. 2001). The plaintiff – a member of the university's women's varsity soccer team – brought an action against the university, seeking injunctive relief and compensatory damages for the scholarship and financial support she allegedly would have received as a member of the women's varsity soccer team had the university not discriminated against female student-athletes. *Id.* at 572. The Eighth Circuit implicitly

assumed that the athletic and scholarship offerings did not constitute an official policy by applying the *Gebser* test.  *Id.* at 575.

Subsequent applications of *Grandson* support a conclusion that, in the Eighth Circuit, athletic and scholarship offerings are not an official policy exempted from the *Gebser* analysis.[2]  In *Ezell v. Fayetteville Public Schools*, the U.S. District Court for the Western District of Arkansas offered the most developed analysis of *Grandson*.  No. 5:15-CV-05161, 2015 WL 8784431, at *6 (W.D. Ark. Dec. 15, 2015).  The *Ezell* Court noted that *Grandson* adopted a broad view of *Gebser*: "It held that the *Gebser* test applies even when a recipient's own decisions, not a third party's, are at issue."  *Id.* at *4.  Accordingly, the *Ezell* Court applied *Gebser* to the facts of that case, which involved Title IX claims brought on behalf of high school female student-athletes.  *Id.* at *1-2, 6.

The Court need not decide whether *Grandson* applies to **all** Title IX claims.  It is sufficient that the Eighth Circuit applied *Gebser* in *Grandson*, which presented facts analogous to this case – Title IX allegations stemming from unequal athletic programming. The Court will therefore conclude that it must undertake the *Gebser* analysis in this case.

Under *Gebser*, Plaintiffs must demonstrate that SCSU had "actual knowledge" of the alleged discrimination.  *Gebser*, 524 U.S. at 290. Substantively, the facts of this case are similar to those in *Grandson*.  In *Grandson*, the plaintiff argued that the university

_____

[2] The Court acknowledges that other circuits have recognized that athletic programs constitute official policies.  *See, e.g.*, *Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 968 (9th Cir. 2010).  This is not the law of the Eighth Circuit.

had actual notice of the discrimination because the university received complaints about the level of funding for women's athletics and the lack of women's varsity teams. 272 F.3d at 575. The Eighth Circuit held that these complaints were insufficient to constitute actual notice of the alleged discrimination because "[a] vigorous public debate on these issues does not demonstrate that UMD knew of systemic non-compliance." *Id.* Rather, "[w]hen an individual plaintiff such as Grandson claims money damages from a specific Title IX violation, such as failing to award her a soccer scholarship, *Gebser* requires **prior notice to a university official with authority to address the complaint and a response demonstrating deliberate indifference to the alleged violation**." *Id.* at 576. The court suggested that an appropriate complaint to a university official must explicitly complain of monetary injury. *See id.*

There is no evidence that SCSU had actual knowledge of Plaintiffs' claimed monetary injuries or that Plaintiffs' provided notice to a university official with authority to address the complaint. Plaintiffs argue that Athletic Director Heather Weems testified in her deposition that she was aware SCSU was not in compliance with Title IX. (Opp. to Mot. Summ. J. at 25.) Plaintiffs misrepresent Weems's testimony. The following exchange reveals that Weems believes SCSU was and remains Title IX compliant:

> Q.    When you assumed your current position in June of 2012 were you ever told by anybody that St. Cloud State did not comply with Title IX requirements?
> . . . .
> [A.]    I was told we had risk.
> . . . .
> Q.    What does that mean?
> A.    That **we were counting ourselves compliant per Prong 3**, and Prong 3 – so long as you can demonstrate you

are meeting interest and abilities, maintains your compliance, but there are opportunities – if someone in the under-represented gender were to come forward with a request, then they have interest at this point.

. . . .

A.     **I believe that we are in compliance per Prong 3.**

(Sealed Ex. A at 95:4-23, 98:20, June 2, 2017, Docket No. 147.) In fact, Weems asserted that, since 2012, SCSU has had an even stronger case for Title IX compliance because SCSU has added a number of women's sports programs. (*Id.* at 98:21-99:15.) Weems's testimony does not establish that SCSU knew of Plaintiffs' complaints of monetary damages.

Plaintiffs argue that SCSU knew it was not Title IX complaint because it conducted an athletic-interest survey and did not entertain adding any new women's sports. (Opp. to Mot. Summ. J. at 25.) Under the strict-notice standard adopted by the Eighth Circuit in *Grandson*, the survey alone cannot constitute actual notice that SCSU was violating Title IX. *See* 272 F.3d at 575-76.

Moreover, Plaintiffs' arguments focus on assertions that SCSU had general knowledge that it was not Title IX compliant. But there is no evidence that Plaintiffs themselves notified SCSU of their claim to monetary damages prior to initiating this action. As *Grandson* held, when plaintiffs allege monetary damages for failure to receive financial aid, "*Gebser* requires prior notice to a university official with authority to address the complaint and a response demonstrating indifference to the alleged violation." *Id.* Even if SCSU had general knowledge that it violated Title IX, the Plaintiffs would be required to notify an SCSU official of their complaints of monetary injury before initiating this action. *Id.*

The Court finds that there is no genuine issue of material fact that (1) SCSU did not have actual knowledge of the alleged Title IX violations and (2) Plaintiffs failed to

notify SCSU of its claim for money damages.  *See id.* at 575-76.  The Court will therefore grant SCSU's motion for summary judgment and dismiss Plaintiffs' claim for damages.

## II.    MOTION FOR CLASS CERTIFICATION

Plaintiffs move for certification of their proposed class, comprised of:

> All present and future St. Cloud State University female students who participate, seek to participate, or have been deterred from participating in intercollegiate athletics at St. Cloud State University.

(Pls.' Am. Mot. for Class Certification at 2, Aug. 23, 2017, Docket No. 190.)  The Court will grant the Plaintiffs' motion as modified herein.

### A.  Standard of Review

The Court is "accorded broad discretion to decide whether [class] certification is appropriate."  *Prof'l Firefighters Ass'n of Omaha, Local 385 v. Zalewski*, 678 F.3d 640, 645 (8th Cir. 2012) (quoting *Rattray v. Woodbury Cty., Ia.*, 614 F.3d 831, 835 (8th Cir. 2010)).  A plaintiff's proposed class "must be adequately defined and clearly ascertainable."  *Sandusky Wellness Center, LLC. v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016).  To certify a class, Plaintiffs must show that the numerosity, commonality, typicality, and adequacy of representation requirements of Rule 23(a) are met and that the class comports with one of the three types of classes identified in Rule 23(b).  *Mathers v. Northshore Mining Co.,* 217 F.R.D. 474, 483 (D. Minn. 2003).  The Court accepts the substantive allegations in Plaintiffs' complaint as true when determining if the proposed class is acceptable.  *Id.*  In determining the propriety of a class action, the focus is on whether the class satisfies Rule 23 and not whether the

proposed action will prevail. *Id.* The Court must undertake a "rigorous analysis" to ensure that these requirements are met. *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 161 (1982).

