UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| ALEXIE PORTZ, JILL KEDROWSKI, ABIGAIL KANTOR, MARILIA ROQUE DIVERSI, FERNANDA QUINTINO DOS SANTOS, MARIA HAUER, HALEY BOCK, KAITLYN BABICH, ANNA LINDELL, and KIERSTEN ROHDE, *individually and on behalf of all those similarly situated*<br><br>Plaintiffs,<br><br>v.<br><br>ST. CLOUD STATE UNIVERSITY and MINNESOTA STATE COLLEGES AND UNIVERSITIES,<br><br>Defendants. | Civil No. 16-1115<br><br><br>**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Sharon L. Van Dyck, Donald C. Mark, Jr., and Andrew T. James, **FAFINSKI MARK & JOHNSON, P.A.**, 775 Prairie Center Drive, Suite 400, Eden Prairie, MN  55344, for plaintiffs.

Kevin A. Finnerty, Assistant Attorney General, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Suite 900, St. Paul, MN  55101, for defendants.


Plaintiffs – a class of female student-athletes at St. Cloud State University – bring this Title IX action against St. Cloud State University and the Minnesota State Colleges and Universities Board of Trustees (collectively, "SCSU").  Plaintiffs allege that SCSU violated Title IX by failing to provide equal-participation opportunities, benefits, and financial aid to female student-athletes.  SCSU moves for partial summary judgment, seeking dismissal of (1) Plaintiffs' claim that SCSU failed to provide proportionate

athletic-based financial aid to female student-athletes and (2) Plaintiffs' damages claim. The Court will conclude that (1) Plaintiffs have failed to create a genuine dispute of material fact with respect to their financial-aid claim and (2) the Court has already dismissed Plaintiffs' damages claim in its previous order. Accordingly, the Court will grant SCSU's motion in full. The Court will also deny Plaintiffs' request for a jury trial because Plaintiffs now seek only equitable relief.

## BACKGROUND

### I. FACTUAL BACKGROUND

Defendant St. Cloud State University is a public university owned and operated by the State of Minnesota. (2d Am. Compl. ("Compl.") ¶ 18, Aug. 15, 2017, Docket No. 184.) The University is a member of the Minnesota State system, which is governed by a board of trustees known as the Minnesota State Colleges and Universities Board of Trustees. (*Id.* ¶ 20.) SCSU receives federal funds and is subject to Title IX. (*Id.* ¶ 19.) SCSU offers a number of varsity intercollegiate sports, which are divided into a four-tiered system. (*Id.* ¶¶ 59, 67.) Plaintiffs are a class comprised of:

> All present, prospective, and future female students at St. Cloud State University who are harmed by and want to end St. Cloud State University's sex discrimination in: (1) the allocation of athletic participation opportunities; (2) the allocation of athletic financial assistance; and (3) the allocation of benefits provided to varsity athletes.

*Portz v. St. Cloud State. Univ.*, 297 F. Supp. 3d 929, 957 (D. Minn. 2018).

In 2011, SCSU's enrollment peaked at a 19,186, excluding high-school students. (Aff. of Lisa Foss ("Foss Aff.") ¶ 4, May 11, 2016, Docket No. 26.) By 2016, SCSU's

enrollment had declined to 14,990, excluding high-school students. (*Id.* ¶ 5.) From 2011 to 2016, revenues from tuition fell by approximately $8.6 million. (*Id.* ¶ 6.) On March 2, 2016, SCSU announced its intent to reorganize its athletic offerings by eliminating six intercollegiate sports programs, including the women's tennis and women's Nordic skiing teams. (Compl. ¶ 78.)

Plaintiffs allege that SCSU has violated three requirements of Title IX and its implementing regulations. *See* 20 U.S.C. § 1681(a). Relevant to this motion, the Department of Education's ("DOE") regulations require institutions of higher education to allocate athletic-based financial aid proportionate to the number of male and female student-athletes. 34 C.F.R. § 106.37(c)(1). Plaintiffs allege that SCSU provides a disproportionate amount of athletic-based financial aid to male student-athletes over female student-athletes.

## II.   PROCEDURAL HISTORY

On February 26, 2018, the Court issued an order addressing a number of issues in this case. *Portz*, 297 F. Supp. 3d at 929. Relevant here, the Court dismissed Plaintiffs' claims for monetary damages. *Id.* at 957.