"[I]f plaintiff's definition of the class is found to be unacceptable, the court may construe the complaint or redefine the class to bring it within the scope of the rule." *Bryant v. Colgate Univ.*, No. 93-CV-1029, 1996 WL 328446, at *6 (N.D.N.Y. June 11, 1996) (quoting 7A Charles A. Wright et al., Federal Practice and Procedure § 1759, at 111-12 (1986)).

### B. Scope of the Proposed Class

The Court must first decide whether Plaintiffs' proposed class definition is acceptable. For a number of reasons, SCSU argues that it is not. The Court need not deny certification based on these arguments because the Court may redefine the class to accommodate certification. *See id.*

First, the Court must decide whether Plaintiffs' proposed class is overbroad because it includes individuals effectively accommodated by SCSU's athletic programming. In *Bryant*, plaintiffs sought to certify a class of "[a]ll present and future Colgate University women students and potential students who participate, seek to participate, and/or are deterred from participating in Colgate's intercollegiate athletics program." *Id.* at *6. The court found that the proposed class was not appropriate because it was overbroad, including athletes who were "effectively accommodated, e.g. women students who participated in Colgate's intercollegiate athletics program whose interests and abilities [were] satisfied by Colgate's current state of women's varsity teams." *Id.*

Plaintiffs' proposed class in this case is substantively identical to the *Bryant* class and therefore presents similar problems of overbreadth.[3]

*Biediger v. Qunnipiac University* presents a solution. No. 3:09cv621, 2010 WL 2017773, at *8 (D. Conn. May 20, 2010). The *Biediger* Court certified a class of "All present, prospective, and future female students at Quinnipiac University **who are harmed by** and want to end Quinnipiac University's sex discrimination in (1) the allocation of athletic participation opportunities; (2) the allocation of athletic financial assistance; and (3) the allocation of benefits provided to varsity athletes." *Id.* The *Biediger* definition avoids any overbreadth problems arising from the inclusion of individuals who are not harmed by SCSU's noncompliance with Title IX. Accordingly, The Court will redefine the class as:

---

[3] The Court acknowledges that other district courts have certified classes just as broad as Plaintiffs' proposed class. *Foltz v. Del. State Univ.*, 269 F.R.D. 419, 426 (D. Del. 2010) (certifying a class of "All present, prospective, and future DSU female students, including currently enrolled students, students admitted for the 2010-11 academic year, and prospective students, who participate, seek to participate, or have been deterred or prevented from participating in or obtaining the benefits of, intercollegiate athletics sponsored by DSU"). Nevertheless, the Court agrees with the *Bryant* court's concerns of overbreadth. Hypothetically, there is a female student-athlete at SCSU who participates in women's athletics and has not been injured by SCSU's Title IX violations. The Court acknowledges – as Plaintiffs' argue – that given the scope of Plaintiffs' allegations, this hypothetical student would be the rare exception. Nevertheless, the Court believes narrowing the proposed class is legally necessary.

> All present, prospective, and future female students at St.
> Cloud State University who are harmed by and want to end
> St. Cloud State University's sex discrimination in: (1) the
> allocation of athletic participation opportunities; (2) the
> allocation of athletic financial assistance; and (3) the
> allocation of benefits provided to varsity athletes.

Second, the Court must decide whether the inclusion of "future female students" renders the class unascertainable. In other cases in the Eighth Circuit, certified classes have included members who will be affected in the future if defendants are allowed to continue to practice their harmful conduct. *See Rajender v. Univ. of Minn.*, No. 4-73-435, 1978 WL 212, at *4 (D. Minn. Feb. 13, 1978); *see also Ahrens v. Thomas*, 570 F.2d 286, 288 (8th Cir. 1978). Indeed, class certification is appropriate to avoid mootness that may arise from students transferring or graduating from SCSU. *See Ollier v. Sweetwater Union High Sch. Dist.*, 251 F.R.D. 564, 566 (S.D. Cal. 2008). The Court therefore concludes that the inclusion of "future female students" does not render the class unascertainable.

Third and finally, the Court must decide whether it must restrict the class to women's tennis and Nordic skiing teams. The *Bryant* court restricted the definition of plaintiffs' proposed class to just members of the women's ice hockey team after finding that "plaintiffs proffer no evidence that the interests and abilities of female varsity or club athletes other than members of the women's club ice hockey team are ineffectively accommodated." 1996 WL 328446, at *6. But Plaintiffs' complaint alleges that more than just the women's tennis and Nordic skiing teams are affected by SCSU's noncompliance. For example, Plaintiffs allege that SCSU offers more athletic

scholarships to men as a result of its tiered system. (Compl. ¶¶ 69-70.) The Court therefore concludes that the class need not be restricted to members of the women's tennis and Nordic skiing teams.

## C. Rule 23(a) Requirements

The Court must decide whether Plaintiffs have satisfied the four requirements of Federal Rule of Civil Procedure 23(a). First, the class must be "so numerous that joinder of all members is impracticable" ("numerosity"). Fed. R. Civ. P. 23(a)(1). Second, there must be "questions of law or fact common to the class" ("commonality"). *Id.* at 23(a)(2). Third, the claims or defenses of the representative parties must be "typical of the claims or defenses of the class" ("typicality"). *Id.* at 23(a)(3). Fourth, the representative parties must "fairly and adequately protect the interests of the class" ("adequacy of representation"). *Id.* at 23(a)(4). The Court will conclude that Plaintiffs' proposed class—as modified by the Court—satisfies the requirements of Rule 23(a).

### 1. Numerosity

First, the Court must decide whether "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). No specific rules govern the required size of a class, and "what constitutes impracticability depends upon the facts of each case." *Glenn v. Daddy Rocks, Inc.*, 203 F.R.D. 425, 428-29 (D. Minn. 2001). Generally, a "putative class size[] of forty will support a finding of numerosity, and much smaller classes have been certified by courts in the Eighth Circuit." *Beaver Cty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*, No. 14-786, 2016 WL 4098741, at *12 (D. Minn.

July 28, 2016) (quoting *In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*,
No. 11-2247, 2012 WL 2512750, at *4 (D. Minn. June 29, 2012)).   "Practicality of
joinder depends on such factors as the size of the class, the ease of identifying its
members and determining their addresses, the facility of making service on them if
joined, their geographic dispersion and whether the size of the individual claims is so
small as to inhibit individuals from separately pursuing their own claims."  *Glenn*, 203
F.R.D. at 429.

Plaintiffs argue that, at a minimum, the class includes all 4,470 female students
enrolled at SCSU during the 2015-2016 academic year.   It is unlikely that all female
students at SCSU "participate, seek to participate, or have been deterred from
participating in intercollegiate athletics at St. Cloud State University."   Nevertheless, the
Court agrees that the class is comprised of a significant number of SCSU female student-
athletes.   Plaintiffs allege that SCSU has deprived its female student-athletes of equal
athletic-related financial assistance and that SCSU does not provide equal benefits to
women's athletics as compared to men's athletics.   (Compl. ¶¶ 116-17; 127-37.)   The
number of female athletes at SCSU exceeds the customary forty-person class that
generally results in a finding of numerosity.  *See Beaver Cty.*, 2016 WL 4098741, at *12.