## DISCUSSION

## I.   STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a

dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. *Liberty Lobby*, 477 U.S. at 256.

## II.   ATHLETIC-BASED FINANCIAL AID

The Court must decide whether a genuine issue of material fact remains with respect to Plaintiffs' Title IX claim arising from the allocation of athletic-based financial aid. Plaintiffs allege that SCSU provides athletic-based financial aid "to its female students in amounts and terms less favorable than their male-student counterparts in violation of Title IX." (Compl. ¶ 116.) The Court will dismiss Plaintiffs' claim because female student-athletes receive disproportionately **more** athletic-based financial aid than male student-athletes.

Title IX provides, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

The DOE's regulations make Title IX applicable to intercollegiate athletics. When a university "awards athletic scholarships or grants-in-aid, it must provide reasonable opportunities for such awards for members of each sex in proportion to the **number of students of each sex participating in interscholastic or intercollegiate athletics**." 34 C.F.R. § 106.37(c)(1) (emphasis added). Institutions must provide "substantially equal amounts" of financial aid to student-athletes of both sexes or explain "legitimate, nondiscriminatory factors" for the disparity. Title IX of the Education Amendments of 1972; a Policy Interpretation; Title IX and Intercollegiate Athletics, 44 Fed. Reg. 71,413, 71,415 (Dec. 11, 1979) [hereinafter Policy Interpretation]. DOE measures compliance with this provision "by dividing the amounts of aid available for members of each sex by the numbers of male or female participants in the athletic program and comparing the results." *Id.* The regulations do not require colleges to achieve "exact proportionality" or to grant "the same number of scholarships to men and women." *Dear Colleague Letter: Bowling Green State University*, U.S. Dep't of Edu. (July 23, 1998), https://www2.ed.gov/about/offices/list/ocr/docs/bowlgrn.html [hereinafter *Bowling Green Letter*]. There is a strong, rebuttable presumption that the institution is in compliance if the unexplained disparity in the athletic-based financial aid for either sex is 1% or less. *Id.*

The parties dispute how to count "the number of students of each sex participating in interscholastic or intercollegiate athletics." 34 C.F.R. § 106.37(c)(1). SCSU argues that each student-athlete should be counted only once, regardless of many sports he or she participates in. Plaintiffs argue that the Court should calculate the expected athletic-based

financial aid for each sex based on the participation opportunities that would be available if SCSU were compliant with the participation-opportunity provisions of Title IX.

In 1990, the DOE's Office of Civil Rights ("OCR") developed the *Title IX Athletics Investigator's Manual* to assist OCR "in the investigations of interscholastic and intercollegiate athletics programs offered by educational institutions." Valerie M. Bonnette & Lamar Daniel, Title IX Athletics OCR Manual 4 (1990), https://eric.ed.gov/?id=ED400763 [hereinafter OCR Manual]. In calculating financial-aid disparities, the OCR Manual instructs that "[p]articipants who participate on more than one team are to be counted only once." *Id.* at 21.

Plaintiffs argue that the Court should not afford deference to the OCR Manual under the *Chevron* standard of review because the OCR Manual is an interagency document that did not undergo notice-and-comment rulemaking. *See Chevron U.S.A. Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 841-42 (1984); *see also United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). Plaintiffs are correct that the OCR Manual is not entitled to deference under *Chevron*, but only because *Chevron* applies to a Court's review of an agency's interpretation of a statute. *See Mead*, 533 U.S. at 226-27. The OCR Manual does not interpret the Title IX statute. Title IX itself makes no mention of its application to intercollegiate athletics. Rather, Section 844 of the Education Amendments of 1974 instructed the Department of Health, Education, and Welfare ("HEW") (the predecessor to DOE) to "prepare and publish . . . proposed regulations implementing the provisions of title IX . . . relating to the prohibition of sex discrimination in federally assisted education programs which shall include with respect to intercollegiate athletic activities reasonable

provisions considering the nature of particular sports." Pub. L. No. 93-380, § 844, 88 Stat. 484, 612. HEW implemented this directive in a final rule, the financial-aid portions of which are codified at 34 C.F.R. § 106.37(c). The OCR Manual is an interpretation of DOE's regulations.[1]