Moreover, the class is comprised of future female SCSU students who want to
participate in intercollegiate athletics.   In other cases, courts in this circuit have found
numerosity where an unknown group may in the future suffer harm.  *See Rajender*, 1978
WL 212, at *4 ("It is clear that the joinder of unknown women who in the future may
suffer discrimination by the Chemistry Department is impracticable.");  *see also Ahrens*,

570 F.2d at 288 (affirming district court's numerosity finding for class composed of present and future members). Courts in other circuits have similarly certified proposed classes comprised of future students in the Title IX context when future students face "imminent threat of injury." *Biediger*, 2010 WL 2017773, at *3. Female students intending to enroll in SCSU and participate in intercollegiate athletics have an interest in SCSU's Title IX compliance and will be harmed by the institution's failure to comply.

Again, SCSU seeks to define the class as just members of the tennis and Nordic skiing teams, arguing that the teams are comprised of only 10 to 15 students. The proposed class is not restricted to female student-athletes participating on these two teams. Rather, the class includes any female students who participate in sports and may do so in the future.[4]

The Court concludes that the class meets the requirement of numerosity.

### 2. Commonality

Second, the Court must decide whether "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality is not required on every question raised in a class action" so long as the legal question "linking the class members is substantially related to the resolution of the litigation." *DeBoer v. Mellon Mortg. Co.*,

---

[4] Moreover, even if the class were restricted to just members of the tennis and Nordic skiing teams, the Court would still conclude that the class is sufficiently numerous. Not including future female student-athletes who may choose to participate in tennis and/or Nordic skiing, there are approximately 20 to 30 members of the class. A class with thirty members approaches a class that "is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Once the Court includes future female student-athletes who attend SCSU and participate in tennis and/or Nordic skiing, joinder becomes impossible.

64 F.3d 1171, 1174 (8th Cir. 1995).  The U.S. Supreme Court has recently clarified the requirements of commonality:

> Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury.  This does not mean merely that they have all suffered a violation of the same provision of law . . . . Their claims must depend upon a common contention . . . . That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2013) (internal citations omitted). What matters for commonality is "the capacity of a classwide proceeding to generate common **answers** apt to drive the resolution of the litigation."  *Id.* at 350 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).  A single common question will suffice for commonality.  *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 478 (8th Cir. 2016).

Plaintiffs' claims present common questions of law, namely whether SCSU has discriminated against female athletes in violation of three of Title IX's provisions.  *See Beal v. Midlothian Ind. Sch. Dist. 070908 of Ellis Cty.*, No. Civ.A. 3:01-CV-0746L, 2002 WL 1033085, at *5 (N.D. Tex. May 21, 2002).  Additionally, Plaintiffs' claims present common questions of fact.  Plaintiffs have identified several of the common factual questions in this case:

- Did SCSU fully meet the athletic interests and abilities of its female students before March 2, 2016?

- How many genuine athletic participation opportunities did SCSU provide to its female students each academic year?

- How many of those opportunities are properly considered under Title IX?

- Does SCSU provide athletic participation opportunities to its female students compared to its male students in a substantially proportionate manner?

As demonstrated by Plaintiffs' proposed common questions of fact, the facts in this case revolve almost exclusively around SCSU's conduct in developing its athletic programming. SCSU's conduct is common to all members of the class. This case is distinguishable from other cases, such as *Dukes*, where the class members' grievances stemmed from individualized, discretionary decisions made by hundreds of different actors. 564 U.S. at 355-568. The Court concludes that this case presents both common questions of law and fact.[5]

Additionally, Plaintiffs' proposed injunction will force SCSU to comply with Title IX by providing equal participation opportunities, equal access to athletic-related financial assistance, and equal athletic benefits and resources. (Compl. at 47-48.) This injunction would resolve any harm suffered by individual class members as a result of

---

[5] SCSU concedes that commonality is easily met but objects to two of the common factual questions proposed by Plaintiffs. Commonality does not require the Court to sift through each of Plaintiffs' proposed questions and certify them. Commonality is a far less rigorous standard than Rule 23(b)(2), which Plaintiffs do not invoke in this case. *See In re Hartford Sales Practices Litig.*, 192 F.R.D. 592, 604 (D. Minn. 1999). The mere fact that there are **some** common questions that make the class action more suitable than individual litigation warrants a finding of commonality. *See Dukes*, 564 U.S. at 349-50.

SCSU's Title IX violations.  The Court concludes that Plaintiffs' claims are "capable of classwide resolution."  *Dukes*, 564 U.S. at 350.

The Court therefore concludes that the class meets the requirement of commonality.

### 3.  Typicality

Third, the Court must consider whether "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Rule 23(a)(3) "requires a demonstration that there are other members of the class who have the same or similar grievances as the plaintiff."  *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 562 (8th Cir. 1982) (quoting *Donaldson v. Pillsbury Co.*, 554 F.2d 825, 830 (8th Cir. 1977)).  The burden of typicality is "fairly easily met so long as other class members have claims similar to the named plaintiff."  *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996) (quoting *DeBoer*, 64 F.3d at 1174).

The lead Plaintiffs have brought claims that are typical of other female student-athletes at SCSU.  This case mirrors *Foltz v. Delaware State University*, where the court stated:

> "[Plaintiffs] claims are typical of those of the class because they arise from the same practices:  [the University's] alleged failure to comply with Title IX by providing inadequate athletic opportunities and recruiting resources for its female students . . . As a result, they seek the same relief as other female athletes who desire to participate, or have been deterred or prevented from participating in varsity sports, namely the equal opportunity to do so."

269 F.R.D. 419, 423 (D. Del. 2010).  The same can be said of Plaintiffs' claims in this case.

SCSU argues that Plaintiffs' interests are not identical to the proposed class because their interest is limited to their own sports.  The *Foltz* Court rejected a similar argument, concluding that "it was the recent decision to eliminate the equestrian team that motivated the named plaintiffs—all of whom are on the equestrian team—to file suit.  Nonetheless, Plaintiffs' legal theories and desire relief are not limited to [the University's] treatment of the equestrian team."  *Id.*  Although Plaintiffs were motivated to file this suit by the elimination of the women's tennis and Nordic skiing teams, their legal theories and desired relief extend to all female student-athletes in the class.  Whether Plaintiffs' interests are so limited as to prevent them from fairly and adequately protecting the class is a question for the Court's adequacy inquiry.

The Court concludes that the class meets the requirement of typicality.

### 4.  Adequacy of Representation

Finally, the Court must decide whether Plaintiffs will "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The adequacy inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

SCSU identifies a number of potential conflicts between the Plaintiffs and the class they seek to represent.