When considering an agency's interpretation of its own regulations, the Court reviews the interpretation under either the *Auer* or *Skidmore* standards of review. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 154-59 (2012); *see also Auer v. Robbins*, 519 U.S. 452, 461 (1997) (citing *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). An agency's "internal memorandum" is entitled to deference under *Auer* so long as it is not "plainly erroneous or inconsistence with the regulation[s]." *Couer Alaska, Inc. v. Se. Alaska Conservation*, 557 U.S. 261, 278 (2009) (alteration in original) (quoting *Auer*, 519 U.S. at 461). The Supreme Court's best exposition of when *Auer* does not apply comes from *SmithKline Beecham*:

> Although *Auer* ordinarily calls for deference to an agency's interpretation of its own ambiguous regulation, even when that interpretation is advanced in a legal brief, this general rule does not apply in all cases. Deference is undoubtedly inappropriate, for example, when the agency's interpretation is plainly erroneous or inconsistent with the regulation. And deference

---

[1] Plaintiffs argue that the OCR Manual is best characterized as an interpretation of the Policy Interpretation, which interpreted DOE's regulations. There is some truth to this characterization. Much of the OCR Manual focuses on how to carry out the interpretations contained within the Policy Interpretation. However, the OCR Manual still seeks to instruct OCR investigators on how to enforce DOE's **regulations**. The OCR Manual expounds upon the framework provided in the Policy Interpretation to create a more instructive interpretation of the regulations. Despite drawing from the Policy Interpretation, it is nonetheless an interpretation of the regulations – as opposed to merely just an interpretation of the Policy Interpretation.

>   is likewise unwarranted when there is reason to suspect that the agency's interpretation does not reflect the agency's fair and considered judgment on the matter in question. This might occur when the agency's interpretation conflicts with a prior interpretation, or when it appears that the interpretation is nothing more than a convenient litigating position, or a *post hoc* rationalization advanced by an agency seeking to defend past agency action against attack.

567 U.S. at 155 (2012) (cleaned up). If *Auer* is inappropriate, the Court examines the interpretation under the *Skidmore* standard of review.

The OCR Manual is an internal guidance manual that instructs agency officials on how to apply the Title IX regulations and, therefore, the interpretations contained therein are entitled to deference under *Auer* unless the circumstances suggest otherwise. *See Couer Alaska*, 557 U.S. at 278. Although Plaintiffs cite the wrong standard of review, they argue that the OCR Manual (1) conflicts with the Policy Interpretation and (2) was denounced by the Bowling Green Letter. Neither argument is persuasive.

The Policy Interpretation measures compliance by, in effect, comparing the per-capita amount of financial aid awarded to male student-athletes with that for female student-athletes. The Policy Interpretation states that the agency "will measure compliance . . . by dividing the amounts of aid available for members of each sex by the **numbers of male or female participants** in the athletic program and comparing the results." Policy Interpretation, 44 Fed. Reg. at 71,415 (emphasis added). It does not specify – for purposes of the financial-aid regulation – how "participants" should be counted. The OCR Manual clarifies that "[p]articipants who participate on more than one team are to be counted only once." OCR Manual at 21. Because the Policy Interpretation does not instruct how to

count the numbers of male or female participants, the OCR Manual does not conflict with the Policy Interpretation.

The Bowling Green Letter rejected certain provisions of the OCR Manual. However, there is no conflict between the Bowling Green Letter and the OCR Manual with respect to counting participants. The Bowling Green Letter disavows the use of statistical tests for purposes of evaluating the proportionality of athletic financial aid. *Bowling Green Letter*. The Bowling Green Letter does not disavow any other portion of the OCR Manual and, most certainly, does not disavow the OCR Manual with respect to counting participants.

Because the OCR Manual is not plainly erroneous, inconsistent with the DOE's regulations, or inconsistent with the DOE's other interpretations, the Court will defer under *Auer* to the OCR Manual on how to count participants for purposes of 34 C.F.R. § 106.37(c)(1).[2]

---

[2] Even if the Court evaluated the OCR Manual under the *Skidmore* standard of review, the Court would defer to the agency's interpretation. Under *Skidmore*, in deciding how much weight to accord an agency interpretation, the Court considers "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140. The Court finds that OCR thoroughly considered the text of the regulations and DOE's previous policy interpretations in developing the OCR Manual.

As a policy matter, the Court finds the reasoning of the OCR Manual persuasive. It makes sense to count each student-athlete once when calculating disparities in athletic-based financial aid. For example, a female student-athlete who receives full tuition for her athletic participation receives only one award for full tuition even if she participates in three sports. Counting this student three times based on her participation in three sports would confuse the disparity calculation by making it appear as though she received three full awards when, in fact, she only received one.