First, SCSU argues that the Plaintiffs are antagonistic toward the class members who participate on different women's sports teams.  SCSU argues that the Plaintiffs have

never expressed an interest for sports other than women's tennis and Nordic skiing. The *Foltz* court rejected a similar argument. 269 F.R.D. 424-25. The defendants in *Foltz* argued that the class "should be limited to current and future members of the university's equestrian team because the named plaintiffs are only adequate to represent other equestrian team members." *Id.* at 424. The court disagreed, stating:

> [The university] has merely pointed to speculative, potential conflicts: if [the university] adheres to its plan to eliminate the women's equestrian team and if [the university] otherwise satisfies its obligations under Title IX, then at that point it will become possible that the named plaintiffs will not adequately represent the interests of the class, because maybe then the named plaintiffs will abandon their stated commitment to equal athletic opportunities for all female students at [the university].

*Id.* The court refused to credit this speculation because "several of the named plaintiffs have testified expressly that they are motivated to obtain equal opportunities for all female students at [the university], not just to preserve the equestrian team." *Id.* at 424-25.

Similarly, SCSU's concerns are merely speculative and not supported by any convincing evidence. All Plaintiffs in this case have filed declarations stating that their primary goal is "to force SCSU to provide sex-based equality in athletics **overall**."[6]

---

[6] (Decl. of Abigail Kantor ¶ 2, June 19, 2017, Docket No. 163; Decl. of Alexie Portz ¶ 2, June 19, 2017, Docket No. 164; Decl. of Anna Lindell ¶ 2, June 19, 2017, Docket No. 165; Decl. of Fernanda Quintino Dos Santos ¶ 2, June 19, 2017, Docket No. 166; Decl. of Haley Bock ¶ 2, June 19, 2017, Docket No. 167; Decl. of Jill Kedrowski ¶ 2, June 19, 2017, Docket No. 168; Decl. of Kaitlyn Babich ¶ 2, June 19, 2017, Docket No. 169; Decl. of Kiersten Rohde ¶ 2, June 19, 2017, Docket No. 170; Decl. of Maria Hauer ¶ 2, June 19, 2017, Docket No. 171; Decl. of Marilia Roque Diversi ¶ 2, June 19, 2017, Docket No. 172.)

(Footnote continued on next page.)

Moreover, Plaintiffs rejected a settlement offer that would give them each $2,000 and allow them to continue playing their individual sports because "it did not contain any provisions to require SCSU to provide equal opportunities for SCSU's current and future female students to play intercollegiate sports, or to ensure SCSU's compliance with Title IX."[7]  As another example, Portz testified at her deposition that Plaintiffs "want to see an equal opportunity in terms of women's sports and all sports."  (Decl. of Kevin Finnerty ¶ 2, Ex. 1 at 53:21-24, June 5, 2017, Docket No. 154); *see Foltz*, 269 F.R.D. at 424-25. Plaintiffs have expressed a desired to end the alleged sex discrimination for all women's sports.  Should this alleged "antagonism" become an issue at any point during this case, the Court is empowered to withhold approval of a settlement agreement or redefine the classes.  *See* Fed. R. Civ. P. 23(c)(1)(C), (e)(2).

Second, SCSU argues that hidden conflicts exist because Plaintiffs refuse to disclose their fee arrangements.  Costs in a class action can be staggering, including the costs of preparing and sending the notice, costs of depositions, preparing motions and briefs, and conducting the hearings and trial of the case.  *Klein v. Henry S. Miller Residential Servs., Inc.*, 82 F.R.D. 6, 8 (N.D. Tex. 1978).  But "courts do not normally examine the financial responsibility of class representatives."  *Dirks v. Clayton Brokerage Co.*, 105 F.R.D. 125, 134 (D. Minn. 1985).  When courts choose to investigate

---

(Footnote continued.)

[7] (Decl. of Abigail Kantor ¶ 7; Decl. of Alexie Portz ¶ 8; Decl. of Anna Lindell ¶ 7; Decl. of Fernanda Quintino Dos Santos ¶ 7; Decl. of Haley Bock ¶ 7; Decl. of Jill Kedrowski ¶ 8; Decl. of Kaitlyn Babich ¶ 7; Decl. of Kiersten Rohde ¶ 7; Decl. of Maria Hauer ¶ 8; Decl. of Marilia Roque Diversi ¶ 7.)

plaintiffs' financial responsibility, it is because the court "is legitimately concerned about the class representatives' ability to bear the costs of sending adequate notice to class members." *Id.* at 134. The financial conflicts identified by SCSU are purely speculative, and the Court does not believe that further investigation is warranted at this time.[8] The Court will note, however, that class counsel has an ethical duty to the Court to come forward and notify the Court of any potential conflicts that may arise during the course of litigation. Moreover, the Court will review any proposed settlement agreements with an eye toward avoiding conflicts and ensuring that all class members receive equal treatment.

Third and finally, SCSU argues that Plaintiffs have participated minimally in this lawsuit and, therefore, vigorous representation of the class cannot be assured. Other courts have identified four situations in which plaintiffs may be deemed inadequate representatives: (1) the plaintiffs lack personal knowledge concerning the type and extent of damages they have suffered; (2) the plaintiffs lack credibility concerning their claims; (3) the plaintiffs have afforded unfettered discretion to conduct the litigation; and (4) the plaintiffs have physical or mental limitations which may preclude them from being in a position to act in the best interests of the class. *See Banks v. Cent. Refrigerated Servs.*, *Inc.*, No. 2:16-CV-356-DAK, 2017 WL 1683056, at *8 (D. Utah, May 2, 2017) (citing

---

[8] It is true that "client identity and fee arrangements are not confidential professional communications protected by the attorney-client privilege," but SCSU has not brought a motion to compel the production of documents related to Plaintiffs' fee arrangement. *Cf. In re Grand Jury Proceedings Subpoena to Testify: Wine*, 841 F.2d 230, 233 n.3 (8th Cir. 1988).

*Robinson v. Gillespie*, 219 F.R.D. 179, 186 (D. Kan. 2003)).    The plaintiffs'
understanding of the law or minutiae of litigation procedure is not the fundamental
inquiry. *See id.*  Rather, the primary question is whether "the plaintiff is willing and able
to assist his or her counsel in vigorously prosecuting the action on behalf of the class
without demonstrating other characteristics that could conflict with or hurt the interests of
the class." *Id.*

Plaintiffs are knowledgeable of their claims.  Plaintiffs' affidavits recognize that
their respective sport might be eliminated as a result of SCSU's noncompliance with Title
IX and that SCSU was providing female students with fewer participation opportunities
overall.[9]  Plaintiffs' claims are credible as evidenced by the Court's previous finding that
Plaintiffs stand a fair chance of prevailing on their Title IX claims.  *Portz*, 196 F. Supp.
3d at 977.  Finally, there is nothing to suggest that Plaintiffs have mental limitations that
prevent them from acting within the best interests of the class.