*(footnote continued on next page)*

Nevertheless, Plaintiffs propose an alternative calculation for the Court's consideration. Plaintiffs allege that SCSU violates Title IX by offering an inadequate number of participation opportunities for female student-athletes and that there would be more female student-athletes if SCSU complied with Title IX. Plaintiffs argue that "[a]llowing SCSU to match its allocation of financial aid to a participation rate that itself violates Title IX is itself discrimination—which in turn violates Title IX." (Pls.' Mem. Opp'n at 21, Apr. 2, 2018, Docket No. 259.) Accordingly, Plaintiffs believe that the Court should calculate the expected financial-aid awards for each sex based on the expected number of participation opportunities SCSU should offer.

Plaintiffs' theory is not supported by the law. First, participation-opportunity discrimination claims and financial-aid discrimination claims are wholly separate claims under Title IX, and one can proceed without the other. *Compare* 34 C.F.R. § 106.37(c)(1), *with* 34 C.F.R. § 106.41(a). Indeed, in this case, Plaintiffs' participation-opportunity claim will proceed to trial. Second, the plain text of 34 C.F.R. § 106.37(c)(1) requires the Court to calculate the athletic-based financial-aid disparity based on the "number of students of

---

Moreover, the interpretation contained within the OCR Manual is longstanding, and universities have come to rely on the guidance contained therein. Regulated entities rely on agency guidance – even if that guidance is just the agency's internal enforcement policies – in deciding how to structure compliance. Nicholas R. Parrillo, Federal Agency Guidance: An Institutional Perspective 37-76, Administrative Conference of the U.S. (Oct. 12, 2017), https://www.acus.gov/sites/default/files/documents/parrillo-agency-guidance-final-report.pdf (describing regulated entities' incentives to follow guidance). A refusal to defer to OCR's otherwise reasonable interpretation would pull the rug out from under the feet of SCSU and other universities who have relied on its guidance for nearly 30 years.

Accordingly, even if the OCR Manual is not entitled to review under *Auer*, the Court would defer under *Skidmore*.

each sex participating in interscholastic or intercollegiate athletics." The regulation is clear that the Court calculates the disparity using the number of student-athletes actually participating in intercollegiate athletics. Third, the Court must defer to DOE's reasonable interpretation about how to calculate financial-aid disparity, and Plaintiffs have not provided any agency guidance that suggests that Plaintiffs' proposed calculation is permissible. *See Auer*, 519 U.S. at 462. The Court will not use participation opportunities to calculate SCSU's athletic-based financial aid disparity.

The Court will use SCSU's Associate Athletic Director Holly Schreiner's numbers of singly counted student-athletes to determine whether male student-athletes receive disproportionately more athletic-based financial aid than female student-athletes.[3]

| TABLE 1 – NUMBER OF STUDENT ATHLETES BY SEX ||||||
|---|---|---|---|---|---|
| Survey Year | Total # of Student-Athletes | # of Male Student-Athletes | % of Male Student-Athletes | # of Female Student-Athletes | % of Female Student-Athletes |
| **2013-2014** | 526 | 329 | 62.5% | 197 | 37.5% |
| **2014-2015** | 520 | 318 | 61.2% | 202 | 38.8% |

---

[3] Plaintiffs appear to agree with the numbers provided in Schreiner's affidavit. In a subsequent letter to the Court, Plaintiffs used Schreiner's affidavit to calculate the number of male and female student-athletes. Plaintiffs state that, of the 241 participation opportunities provided to SCSU's female student-athletes, 39 were given to women who already received participation opportunities. (Letter at 2, June 21, 2018, Docket No. 270.) This would mean that there are 202 singly counted female student-athletes, as suggested by Schreiner's affidavit. Plaintiffs do not dispute Schreiner's count of male student-athletes. (*Id.*) Moreover, at oral argument, Plaintiffs stated that they had no reason to dispute these numbers.