The only real question is whether Plaintiffs have afforded their attorneys
unfettered discretion to conduct the litigation.  Sufficient evidence shows that they have
not.  Plaintiffs have filed affidavits, attended depositions, and communicated with their
attorneys.   Plaintiffs have indicated that they have personally reviewed settlement

---

[9] (Decl. of Abigail Kantor ¶ 2; Decl. of Alexie Portz ¶ 2; Decl. of Anna Lindell ¶ 2; Decl.
of Fernanda Quintino Dos Santos ¶ 2; Decl. of Haley Bock ¶ 2; Decl. of Jill Kedrowski ¶ 2;
Decl. of Kaitlyn Babich ¶ 2; Decl. of Kiersten Rohde ¶ 2; Decl. of Maria Hauer ¶ 2; Decl. of
Marilia Roque Diversi ¶ 2.)

offers.[10]  Plaintiffs have thus demonstrated a willingness to work with their attorneys and vigorously represent the class.

SCSU's most noteworthy complaint is that Plaintiffs themselves were absent from a scheduled mediation.  Plaintiffs' attorney notified SCSU that Plaintiffs were from the mediation because "they were just returning from break and they had significant responsibilities for their classes, including examinations to study for and papers to complete."  (Letter to Judge Brisbois at 3, Oct. 26, 2016, Docket No. 66.)  While it is ideal that Plaintiffs attend mediations in the future, the Court does not believe that this single incident indicates that Plaintiffs are incapable of vigorously representing the class. Plaintiffs are students with academic obligations; any class representative in this sort of case must necessarily be a student.  To hold that Plaintiffs must drop their academic careers to pursue this litigation would frustrate the ability of student-plaintiffs to bring class-action lawsuits under Title IX.

The Court concludes that the class meets the requirement of adequacy of representation and, therefore, that Plaintiffs have met their burden with respect to each element in Rule 23(a).

---

[10] (Decl. of Abigail Kantor ¶ 7; Decl. of Alexie Portz ¶ 8; Decl. of Anna Lindell ¶ 7; Decl. of Fernanda Quintino Dos Santos ¶ 7; Decl. of Haley Bock ¶ 7; Decl. of Jill Kedrowski ¶ 8; Decl. of Kaitlyn Babich ¶ 7; Decl. of Kiersten Rohde ¶ 7; Decl. of Maria Hauer ¶ 8; Decl. of Marilia Roque Diversi ¶ 7.)

### D.   Rule 23(b) Requirements

The Court must decide whether the proposed class falls within one of the three categories of Rule 23(b).  A party may satisfy Rule 23(b)(2) by showing that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class."  *Dukes*, 564 U.S. at 360. The rule is particularly appropriate in civil rights actions. *See Coley v. Clinton*, 635 F.2d 1364, 1378 (8th Cir. 1980).

SCSU concedes that Plaintiffs are able to satisfy the requirements of Rule 23(b)(2).  (Defs.' Opp. Mem. at 8, Sept. 11, 2017,  Docket No. 202.)  Plaintiffs' main request for relief is an injunction restraining SCSU from

> (1) continuing to discriminate against female students on the basis of sex; (2) restraining Defendants from eliminating any women's varsity sports programs, including, but not limited to, the women's varsity tennis and Nordic skiing programs; (3) requiring Defendants to provide women with an equal opportunity to participate in varsity intercollegiate athletics by sponsoring additional women's sports based upon the interests and abilities of SCSU's present, prospective, and future students; (4) requiring Defendants to provide female athletes with equal access to athletic-related financial assistance; and (5) requiring Defendants to provide female athletes with equal athletic benefits and resources.

(Compl. at 47-48.)  This injunctive relief would remedy the complaint of the entire class. The Court, therefore, concludes that Plaintiffs satisfy Rule 23(b)(2).

- 34 -

Because Plaintiffs have satisfied all of the requirements of Rule 23(a) and Rule 23(b), the Court will certify the Plaintiffs' class as modified by the Court.

### E.  Class Counsel

The Court must decide whether to appoint Fafinski Mark & Johnson, P.A., as class counsel.  In appointing class counsel, the Court considers (1) "the work counsel has done in identifying or investigating potential claims in the action;" (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;" (3) "counsel's knowledge of the applicable law;" and (4) "the resources that counsel will commit to representing the class."  Fed. R. Civ. P. 23(g)(1)(A).  First, the filings in this case—the complaint, the preliminary injunction, and class certification—demonstrate that counsel has sufficiently investigated and identified potential claims in this case.  *See* Fed. R. Civ. 23(g)(1)(A)(i).  Second, counsel has experience in handling both class-action lawsuits and Title IX cases.  (Decl. of Donald C. Mark, Jr., ("Mark Decl.") ¶ 3, May 15, 2017, Docket No. 137.); *see* Fed. R. Civ. P. 23(g)(1)(A)(ii)-(iii).  Finally, counsel has demonstrated that the firm has sufficient resources to manage a class-action lawsuit.  (Mark Decl. ¶ 2-5.)  SCSU admits that Plaintiffs' counsel is sufficiently prepared to serve as class counsel in this action.  Accordingly, the Court will appoint Fafinski Mark & Johnson, P.A., as class counsel.

## III.  MOTION TO STRIKE

SCSU has brought a motion to strike (1) Plaintiffs' September 25, 2017, Reply to the Amended Motion to Certify Class and the declarations accompanying it, (Dockets

213-218),and (2) Plaintiffs' June 19, 2017, declarations accompanying their original motion for class certification, (Dockets 163-172). (Mot. to Strike, Oct. 13, 2017, Docket No. 221.) The Court will deny SCSU's motion.

This District has been clear that there is no such thing as a motion to strike late memoranda or affidavits. "While an unsolicited memorandum of law is expressly prohibited by Local Rule 7.1(i), this District has consistently denied motions to strike aimed at 'memoranda, affidavits, or anything else that is not a pleading for purposes of Civil Rule 12(f).'" *Vogel v. Turner*, No. 11-446, 2013 WL 358874, at *9 (D. Minn. Jan. 8, 2013) (quoting *Carlson Mktg. Grp., Inc. v. Royal Indem. Co.,* No. 04-3368, 2006 WK 2917173, at *3 (D. Minn. Oct. 11, 2006)). "[T]here is no such thing as a 'motion to strike' – at least when the paper being targeted is a memorandum or affidavit submitted in connection with a [dispositive motion]." *Carlson Mktg. Grp.*, 2006 WL 291713, at *2. "Such motions will be denied – and, in appropriate cases, the attorneys who file them may be sanctioned." *Id.* at *3.

The Court acknowledges that it "may issue any just orders" when a party "fails to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f)(1)(C). The Court does not believe that sanctions are warranted in this case. The Court will take future filing deadlines seriously and will not tolerate delays in briefing, particularly now that the Court has certified the class action and such delays may result in prejudice toward the entire class.

The Court will deny SCSU's motion to strike.