| | | | | | |
|---|---|---|---|---|---|
| **2015-2016** | 530 | 322 | 60.8% | 208 | 39.2% |
| **2016-2017** | 454 | 252 | 55.5% | 202 | 44.5% |

| TABLE 2 – FINANCIAL-AID AWARDS FOR STUDENT ATHLETES BY SEX | | | | | |
|---|---|---|---|---|---|
| Survey Year | Total $ of Financial Aid | $ of Male Financial Aid | % of Male Financial Aid | $ of Female Financial Aid | % of Female Financial Aid |
| **2013-2014** | $2,028,702 | $1,156,865 | 57.0% | $871,837 | 43.0% |
| **2014-2015** | $2,081,812 | $1,169,941 | 56.2% | $911,871 | 43.8% |
| **2015-2016** | $2,267,514 | $1,271,934 | 56.1% | $995,580 | 43.9% |
| **2016-2017 (REPORTED)** | $2,202,739 | $1,214,844 | 55.2% | $987,895 | 44.8% |
| **2016-2017 (CORRECTED)** | $2,209,435 | $1,219,040 | 55.2% | $990,395 | 44.8% |

| TABLE 3 – DISPARITY OF FINANCIAL AID BY SEX[4] | | | | | | |
|---|---|---|---|---|---|---|
| Survey Year | % of Male Financial Aid | % of Male Student-Athletes | Disparity – Male | % of Female Financial Aid | % of Female Student-Athletes | Disparity – Female |
| **2013-2014** | 57.0% | 62.5% | -5.5% | 43.0% | 37.5% | **+5.5%** |
| **2014-2015** | 56.2% | 61.2% | -5.0% | 43.8% | 38.8% | **+5.0%** |
| **2015-2016** | 56.1% | 60.8% | -4.7% | 43.9% | 39.2% | **+4.7%** |
| **2016-2017 (REPORTED)** | 55.2% | 55.5% | -0.3% | 44.8% | 44.5% | **+0.3%** |
| **2016-2017 (CORRECTED)** | 55.2% | 55.5% | -0.3% | 44.8% | 44.5% | **+0.3%** |

(Aff. of Holly Schreiner ¶¶ 5-6, 11-12, Feb. 28, 2018, Docket No. 246.)

As Table 1 shows, SCSU has (and has had) more male student-athletes than female student athletes. And, as Table 2 shows, SCSU awards (and has awarded) a greater total

---

[4] [Disparity] = [% of Financial Aid Awarded to Sex] – [% of Student-Athletes of that Sex]. A negative disparity indicates that student-athletes of that sex were awarded **less** financial aid than expected. A positive disparity indicates that student-athletes of that sex were awarded **more** financial aid than expected.

amount of financial aid to male student-athletes than female student athletes. But as Table 3 shows, contrary to Plaintiffs' claim, **female** student-athletes received disproportionately **more** athletic-based financial aid on a per-capita basis than male student-athletes. While the disparity has not always fallen within the 1% presumption of the OCR Manual, it has favored women since at least 2013-2014. Nevertheless, female student-athletes have always been the beneficiaries of the disparity. And, in 2016-2017, the disparity did fall within the 1% presumption. Plaintiffs do not present any "direct evidence of discriminatory intent" with respect to financial-aid awards to rebut the presumption. *Bowling Green Letter*.

Because the Court concludes that there is no genuine dispute of material fact that female student-athletes receive disproportionately more athletic-based financial aid than male student-athletes, the Court will grant SCSU's motion for summary judgment with respect to this claim.

## III.   DAMAGES AND JURY TRIAL

The Court previously dismissed Plaintiffs' claim for monetary damages with respect to all of their claims. *Portz*, 297 F. Supp. 3d at 929. Accordingly, SCSU requests that the Court deny Plaintiffs' request for a jury trial. The declaratory relief and injunctive relief sought in this case are equitable in nature and, therefore, Plaintiffs are not entitled to a jury trial. *See Northgate Homes, Inc. v. City of Dayton*, 126 F.3d 1095, 1098-99 (8th Cir. 1997). Accordingly, the Court will deny Plaintiffs' request for a jury trial.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Second Motion for Partial Summary Judgment [Docket No. 242] is **GRANTED**.

2. Plaintiffs' Unequal Allocation of Athletic-Related Financial Assistance in Count Four of the Seconded Amended Complaint is **DISMISSED with prejudice**.

3. Plaintiffs' request for a jury trial is **DENIED**.

DATED: July 25, 2018                  _____s/John R. Tunheim_____
at Minneapolis, Minnesota.                JOHN R. TUNHEIM
                                                      Chief Judge
                                       United States District Court