## IV.    *DAUBERT* MOTION

Finally, the Court must decide whether to exclude the testimony and opinions of Plaintiffs' proposed expert witness, Dr. Donna Lopiano. Dr. Lopiano holds a Ph.D. in Physical Education.  (Decl. of Sharon L. Van Dyck ("Van Dyck Decl.") ¶ 3, Ex. A at 1, June 2, 2017, Docket No. 151.)  Dr. Lopiano is the President of Sports Management Resources, which "focuses on helping educational institutions and sport organizations solve sports program integrity, equity, growth, and development challenges." (Finnerty Decl. ¶ 2, Ex. 1 ("Lopiano Report") at 2, May 12, 2017, Docket No. 129.)  As a gender-equity consultant to the Office for Civil Rights of the U.S. Department of Health, Education, and Welfare, Dr. Lopiano assisted in drafting the 1979 Policy Interpretation on Title IX, which forms the basis for some of Plaintiffs' claims.  (*Id.* at 3.)  Dr. Lopiano has been hired by Plaintiffs to address the following questions:

A.  What is the mandate of Title IX and how long were institutions given to come into compliance?

B.  It has been forty-four years since the adoption of Title IX.  Are most institutions in compliance with the law with regard to their athletics programs?

C.  Generally, what are the Title IX athletic standards for gender equity with regard to "effective accommodation," treatment and benefits, financial assistance, recruiting, admissions and other requirements and how are these standards applied?

D.  What were your findings with regard to whether the selection of sports and levels of competition provided by SCSU during the 1972-73 through 2014-15 period "effectively accommodated the interests and abilities of members of both sexes"?

E.  What were your findings with regard to whether SCSU treated male and female athletes equally with regard to the provision of athletics financial aid during the 2003-04 through the 2014-15 periods?

F. What were your findings with regard to whether SCSU treated male and female athletes equally in 2014-15, the most recent year in which complete data was available, with regard to Title IX's "laundry list" of treatment and benefits and including recruiting and admissions?

G. In your opinion, has SCSU ever treated athletes equally as required by Title IX?

H. In your opinion, will the plan advanced by SCSU to provide athletic participation opportunities to male and female athletes proportional to undergraduate enrollment of male and females result in the equal treatment of male and female athletes as required by Title IX?

(*Id.* at 7, 10-11, 47, 73, 75, 115, 117.)

SCSU argues these eight subjects of Dr. Lopiano's proposed testimony should be excluded.  The Court will address each of SCSU's objections in turn and will ultimately grant SCSU's motion in part and deny the motion in part.

**A. Standard of Review**

Under Federal Rule of Evidence 702, expert testimony must satisfy three prerequisites to be admitted:

> First, evidence based on scientific, technical, or other specialized knowledge must be **useful** to the finder of fact in deciding the ultimate issue of fact.  This is the basic rule of relevancy.  Second, the proposed witness must be **qualified** to assist the finder of fact.  Third, the proposed evidence must be **reliable or trustworthy** in an evidentiary sense, so that, if the finding of fact accepts it as true, it provides the assistance the find of fact requires.

*Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (emphasis added) (cleaned up).  The district court has a "gatekeeping" obligation to make certain that all testimony admitted under Rule 702 satisfies these prerequisites and that "any and all

scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 597 (1993).  The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the expert is qualified, that his methodology is scientifically valid, and that "the reasoning or methodology in question is applied properly to the facts in issue." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757-58 (8th Cir. 2006).

Expert witnesses may not testify regarding the requirements of law.  *See Farmland Indus. v. Frazier-Parrott Commodities, Inc.*, 871 F.2d 1402, 1409 (8th Cir. 1989).  "Explaining the law is the judge's job."  *Police Ret. Sys. of St. Louis v. Midwest Inv. Advisory Serv., Inc.*, 940 F.2d 351, 357 (8th Cir. 1991).   The admission of expert testimony about the requirements of the law "would give the appearance that the court was shifting to witnesses the responsibility to decide the case."  *Farmland Indus.*, 871 F.2d at 1409 (quoting *Marx & Co. v. Diner's Club, Inc.*, 550 F.2d 505, 510 (2d Cir. 1977)).

"Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility."   *Marmo*, 457 F.3d at 758; *see also Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) ("[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.").  "Only if the expert's testimony is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929-30 (8th Cir. 2001) (quoting *Hose v. Chi. Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1996)).

**B.  SCSU's Compliance with Title IX (Sections A, C, G, and H)**

First, the Court must decide whether to exclude Dr. Lopiano's testimony about the mandate of Title IX and SCSU's compliance with the statute and its associated regulations.  The Court will grant SCSU's motion to the extent that Dr. Lopiano seeks to testify about the legal requirements of Title IX or about her conclusions as to whether SCSU complies with Title IX.

Dr. Lopiano describes extensively the requirements of Title IX and the interpretations adopted by the U.S. Department of Education.  (Lopiano Report at 7-10.)  Specifically, Sections A and C of her report detail the Title IX mandate, the steps institutions were required to take to become Title IX compliant, and the date by which institutions were given to reach full compliance.  (*Id.* at 7-47.)  She also opines – particularly in Sections G and H, but in other sections too – about whether SCSU complies with Title IX.  (*Id.* at 115-34.)  Notwithstanding any reference to specific sections, the Court's analysis here is applicable to the entirety of Dr. Lopiano's proposed testimony.

Dr. Lopiano's proposed testimony concerns the statutory and regulatory requirements of Title IX.  As one example, Dr. Lopiano explains in Section A that "[i]nstitutions were required to evaluate their own policies, procedures, and actions; to modify an such actions that were discriminatory; to take remedial steps to eliminate the effects of such actions; and, even in the absence of a finding of discrimination, to 'take affirmative action to overcome the effects of conditions which resulted in limited participation" by the under-represented sex.'"  (*Id.* at 8 (quoting 34 C.F.R. § 106.3).)

This statement is just a summary of the requirements of 34 C.F.R. § 106.3. Dr. Lopiano may not testify regarding the requirements of law because it would give the jury the appearance that the Court is shifting to Dr. Lopiano the responsibility to decide the case. *See Farmland Indus*, 871 F.2d at 1409. Explaining the statutory and regulatory requirements of Title IX "is the judge's job." *See Police Ret. Sys.*, 940 F.2d at 357.

Moreover, Dr. Lopiano offers conclusions about whether SCSU has complied with Title IX. This case is "about whether federal law was contravened, and expert opinion as to that [is] simply inadmissible." *See S. Pine Helicopters v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003). The Court will grant SCSU's Motion to the extent that it involves Dr. Lopiano's testimony about the requirements of Title IX or whether SCSU has complied with those requirements.

The Court acknowledges that Dr. Lopiano may testify about "the history and purposes" of Title IX. *See Police Ret. Sys.*, 940 F.2d at 357. She may also testify about "industry practice or standards" that are relevant in this case. *See S. Pine Helicopters*, 320 F.3d at 841. However, the Court warns Plaintiffs that it will not tolerate even a slight deviation by their expert into the requirements of Title IX. If Dr. Lopiano is not able to recount the history and purposes of Title IX without referencing its specific requirements, the Court will not hesitate in excluding her testimony.

As such, the Court will grant SCSU's motion to exclude the testimony of Dr. Lopiano to the extent that she seeks to testify about the legal requirements of Title IX or about her conclusions as to whether SCSU complies with Title IX.

### C.  Compliance of Other Institutions (Section B)

Second, the Court must decide whether to exclude Dr. Lopiano's proposed testimony about the compliance of other institutions.  The Court will deny SCSU's Motion to the extent that it involves proposed testimony from Section B of Dr. Lopiano's report.

The Court finds that Dr. Lopiano's testimony is relevant to demonstrating her knowledge of Title IX compliance and providing background to the factfinder about Title IX compliance more generally.   Moreover, Dr. Lopiano's testimony demonstrates "how [universities] responded to [Title IX.]"  *Police Ret. Sys.*, 940 F.2d at 357.  The Court concludes that Dr. Lopiano's testimony about the compliance of other institutions with Title IX is relevant.

SCSU argues that Dr. Lopiano's testimony constitutes an impermissible legal opinion.  Dr. Lopiano's testimony primarily concerns statistics related to college athletic participation.  (Lopiano Report at 10-11.)  The Court acknowledges that Dr. Lopiano's proposed testimony – in some instances – comes close to being legal in nature (*e.g.*, "Even though Title IX prohibits retaliation . . . .").  (*Id.* at 11.)  Again, the Court will reiterate that Dr. Lopiano may not testify about the requirements or interpretation of Title IX or its associated regulations.  *See Farmland Indus*, 871 F.2d at 1409.  Nevertheless, the Court finds the majority of Dr. Lopiano's proposed testimony in Section B presents a relevant – and non-legal – expert opinion.

The Court will deny SCSU's Motion to the extent that it involves testimony from Section B of Dr. Lopiano's report.

### D. SCSU's Sports Offerings from 1972 to 2015 (Section D)

Third, the Court must decide whether to exclude Dr. Lopiano's testimony about whether SCSU's selections of sports effectively accommodated the interest and abilities of members of both sexes from 1972 to 2015. The Court will deny SCSU's Motion to the extent that it involves testimony from Section D of Dr. Lopiano's report.

The Office of Civil Rights' policy interpretation identifies three ways that institutions of higher education can comply with Title IX requirements. *Title IX and Intercollegiate Athletics*, 44 Fed. Reg. at 71,418. Dr. Lopiano's report "simply accepted [] SCSU['s] representation that it was not in compliance with Prong [1] prior to 2015," and therefore focused her inquiry on Prongs 2 and 3. (Lopiano Report at 48.)

Under Prong 2, the factfinder assesses "where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show **a history and continuing practice** of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex." *Title IX and Intercollegiate Athletics*, 44 Fed. Reg. at 71,418 (emphasis added). Dr. Lopiano's proposed testimony is relevant to determining whether SCSU has a history of being responsive to the interests and abilities of female student-athletes. As one example, Dr. Lopiano describes informal requests made to SCSU to add certain women's sports, and SCSU's refusal to add those sports. (Lopiano Report at 50.) The Court finds that Dr. Lopiano's proposed testimony in Section D of her report is relevant for the factfinder's determination under Prong 2.

Under Prong 3, the factfinder assesses "where the members of one sex are underrepresented among intercollegiate athletes, and the institution **cannot show a continuing practice of program expansion** such as cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program." *Title IX and Intercollegiate Athletics*, 44 Fed. Reg. at 71,418 (emphasis added). One element of Prong 3 is that "the institution cannot show a continuing practice of program expansion." *Id.* As such, the Court finds that Dr. Lopiano's proposed testimony in Section D of her report is relevant for the factfinder's determination under Prong 3.

SCSU argues that Dr. Lopiano's testimony is barred by the statute of limitations. *See Egerdahl*, 72 F.3d at 618 (stating a six-year statute of limitations applies to Title IX claims). SCSU does not provide any support for the notion that the statute of limitations requires the exclusion of evidence in Title IX cases – particularly where the Office of Civil Rights' policy interpretation requires a historical analysis. Excluding the evidence from beyond the statute of limitations would restrict the historical analysis necessary for Prongs 2 and 3 to a six-year period; the Court does not believe that either Title IX or its associated regulations support such a restriction.

The Court will deny SCSU's Motion to the extent that it involves testimony from Section D of Dr. Lopiano's report.

**E.  SCSU's Athletic-Related Financial Aid from 2003 to 2015 (Section E)**

Fourth, the Court must decide whether to exclude Dr. Lopiano's testimony about whether SCSU treated male and female student-athletes equally with regard to the

provisions of financial aid from 2003 to 2015. (Lopiano Report at 73-75.) The Court will deny SCSU's Motion to the extent that it involves proposed testimony from Section E of Dr. Lopiano's report.

Plaintiffs claim that SCSU has allocated athletic-related financial aid in violation of Title IX. (Compl. ¶¶ 112-123.) As such, the Court finds that Lopiano's testimony about SCSU's athletic-related financial aid is relevant and useful to the trier of fact. *See Lauzon*, 270 F.3d at 686.

SCSU argues that expert testimony is not required about SCSU's athletic-related financial aid because the regulations require "[s]imple math." (Mem. Supp. Mot. to Exclude at 10, May 12, 2017, Docket. No. 126.) In the alternative, SCSU argues that even if expert testimony is necessary, Lopiano is an unqualified expert because she is not a "mathematician or statistician." (*Id.*) The applicable regulations state that Title IX compliance is determined by "dividing the amounts of aid available for the members of each sex by the numbers of male or female participants in the amounts of aid available for members of each sex by the numbers of male or female participants in the athletic program and comparing the results" and looking for "substantially equal amounts or if a resulting disparity can be explained by adjustments to take into account legitimate, nondiscriminatory factors." *Title IX and Intercollegiate Athletics*, 44 Fed. Reg. at 71,415. The Court disagrees with SCSU's characterization of this standard as the mere application of simple math – even if the calculations themselves are simple. The factfinder will benefit from having an expert explain what "legitimate, nondiscriminatory

factors" may or may not explain disparities in the allocation of athletic-based financial aid.

Moreover, the Court finds that Dr. Lopiano is qualified to testify about the disparity in athletic-based financial aid, and Plaintiffs do not need to hire a mathematician or statistician to conduct this analysis. SCSU concedes this calculation requires "simple math." A District Court may allow an expert to testify about "basic math" that involves "simple deductive reasoning." *See In re Prempro Prods. Liability Litig.*, 514 F.3d 825, 831 (8th Cir. 2008). Moreover, Dr. Lopiano is an expert in the application of Title IX to institutions of higher education. (Lopiano Report at 3-4.) The Court is confident that Dr. Lopiano is qualified to undertake this simple mathematic analysis in light of her previous experience. *See Lauzon*, 270 F.3d at 686.

The Court will deny SCSU's Motion to the extent that it involves Dr. Lopiano's testimony from Section E of Dr. Lopiano's report.

### F. SCSU's Compliance with Title IX "Laundry List" (Section F)

Fifth and finally, the Court must decide whether to exclude Dr. Lopiano's testimony about whether SCSU treated male and female student-athletes equally with regard to SCSU's compliance with Title IX. (Lopiano Report at 75-115.) The Court will grant SCUS's motion with respect to Section F in part.

Plaintiffs claim that SCSU did not provide equal benefits to student-athletes of different sexes under the "laundry list." (Compl. ¶¶ 124-37.) As such, the Court finds that Dr. Lopiano's testimony about SCSU's compliance with the "laundry list" is relevant and useful to the trier of fact. *See Lauzon*, 270 F.3d at 686.

In this case, Dr. Lopiano based her opinions in part on conversations with two former SCSU employees:  former Director of Athletics Dr. Morris Kurtz and former Associate Director of Athletics Dr. Susan Becker.  (*Id.* at 76.)  Dr. Kurtz retired from SCSU in 2012 and Dr. Becker retired from SCSU in 2013.  (*Id.*)  Dr. Lopiano worked through a series of worksheets with Dr. Kurtz and Dr. Becker based on the 1990 Title IX Athletics Investigator's Manual.  (*Id.* at 42-43, 77.)  Dr. Lopiano developed qualitative definitions she believed were appropriate for SCSU, which were reviewed by Dr. Kurtz and Dr. Becker.  (*Id.* at 77.)  Dr. Lopiano then asked Dr. Kurtz and Dr. Becker to provide a qualitative rating for facilities as "Superior," "Adequate," or "Inadequate."  (*Id.*)  Dr. Lopiano "took those ratings and mathematically determined the percent of male and female athletes, for example, who received Superior, Adequate or Inadequate treatment." (*Id.* at 88.)  At her deposition, Dr. Lopiano testified that Dr. Kurtz and Dr. Becker provided her with the inequality determinations as defined by her proposed definitions and that she relied on it.  (Finnerty Decl. ¶ 3, Ex. 2 ("Lopiano Dep.") at 165:14-18.)  Dr. Lopiano did not independently verify any of the ratings provided by Dr. Kurtz and Dr. Becker.  (*Id.* at 158:3-5.)

Dr. Lopiano's opinion is based on inadmissible hearsay.  Plaintiffs have not offered any exception to the hearsay rules that would otherwise allow Dr. Kurtz and Dr. Becker's out-of-court statements to be admitted.  However, this alone does not result in exclusion of Dr. Lopiano's proposed testimony.

"If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for **the opinion** to

be admitted." Fed. R. Evid. 703. "[E]xpert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts or data are of a type reasonably relied upon by experts in the particular field in forming opinion or inferences upon the subject." *Daubert*, 509 U.S. at 595. Dr. Lopiano discussed her traditional method for assessing Title IX compliance:

> Whenever I am hired to do a Title IX assessment in my consulting practice, I take one or more institutional athletic administrators . . . through a series of meetings in which they complete pre-prepared worksheets on each Title IX element with my assistance for the purpose of teaching them how to perform a comprehensive Title IX athletics self-evaluation. Normally I do not have the opportunity to do this for a lawsuit because defendants are not eager to reveal differences in treatments that might be judged to constitute gender inequities.

(Lopiano Report at 75-76.) Her deposition clarifies that the system she used is "contained in the Athletic Director's Desk Reference." (Lopiano Dep. at 156:11-15.) The Court, therefore, finds that Dr. Lopiano's opinions are based on hearsay that is reasonably relied on by experts in the field. *See Daubert*, 509 U.S. at 595. Dr. Lopiano's opinions are admissible.

Whether the actual hearsay statements of Dr. Kurtz and Dr. Becker can be admitted is a separate inquiry. Rule 703 specifies, "if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose to the jury **only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect**." (emphasis added.) The Court is particularly concerned that the

assessments provided by Dr. Kurtz and Dr. Becker may be outdated. Dr. Kurtz retired from SCSU in 2012 and Dr. Becker retired from SCSU in 2013. (*Id.* at 76.) Dr. Lopiano stated that she was "comfortable" relying on the opinions of Dr. Kurtz and Dr. Becker because "within any three to five year period, treatment remains relatively constant." (*Id.*) Beyond her vague assertion that facilities rarely change, Dr. Lopiano has done nothing to ensure that Dr. Kurtz and Dr. Becker's evaluations remain current. For example, she has neither conducted a site visit nor interviewed the current athletic director.

Yet this case relates to whether SCSU **presently** complies with Title IX. Generally, the Rules of Evidence prohibit the introduction of evidence of past violations to show that an actor is in current violation of the law. *See* Fed. R. Evid. 404(b)(1). The advisory committee notes specify that "[c]haracter evidence is of slight probative value and may be very prejudicial. It tends to distract the trier of fact from the main question of what actually happened." *Id.* The Court need not conduct a full inquiry under Rule 404 to see the prejudicial effect of Dr. Kurtz and Dr. Becker's evaluations. At best, the factual predicates on which Dr. Lopiano bases her opinion – the evaluations of Dr. Kurtz and Dr. Becker – establish that SCSU was not in compliance when Dr. Kurtz and Dr. Becker were employed at SCSU. These factual predicates do not establish that SCSU is presently violating the "laundry list" requirement of Title IX. The Court therefore concludes that, under Rule 703, the probative value of the factual predicates of Dr. Lopiano's opinion do not outweigh their prejudicial effect.

In sum, the Court will permit Dr. Lopiano to testify about her opinion in Section F but will not permit Dr. Lopiano to disclose to the jury the factual predicates of her opinion. The Court will grant SCSU's Motion to the extent that it is consistent with this conclusion.

## ORDER

Accordingly, **IT IS HEREBY ORDERED**:

1. Defendant's Motion for Partial Summary Judgment [Docket No. 116] is **GRANTED**.

2. Plaintiffs' Section 1983 Claim in Count Four of the Second Amended Complaint is **DISMISSED with prejudice**.

3. Plaintiffs' claims for monetary damages are **DISMISSED with prejudice**.

4. Plaintiffs' Amended Motion to Certify Class [Docket No. 190] is **GRANTED**.

5. The Court certifies the class defined as:

   > All present, prospective, and future female students at St. Cloud State University who are harmed by and want to end St. Cloud State University's sex discrimination in: (1) the allocation of athletic participation opportunities; (2) the allocation of athletic financial assistance; and (3) the allocation of benefits provided to varsity athletes.

6. The Court certifies Alexie Portz, Jill Kedrowski, Abigail Kantor, Marilia Roque Diversi, Fernanda Quintino dos Santos, Maria Hauer, Haley Bock, Kaitlin Babich, Anna Lindell, and Kiersten Rohde as representatives for the class.

7. The Court appoints Fafinski Mark & Johnson, PA, as lead class counsel.

8. Defendant's Motion to Strike [Docket No. 221] is **DENIED**.

9. Defendant's Motion to Exclude Expert Testimony [Docket No. 124] is

**GRANTED IN PART AND DENIED IN PART**.

DATED:  February 26, 2018                              s/John R. Tunheim
at Minneapolis, Minnesota.                           JOHN R. TUNHEIM
                                                      Chief Judge
                                              United States District Court