# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| ALEXIE PORTZ, JILL KEDROWSKI, ABIGAIL KANTOR, MARILIA ROQUE DIVERSI, FERNANDA QUINTINO DOS SANTOS, MARIA HAUER, HALEY BOCK, KAITLYN BABICH, ANNA LINDELL, and KIERSTEN ROHDE, *individually and on behalf of all those similarly situated*, | Civil No. 16-1115 (JRT/LIB)<br><br>**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT** |

          Plaintiffs,

  v.

ST. CLOUD STATE UNIVERSITY and
MINNESOTA STATE COLLEGES AND
UNIVERSITIES,

          Defendants.

---

Sharon L. Van Dyck, **VAN DYCK LAW FIRM, PLLC**, 310 Fourth Avenue South, Suite 5010, Minneapolis, MN 55415, and Donald C. Mark, Jr., and Tyler P. Brimmer, **FAFINSKI MARK & JOHNSON, P.A.**, 775 Prairie Center Drive, Suite 400, Eden Prairie, MN 55344, for plaintiffs.

Kevin A. Finnerty and Ian M. Welsh, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Saint Paul, MN 55101, for defendants.


Plaintiffs Alexie Portz, Jill Kedrowski, Abigail Kantor, Marilia Roque Diversi, Fernanda Quintino Dos Santos, Maria Hauer, Haley Bock, Kaitlyn Babich, Anna Lindell, and Kiersten Rohde brought this class action against Defendants St. Cloud State University ("SCSU") and Minnesota State Colleges and Universities ("MNSCU"), alleging gender

discrimination in SCSU's past and present allocation of athletic opportunities and in SCSU's treatment and allocation of benefits for its female student-athletes in violation of Title IX of the Education Amendments Act of 1972 ("Title IX").

The Court previously dismissed Plaintiffs' Title IX claim for unequal allocation of athletic-related financial assistance, Plaintiffs' section 1983 claim for sex-based discrimination in violation of the Fourteenth Amendment, and Plaintiffs' claims for damages. *Portz v. St. Cloud State Univ. ("Portz I")*, 297 F. Supp. 3d 929, 957 (D. Minn. 2018); *Portz v. St. Cloud State Univ.*, No. CV 16-1115, 2018 WL 3579109, at *6 (D. Minn. July 25, 2018). The Court conducted a bench trial from November 26 through December 4, 2018, and the parties provided final written submissions on January 14, 2019. The issues for trial included (1) whether SCSU's past allocation of athletic participation opportunities and treatment and benefits was inequitable in violation of Title IX, and (2) whether SCSU's present allocation of athletic participation opportunities and treatment and benefits is inequitable in violation of Title IX. After carefully considering all testimony, exhibits, and arguments presented at trial, taking into account the credibility and accuracy of the evidence, and examining the applicable law, the Court will find that both SCSU's past and present allocation of athletic-participation opportunities and athletic treatment and benefits do not comply with Title IX.

# FINDINGS OF FACT[1]

1.      The Findings of Fact set forth herein are undisputed or have been proven by a preponderance of the evidence.

2.      To the extent the Court's Conclusions of Law include what may be considered Findings of Fact, they are incorporated herein by reference.

## I.      THE PARTIES

3.      SCSU is a university in the MNSCU system. Minn. Stat. § 136F.10 (2018). Dr. Robbyn Wacker is the President of SCSU. (Tr. Vol. V at 56, Dec. 27, 2018, Docket No. 361.) SCSU receives approximately $20 million in federal financial assistance each year. (Tr. Vol. I at 78-79, Dec. 27, 2018, Docket No. 357; Tr. Vol. V at 40; Pls.' Ex. 215F at 24; Pls.' Ex. 215G at 25; Pls.' Ex. 215H at 27.) Thus, it is subject to Title IX and its regulations. 20 U.S.C. § 1682, *et seq*.; 34 C.F.R. § 106.11.

4.      MNSCU's mission "is to provide programs of study that meet the needs of students for occupational, general, baccalaureate, and graduate education." Minn. Stat. § 136F.05 (2018). MNSCU has policies that prohibit discrimination based on gender, including in the context of athletics. (Pls.' Ex. 47.)

5.      Alexie Portz, Jill Kedrowski, Abigail Kantor, Marilia Roque Diversi, Fernanda Quintino dos Santos, Maria Hauer, Haley Bock, Kaitlyn Babich, Anna Lindell, and Kiersten Rohde are female student-athletes who attend or recently attended SCSU and

---

[1] During the seven-day bench trial, the parties presented evidence on myriad issues. The Court discusses only those facts relevant to determining the merits of Plaintiffs' claims.

are members or were recently members of SCSU's varsity intercollegiate women's tennis or women's Nordic skiing teams. Portz participated in SCSU's tennis team between 2014 and 2018 while she attended SCSU. (Tr. Vol. I at 44.) Hauer participated in SCSU's Nordic skiing team all four years she attended SCSU until 2017. (*See* Tr. Vol. II at 256-57, Dec. 27, 2018, Docket No. 358.)

6. Plaintiffs represent a class certified by this Court defined as "[a]ll present, prospective, and future female students at St. Cloud State University who are harmed by and want to end St. Cloud State University's sex discrimination in: (1) the allocation of athletic participation opportunities . . . and (3) the allocation of benefits provided to varsity athletes." *Portz I*, 297 F. Supp. 3d at 957.

## II. SCSU'S ATHLETIC PROGRAMS

7. SCSU's student enrollment reached its peak in fiscal year ("FY") 2011. (Tr. Vol. IV at 163, Dec. 27, 2018, Docket No. 360; *see also* Pls.' Ex. 200 at 1.) SCSU has experienced declining enrollment since then. (Tr. Vol. IV at 163; *see also* Pls.' Ex. 200 at 1.) SCSU went from a peak in student enrollment in FY 2011 of 12,050 students to a low in FY 2017 of 8,506 students. (Pls.' Ex. 200 at 1.)

8. SCSU athletic teams compete in one of two National Collegiate Athletics Association ("NCAA") divisions. (Tr. Vol. VI at 49, Dec. 27, 2018, Docket No. 362.) Two SCSU athletic teams—men's ice hockey and women's ice hockey—compete at the NCAA Division I level. (*Id.*) All other SCSU intercollegiate athletic teams compete at the NCAA Division II level. (*Id.*)

9. During the 2015-16 academic year SCSU sponsored twenty-three sports teams including twelve women's teams and eleven men's teams. (*See* Tr. Vol. V at 56, 67, 70-71.)

10. SCSU suffered a budget shortfall during the 2015-16 academic year so all departments were asked to come up with a cost-containment strategy. (*See id.* at 56; Tr. Vol. III at 78-79, Dec. 27, 2018, Docket No. 359.) Multiple strategies were proposed by the Athletic Department and reviewed. (Tr. Vol. V at 56-57.) Ultimately, a recommendation to eliminate certain athletic teams was adopted. (*See id.* at 58; Tr. Vol. I at 13.)

11. On March 2, 2016, SCSU announced its plan to eliminate six sports starting in the 2016-17 academic year. (*See* Tr. Vol. I at 12-13; Pls. Ex. 63.) Those sports included men's indoor track, men's outdoor track, men's cross-country, men's and women's tennis, and women's Nordic skiing.[2] (Tr. Vol. I at 13; Pls.' Ex. 63.) One reason given for the cuts was to bring SCSU into compliance with Title IX. (Pls.' Ex. 63.)

12. In the 2016-17 academic year, SCSU sponsored nineteen athletic teams including: men's baseball, men's and women's basketball, women's indoor and outdoor track and field, men's football, men's and women's golf, men's and women's ice hockey, women's Nordic skiing, women's soccer, women's softball, men's and women's

---

[2] Pursuant to a preliminary injunction issued by this Court, women's tennis and Nordic skiing were not eliminated.

swimming and diving, women's tennis, women's cross country, women's volleyball, and men's wrestling.  (Pls.' Ex. 200 at 1-4; *see also* Pls.' Ex. 206 at 2.)

13.     SCSU organizes its intercollegiate sports into three tiers offering three different levels of support for each tier.  (Tr. Vol. V at 25.)  Tier 1 includes men's hockey, women's hockey, men's basketball, women's basketball, men's football and women's volleyball.  (*Id.*)  Tier 2 includes baseball, softball, women's soccer, men's swimming and diving, women's swimming and diving, men's track and field, women's track and field, and wrestling.  (*Id.*)  Tier 3 includes men's cross country, women's cross country, Nordic skiing, men's golf, women's golf, men's tennis, and women's tennis.  (*Id.*)  Table 1 summarizes the number of male and female athletes participating in sports at each tier for certain academic years.

**Table 1.**

| Academic year Beginning | Male Tier 1 | Female Tier 1 | Male Tier 2 | Female Tier 2 | Male Tier 3 | Female Tier 3 |
|---|---|---|---|---|---|---|
| 2014 | 144 | 57 | 204 | 156 | 24 | 35 |
| 2015 | 140 | 57 | 205 | 158 | 21 | 30 |
| 2016 | 135 | 56 | 107 | 161 | 9 | 24 |
| 2017 | 134 | 60 | 107 | 139 | 8 | 29 |

(Pls.' Exs. 156, 157; Defs.' Exs. 44R, 45R.)

14.     Most SCSU varsity sports compete in the Northern Sun Intercollegiate Conference ("NSIC").  (Tr. Vol. IV at 23.)  Some varsity sports, such as swimming and ice hockey, also compete in other conferences.  (*Id.*)  SCSU made no efforts to get the NSIC to add new sports for women except for one instance when Morris Kurtz, then SCSU Athletic Director, advocated for women's soccer to be added.  (*Id.* at 23-24.)

15.     SCSU actively encouraged its students to participate in club sports and intramurals.  (Tr. Vol. IV at 25.)  Kurtz spearheaded the addition of women's ice hockey as an intercollegiate varsity sport at SCSU.  (*See id.* at 25-26.)  SCSU did not solicit the opinions of coaches, administrators, and athletes to determine if more sports should be added to meet the interests and abilities of students aside from when it added Nordic skiing, soccer, and women's ice hockey.  (*Id.* at 26-27.)  SCSU did not examine student participation in other sports to determine if they demonstrated skills or abilities fundamental to other sports that may be added.  (*Id.* at 27.)  SCSU did not hold tryouts or other direct observations of participation for sports in which there was an interest.  (*Id.* at 27-28.)

16.     SCSU recruits nationally and internationally for their hockey, football, basketball, and volleyball teams.  (Tr. Vol. IV at 26.)

17.     SCSU also offers the following club sports: men's lacrosse, women's lacrosse, men's rugby, women's rugby, rowing, men's hockey, women's equestrian, alpine skiing, karate, judo, cricket, men's volleyball, and ultimate frisbee.  (Pls.' Ex. 131.)

## III.    ROSTER MANAGEMENT

18.     After SCSU announced cuts to its athletic program in 2016, it also implemented a roster management plan designed to achieve Title IX compliance.  (Pls.' Ex. 58.)  The plan involved increases in the roster of several women's teams and decreases in the roster of several men's teams.  (*Id.*)

19.    The roster size for each SCSU athletic team was set by Athletic Director Heather Weems.  (Tr. Vol. I at 242.)  Table 2 summarizes the roster management plan for the 2018-19 academic year.

**Table 2.**

| Athletic Team | Men (# of student-athletes) | Women (# of student-athletes) |
|---|---|---|
| Baseball | ≤ 37 | |
| Softball | | ≥ 21 |
| Basketball | ≤ 15 | ≥ 18 |
| Football | ≤ 97 | |
| Golf | ≤ 9 | ≥ 10 |
| Tennis | | ≥ 9 |
| Volleyball | | ≥ 18 |
| Ice Hockey | ≤ 27 | ≥ 25 |
| Swimming/Diving | ≤ 27 | ≥ 42 |
| Wrestling | ≤ 40 | |
| Cross Country | | ≥ 12 |
| Indoor Track | | ≥ 31 |
| Outdoor Track | | ≥ 35 |
| Nordic skiing | | ≥ 8 |
| Soccer | | ≥ 28 |

(Pls.' Ex. 46 at 1-19.)

20.    Multiple SCSU athletic coaches testified to the challenges presented by the roster management plan.  Women's basketball coach, Lori Fish, testified that her ideal roster size was thirteen female student-athletes and a male practice squad.  (Tr. Vol. II at 24.)  Fish testified that thirteen is ideal because it allows her to be more effective as a coach. (*Id.* at 25.)  She is able to work with all of the players and watch what they are doing.  (*Id.*) With a larger team, Fish has to run more drills and manage those drills instead of paying

individual attention to the athletes.  (*See id.*)  A larger rosters also means that more players are standing around during drills, and players do not get as many repetitions at the drill. (*Id.* at 26.)  Fish typically plays eight players each game.  (*Id.*)  Fish testified that it is not realistic that she would ever play eighteen people, as required under the roster management plan, so not everyone on the roster will get playing time.  (*Id.* at 58.)

21.     SCSU men's baseball coach Patrick Dolan testified that playing more nonconference games increases a team's chances of moving on to post-season competition. (Tr. Vol. II at 100.)  It also allows for team bonding and allows him to identify players' strengths and weaknesses.  (*Id.* at 101.)  However, due to roster management, Dolan has chosen not to have the team play in nonconference games before their normal season start date.  (*Id.* at 102.)  For the purposes of roster management, students are counted as participating in a sport if they are on the team roster on the date of the team's first competition.  (Tr. Vol. I at 231.)  Thus, Dolan has foregone the nonconference games to delay the date of his team's first competition.  (*See* Tr. Vol. II at 102.)  The delay gives him more time to pare down his roster to the maximum of thirty-seven.  (*See id.*)

22.     Paula U'Ren, the women's softball coach, testified that her ideal roster size is sixteen to eighteen players.  (Tr. Vol. II at 160.)  A larger roster means that U'Ren is more spread out at practice because she is the only coach.  (*Id.* at 161.)  U'Ren also meets with the players off the field to better understand her players; however, with more players she is spread thin.  (*Id.*)  One of recruits' top five questions is whether they will get to play in games, but the large roster means that not every team member gets to play.  (*Id.* at 162-63.)  Players have left the team due to lack of playing time.  (*Id.* at 163.)  When the softball

team ended up with fewer athletes on the roster than the minimum, Holly Schreiner directed Coach U'Ren to try more players out and then cut them later on. (*Id.* at 164.)

23. Schreiner told Coach Steven Costanzo that he could add players to the men's wrestling team in the second semester after she filed her annual compliance reports and those new players would not count against Costanzo's roster cap. (Tr. Vol. II at 206.) Schreiner then approved the addition of new members to the wrestling team for the second semester. (*Id.* at 206-07.) Schreiner also told Costanzo that he could bring on "a couple" of athletes for the second semester, but "a handful" could be an issue. (Tr. Vol. II at 210.)

## IV.   ATHLETIC PARTICIATION OPPORTUNITIES

24. When performing its participant counts, SCSU counts each athlete on the roster of an athletic team as one "participation opportunity" if that athlete is on the team roster as of the first date of competition. (Tr. Vol. I at 229-31, 244.) Any athlete added after the first date of competition does not count as a participation opportunity. (*Id.* at 230.) Likewise, any athlete on the roster as of the first date of competition that quits after the first date of competition will continue to count as an participation opportunity. (*Id.* at 230-31.) This method of counting is consistent with the Equity in Athletics Disclosure Act counting guidelines. (Tr. Vol. II at 244-45.) The Office of Civil Rights ("OCR"), however, counts participation opportunities differently. (*Id.* at 245.) For OCR purposes, a participation opportunity is triggered if a student-athlete is on the roster as of the first date of the competition or if the student-athlete is added to the roster at any time during the

competitive season.  (*Id.*)  OCR also counts students receiving athletic aid as participation opportunities.  (*Id.* at 245-46.)

25.    Between 2004 and 2016, SCSU would have needed between 117 and 179 more athletic participation opportunities for women to achieve exact proportionality.  (*See* Pls.' Exs. 101, 200, 206.)  Table 3 summarizes SCSU's historical participation numbers.

**Table 3.**

| Academic Year Beginning | Total Undergraduate Enrollment | | Athletic Participation | | | | Exact Proportional Female Number | Female Participation Gap |
| | % Male | % Female | Male | Female | % Male | % Female | | |
|---|---|---|---|---|---|---|---|---|
| 2003 | 45.7 | 54.3 | 314 | 217 | 59.1 | 40.9 | 373 | 156 |
| 2004 | 46.0 | 54.0 | 315 | 208 | 60.2 | 39.8 | 369 | 161 |
| 2005 | 46.2 | 53.8 | 344 | 229 | 60.0 | 40.0 | 401 | 172 |
| 2006 | 47.1 | 52.9 | 328 | 196 | 62.6 | 37.4 | 368 | 172 |
| 2007 | 47.8 | 52.2 | 334 | 201 | 62.4 | 37.6 | 365 | 164 |
| 2008 | 49.4 | 50.6 | 418 | 250 | 62.6 | 37.4 | 429 | 179 |
| 2009 | 49.7 | 50.3 | 340 | 215 | 61.3 | 38.7 | 343 | 128 |
| 2010 | 50.3 | 49.7 | 339 | 219 | 60.8 | 39.3 | 336 | 117 |
| 2011 | 50.1 | 49.9 | 331 | 200 | 62.3 | 37.7 | 330 | 130 |
| 2012 | 51.3 | 48.7 | 369 | 228 | 61.8 | 38.2 | 351 | 123 |
| 2013 | 50.4 | 49.6 | 368 | 228 | 61.7 | 38.3 | 362 | 134 |
| 2014 | 50.0 | 50.0 | 372 | 248 | 60.0 | 40.0 | 372 | 124 |

(Pls.' Ex. 101.)[3]

26.    Table 4 contains SCSU's reported  participation and enrollment numbers for the 2016-17 and 2017-18 academic years.

--------

[3] The parties do not dispute the validity of the calculation of these numbers.

**Table 4.**

| Year | Female Athletes | Male Athletes | Female Students | Male Students |
|------|-----------------|---------------|-----------------|---------------|
| 2016-17 | 241 | 252 | 4,371 | 4,135 |
| 2017-18 | 228 | 249 | 4,092 | 3,973 |

(*See* Defs.' Exs. 38 at 3, 7; 44R; 45R; Tr. Vol. I at 241-42.)

27.     Based on these numbers, women made up 51.4% and 50.7% of the student population in the 2016-17 and 2017-18 academic years respectively. They, however, only made up 48.9% and 47.8% of athletic opportunities offered by SCSU. SCSU would have to add 26 and 28 athletic opportunities for women to achieve exact proportionality.

28.     The disproportionality is even starker when the athletic opportunities provided to women's tennis and Nordic skiing are excluded. SCSU would have to add 41 and 42 more athletic opportunities for women to achieve proportionality. (*See* Defs.' Exs. 38 at 3, 7; 44R; 45R; Tr. Vol. I at 241-42.)

29.    Table 5 summarizes the Court's calculations in paragraphs 21 and 22.

**Table 5.**

| Year | % Female Students | % Male Students | Proportionality | Proportionality without Tennis and Nordic Skiing |
|------|-------------------|-----------------|-----------------|--------------------------------------------------|
| 2016-17 | $\dfrac{4371}{4371 + 4135}$ $= 51.4\%$ | $\dfrac{4135}{4371 + 4135}$ $= 48.6\%$ | $\left(\dfrac{252}{0.486}\right) - 252$ $- 241 = 26$[4] | 26 + 15 = 41 |
| 2017-18 | $\dfrac{4092}{4092 + 3973}$ $= 50.7\%$ | $\dfrac{3973}{4092 + 3973}$ $= 49.3\%$ | $\left(\dfrac{249}{0.493}\right) - 249$ $- 228 = 28$ | 28 + 14 = 42 |

30.    In 2016-17, SCSU sponsored twelve women's sports: basketball, golf, ice hockey, Nordic skiing, soccer, softball, swimming and diving, tennis, indoor track and field, outdoor track and field, cross country, and volleyball.  (Defs.' Ex. 38 at 7.)  Of these, only soccer (27), indoor track and field (32), and outdoor track and field (28) had rosters greater than 26, and only swimming and diving (45) had a roster greater than 41.  (*Id.*)

31.    In 2017-18, SCSU sponsored the same twelve women's sports.  (*See* Defs.' Exs. 44R at 16-26; 45R.)  Only soccer (28), swimming and diving (38), and outdoor track and field (29) had 28 or more athletes on their rosters.  (Defs.' Exs. 44R at 16-26; 45R.) None had more than 42 athletes on their rosters.  (Defs.' Exs. 44R at 16-26; 45R.)

## V.    STUDENT ABILITY AND INTEREST

32.    SCSU has added various women's teams as intercollegiate sports since the passage of Title IX in 1972.  It added track and field in 1973-74, golf and cross country in 1975-76,  soccer in 1994-95, Nordic skiing in 1997-98, and ice hockey in 1998-99.  (Pls.' Ex. 131.)

33.    SCSU has conducted only two surveys of student athletic abilities and interests in participating in a sport since the passage of Title IX.  (*See* Tr. Vol. IV at 16.)  SCSU conducted its first survey (the "1997 Survey") during the 1997-98 academic year.  (Tr. Vol. IV at 11.)  Nordic skiing was added to SCSU's sports portfolio as a result of the 1997 Survey.  (*Id.*)

34.    During the 2015-16 academic year, SCSU conducted another athletic abilities and interests survey (the "2015 Survey").  (*Id.*; Pls.' Ex. 48.)  Overall, 1,912 students responded to the survey.  (Pls.' Ex. 48 at 4.)  Roughly sixty percent (1,164) of respondents were women.  (*Id.*)  Seventy-five percent of respondents (1,434) indicated that they were interested in participating in intramural program, club sport, or varsity athletics.  (*Id.* at 5.)  Twenty-four female students indicated they were interested in Nordic skiing, and 111 were interested in women's tennis.  (*Id.* at 7.)  The survey also showed a variety of interest in other sports by female students such as beach volleyball (167), bowling (93), lacrosse (51), rifle (36), badminton (21), cheer (27), and dance (43).  (*Id.* at 6-9.)  SCSU did not implement any changes based on the results of the 2015 Survey because it decided to comply with Title IX in another way.  (Tr. Vol. III at 179-80.)

35.    Heather Weems is currently the Athletic Director for SCSU.  (Tr. Vol. III at 72.)  She has held the position since 2012.  (*Id.*)  During her tenure, Weems has not received any formal requests to add any new women's sports teams.  (Tr. Vol. III at 161-62.)  Weems did not have any knowledge that there was any unmet interest and abilities of female students.  (*Id.* at 163.)  Weems was, however, aware of growing interest in women's lacrosse in the region.  (*Id.* at 164.)  Additionally, one of the named plaintiffs, Jill Kedrowski, played lacrosse in high school, in addition to basketball and tennis.  (Tr. Vol. IV at 152.)  Kedrowski was a talented player and was recruited to play all three sports at various colleges and universities.  (*Id.* at 153.)  Kedrowski won many awards for lacrosse including being third in the state in scoring as a junior.  (*Id.*)  She also served as the team captain in high school.  (*Id.*)

36.    In the late 1990s, there were informal requests to add women's bowling, rugby, and rowing.  (Tr. Vol. IV at 12-13.)  The requests were denied due to lack of financial resources.  (*Id.* at 13.)  There were also requests to elevate women's bowling, rowing, and rugby from club to varsity status.  (*Id.*)  In 1998 and 2003 two SCSU faculty members met with Kurtz to discuss the possibility of adding women's bowling.  (*Id.* at 14.)  None of these requests resulted in the addition or elevation of any sports.  (*Id.*)  SCSU does not have any policies or processes for elevating club sports and responding to expressions of student interest and varsity opportunities.  (*Id.* at 21-22.)  Relatedly, SCSU does not have any policies or procedures for receiving or responding to requests to add teams.  (*Id.* at 28.)

37.    SCSU did not conduct formal interviews with students, admitted students, coaches, administrators, or others regarding interest in a particular sport from 1984 to the

present.  (*Id.* at 15-16.)  Nor did SCSU research high school, community, or amateur participation in sports.  (*Id.* at 19-20.)

38.     During the 1980-81 academic year, SCSU eliminated the men's and women's gymnastics teams for financial reasons.  (*Id.* at 8-9.)  Specifically, the equipment was too expensive and insurance costs were too high.  (*Id.*)

## VI.     LEVELS OF COMPETITION

39.     SCSU's game schedules are set by the relevant conference.  (Tr. Vol. V at 81.)  But the Nordic skiing conference does not necessarily have a conference schedule, so meets are scheduled by the coaches.  (*Id.* at 81-82.)

40.     All of SCSU's sports teams play NCAA regulated schedules.  (*Id.*at 82.)  The NCAA sets a minimum and maximum number of games teams are required or allowed to play.  (*Id.*)  All SCSU teams compete at the NCAA championship level.  (*Id.*)  All SCSU teams are automatic qualifier sports—they automatically qualify for post season play if they have a successful season and win their championship.  (*Id.*)

41.     The NCAA sets some limits on how practices operate and how long a season is.  (*Id*. V at 88.)  Coaches then run practices and seasons within those parameters.  (*Id.*)

## VII.     TREATMENT AND BENEFITS

### A.  Tennis

42.     The women's tennis team did not have sufficient funding for an entire season but made do as best they could.  (Tr. Vol. I at 21-22.)  During travel, four players shared a

room, and the players were told not to order drinks during meals so that the team could save money. (*Id.* at 21-22, 61.) The team generally travelled only within the region with the exception of a spring break trip to Florida. (*Id.* at 61.) To attend spring break trips, players had to contribute $300 to $500 of their personal funds to cover the trip. (*Id.* at 40.)

43.     The women's tennis team had access to post-season competition. (*Id.* at 36.)

44.     The women's tennis team practiced and played their matches at Stay Fit, a private facility with five indoor tennis courts. (*Id.* at 42, 67.) The men's team, when it existed, did the same. (*Id.* at 67.) Players drove to Stay Fit for practice and games. (*Id.* at 56.) Often, the players carpooled to get to the facility. (*Id.*)

45.     Neither Stay Fit nor SCSU's campus had a locker room designated for the sole use of the SCSU women's tennis team. (*Id.* at 43, 59.) The men's tennis team, when it existed, also did not have a designated locker room. (*Id.* at 67.)

46.     The tennis team did not have a trainer present at practices; however, they were allowed to use the trainer services available in the hockey center. (*Id.* at 57.)

47.     SCSU provided a skirt, shorts, a tank top, and a t-shirt to players as uniforms. (*Id.* at 60.)

48.     A female tennis player complained once that tennis is excluded from flyers promoting upcoming games of SCSU sports. (Pls.' Ex. 89 at 3.) The player complained that both men's and women's tennis matches had been excluded from that flyer. (*Id.*)

**B. Basketball**

49.     The women's basketball team had one head coach, Lori Fish, one full-time assistant, and one adjunct assistant.  (Tr. Vol. II at 23.)  The men's basketball team had one head coach, one full-time assistant, and a graduate assistant.  (Tr. Vol. V at 101-02.)

50.     Because of SCSU's roster management plan, Fish was asked to carry an increased number of players on the team—at least eighteen—despite a cut to the team's budget.  (Tr. Vol. II at 29.)  At the same time, the men's basketball team was mandated to have no more than twelve students, however, their budget had not been cut.  (*Id.*)

51.     The women's basketball team practices between 2:00 p.m. and 4:00 p.m., which is problematic because some players are still in class during this period.  (*Id.* at 30-31.)

52.     Women's basketball games are played at 5:30 p.m., making it difficult for fans to attend the game.  (*Id.* at 32-33.)  The men play at 7:30 p.m., reducing the barriers to fan attendance at games.  (*Id.*)

53.     The women's basketball team budget does not allow for out-of-region travel for games.  (*Id.* at 34.)  The team was able to travel to Washington for a game in 2018; however, the trip was financed through fundraising.  (*Id.* at 34-36.)  The men's basketball team is able to travel about every two years to places like Las Vegas or California.  (*Id.* at 35.)  During overnight travel, the women's basketball team sometimes rooms three or even four players to a room, while the men's team rooms two players to a room.  (*Id.* at 39.)

54.     The women's basketball team cannot meet in the locker room because it is too small.  (*Id.* at 43.)  Instead, they meet in a classroom.  (*Id.* at 48-49.)  The women's

locker room has standard metal lockers lining the walls and red folding chairs in the center of the room. (Defs.' Ex. 64 at 129-30; Pls.' Ex. 173 at 168.) The men's locker room has quality lockers made of wood that appear to be larger than the women's lockers. (Defs.' Ex. 64 at 134-36; Pls.' Ex. 173 at 57.) The men's locker room also has red folding chairs stacked to the side, two large murals covering portions of two walls, two black couches, and wood paneling along one wall with a white board mounted in the center. (Defs.' Ex. 64 at 132-37.) The women's locker room is located further from services, such as the weight room and training room, than the men's locker room. (Tr. Vol. II at 52; Pls.' Ex. 225A at 2.)

55. During home games, the women's team uses the public bathrooms located near the gymnasium because the bathrooms in the locker room are on another floor and too far away. (Tr. Vol. II at 49-50.) The players and coaches wait in line with spectators to use the bathroom. (*Id.*) The men's team does not have to share a bathroom with the public during home games. (*Id.* at 51.) Nor do visiting women's teams. (*Id.* at 50.)

56. The women's team uses one set of travel gear for multiple years and will only order new ones if there is enough money in their budget for it. (Tr. Vol. II at 53-54.) One set is over six years old. (*Id.* at 54.) The players are required to return the gear after each season for use by the team again the following year. (*Id.*) The men's team orders new gear each year and the players keep the gear at the end of the season. (*Id.*)

57. Roster management has diminished the quality of athletic participation opportunities provided to the women's basketball players. Coach Fish is unsure whether SCSU is providing all players on the women's team a meaningful experience because of a

high roster number requirement.  (*Id.* at 58.)  Fish tells players that it is not realistic that eighteen people will get to play, despite eighteen being her minimum roster size requirement.  (*Id.*)  Fish finds it difficult to keep players focused and engaged when they are the bottom five players and those players know that they are probably not going to get a chance to play.  (*Id.*)  Fish also has to spread herself out more off the court to deal with player issues not related to athletics.  (*Id.* at 58-59.)

## C.  Baseball and Softball

58.     The SCSU men's baseball team does not play games on campus; they play at a municipal athletic complex in St. Cloud, Joe Faber Field ("Faber").  (Tr. Vol. II at 75.) Faber has quality features such as a press box, bleachers, concession stand, and scoreboard in addition to the playing field.  (*Id.* at 76-77; Pls.' Ex. 173 at 6-16.)  Faber is about six miles from campus.  (Tr. Vol. V at 122.)  The men's team also sometimes plays at Dick Putz Field ("Putz").  (Tr. Vol. II at 80.)  Putz has an ivy-covered fence, scoreboard, and bleachers and is similar in quality to Faber.  (*Id.*; Pls.' Ex. 173 at 17-20.)  The city of St. Cloud maintains both fields and the baseball team staff do no maintenance of the fields. (Tr. Vol. II at 82-83.)  Baseball coach Patrick Dolan shows these fields to baseball recruits because they are nice facilities and help in recruiting.  (*Id.* at 83.)  Other local teams also use Faber and Putz including three high schools and a technical college.  (*Id.* at 125.)  When there is inclement weather, the men's team is unable to play on Faber and Putz and has to find a nearby field, sometimes an artificial turf field on which to play.  (*Id.* at 126.)  On some occasions the team has traveled to South Dakota or Iowa to play "home" games.  (*Id.*)

The team occasionally uses a high school field, a municipal field at Clear Lake, and a field at Whitney Park in St. Cloud.  (Tr. Vol. V at 122.)

59.    The men's team practices at Faber or Sauk Rapids High School.  (Tr. Vol. II at 124-25.)  In the spring, the men's team has to share both fields with high school teams. (*Id.* at 25.)  When using the Sauk Rapids field, the team has to work around the high school team's practice schedule.  (*Id.*)  The men's team also practices in Husky Dome, a facility built for football and softball with a bubble roof during the winter months.  (*Id.* at 172; Tr. Vol. V at 119.)  Husky Dome is shared with several other varsity teams, and club and intramural teams.  (Tr. Vol. II at 173.)  However, the baseball team is unable to "live hit" because the ceiling is too low.  (Tr. Vol. V at 119.)

60.    The women's team plays their games and holds practices at Selke Field ("Selke") and has exclusive use of Selke.  (Tr. Vol. II at 137, 140; Tr. Vol. V at 120.)  Selke has a small set of bleachers, an old and crumbling brick fence supplemented with a chain link fence, and a scoreboard.  (Tr. Vol. II at 138-39.)  The team had to fund raise for the scoreboard, which is functional but limited and has an incomplete branding logo.  (*Id.* at 139.)  Generally, the women's team coaches and SCSU maintenance maintain Selke.  (*Id.* at 140.)  They mow the grass, drag the field, put down a drying solution on rainy days, chalk lines, wipe off benches in dugouts, pick up garbage, rake the field, and water the field.  (*Id.* at 141-42, 152.)  Coach U'Ren generally reports to the field two hours before practice to prepare the field.  (*Id.* at 141.)  When the field's sprinklers are not turned on, the team has to find other ways of watering the field, including transporting water from the training room.  (*Id.* 142.)  Coach U'Ren was told to use a fire hose to water the field and

did so once.  (*Id.* at 142-43.)  The whole team was needed to hold the hose in order to spray the field.  (*Id.* at 143.)  Coach U'Ren found the situation embarrassing for the team and has not used the fire hose again.  (*Id.* at 142-43.)  Maintenance of Selke during the summer months is limited, so Coach U'Ren weeds the infield prior to bringing recruits to the it. (*Id.* at 144.)  Selke has a small press box that also doubles as storage when games are not being played.  (*Id.* at 144-45.)  Selke's infield is "pebbly," which creates danger for players when they are running and sliding into base.  (*Id.* at 148-49.)  The players' cleats get stuck in the surface.  (*Id.* at 149.)  The field is also not level and has grooves and holes in places. (*Id.* at 149.)  Furthermore, Selke has a noticeable lip rather than a smooth transition between the infield and the outfield; the field needs to be re-set or re-grooved.  (Tr. Vol. VI at 82.) Selke has a small storage shelter next to the third base dugout.  (Tr. Vol. II at 152.)  This storage shelter has water damage and mold.  (*Id.* 152-53.)  No drinking water is available at Selke.  (*Id.* at 154.)  During the fall, players bring water and ice to the field; during the spring, a trainer brings the water to the field.  (*Id.* at 154.)  There is one portable bathroom for use by anyone at Selke, including players and spectators.  (*Id.* at 155.)  There is no place for the players to change.  (*Id.*)  Lack of proper maintenance has deteriorated several features of the field—some that the players need for safety such as the pitching rubber not being squared up to the plate.  (*Id.* at 166-170.)  U'Ren does not bring recruits to Selke field unless they specifically ask because she feels that the facility does not "sell" the program.  (*Id.* at 155-56.)  Indeed, many high school facilities have a "greater wow factor." (*Id.* at 156.)  After football season, the softball team plays in Husky Dome.  (*Id.* 172.)

61. The men's team games are publicized by SCSU. (Tr. Vol. II at 78.) This helps with recruiting for the team. (*Id.*)

62. The men's locker room has an adequate number of lockers, and most years each player has an individual locker. (Tr. Vol. II at 81.) There are two couches in the locker room along with a sound system. (*Id.* at 82; Pls.' Ex. 173 at 36-37, 39-40.) The women's locker room has twenty lockers, so when they have the mandated minimum roster, some players must share. (Tr. Vol. II at 134-35, 188.) The women's team stores their equipment in their locker room where the equipment takes up a substantial amount of space. (Pls.' Ex. 173 at 147, 149; Tr. Vol. II at 136.) The women's team fundraised to purchase a large wall poster for the locker room. (Tr. Vol. II at 136-37.)

63. The men's team has one head coach, one graduate assistant, one stipend assistant, and usually one or two volunteer assistant coaches. (Tr. Vol. II at 87.) The volunteer coaches are typically community members, or former players that have used up their years of eligibility. (*Id.*) The women's team has one head coach, one graduate assistant, one adjunct coach, and a volunteer pitching coach. (Tr. Vol. II at 182.) SCSU provides a game manager for the women's team when they have games. (*Id.* at 184.)

64. Players on the men's team are provided two pairs of pants and four sets of jerseys. (Tr. Vol. II at 89.) Every year six to eight replacement pants are bought, and every four to five years new sets of jerseys are bought. (*Id.*) The jerseys are typically donated to the team from a local sporting equipment provider. (*Id.*)

65. The men's team typically travels to Missouri, Arkansas, and Arizona to play pre-season games because the fields in Minnesota are generally unplayable early in the

season due to weather. (Tr. Vol. II at 99-100.) Playing pre-season games helps with recruiting, regional and NCAA rankings, and with post-season play because it raises the profile of the team. (*Id.* at 100-01.) The men's team travels by chartered bus. (*Id.* at 97.) Four players are assigned to a room when they stay overnight for games. (*Id.*) The men's team travels to locations such as Missouri, Arkansas, and Arizona annually, and every three to four years they travel to Texas to play in Minutemaid Stadium, where the Major League Baseball team the Houston Astros plays. (*Id.* at 97-98.) The men's team buses to Missouri and Arkansas, and they fly to Arizona and Texas. (*Id.* at 98.) The men's team stays over a weekend in Missouri and Arkansas, and seven to nine days in Arizona. (*Id.* at 99.) The men's team gets some of their travel meals donated by parents of players who will purchase the meal for the team. (*Id.* at 91-92.)

66. In the past, the men's team has played a fall season with outside competition to develop players, and evaluate the new players. (*Id.* at 101.) In the last two years, however, the men's team has not played a fall season against outside competition because of the need to decrease the roster size prior to the date of first competition. (*Id.* at 101-02.)

67. The women's team formerly traveled to Las Vegas to play five games, but the trip was canceled because of budget concerns. (*Id*. a 172.) The team now travels once a year to Florida. (*Id*. at 173.) The team has to fundraise money to travel, otherwise Coach U'Ren is personally responsible for the cost of the trip. (*Id*. at 174-75.)

## D. Wrestling

68.    The men's wrestling locker room is a small room with lockers lining the two walls and two rows of benches.  (Pls.' Ex. 173 at 28.)  The locker room has a small white board and countdown clock.  (*Id.* at 29.)

69.    Wrestling practices in a room adjacent to the Halenbeck Hall Fieldhouse. (Tr. Vol. V at 115.)  The wrestling team has exclusive use of the practice room.  (*Id.* at 152.)  The floor mats for the practice room were recently replaced due to safety concerns at a cost of $28,000.  (*Id.* at 115-16, 152.)  The team fundraised to purchase the new floor mats.  (*Id.* at 171.)  SCSU also replaced wall mats due to safety concerns after the fire department noted that they were not up to code, costing roughly $20,000.  (*Id.* at 116, 152.) Custodians prepare the wrestling room for practice by spraying disinfectant once a day. (*Id.* at 116.)  Coaches and student-athletes are also responsible for disinfecting the wrestling room during and after practice.  (*Id.*)

## E. Nordic Skiing

70.    The women's Nordic ski team had one adjunct coach, Dave Johnson, who served as the only coach during the 2016-17 and 2017-18 academic years.  (Tr. Vol. II at 221-22.)  Johnson's duties included preparing the athletes for competition, driving them to the meets, managing the waxing and ski preparation, preparing the athletes, arranging lodging, and recruiting.  (*Id.* at 223.)  Managing waxing and ski prep frequently kept Johnson from being able to scout or ski the course to help his athletes prepare for a meet. (*Id.* at 225-26.)  Johnson left the coaching job after the 2017-18 academic year because

insufficient support from SCSU made him feel that he was not doing the kind of job that was needed or appropriate for the team.  (*Id.* at 229.)  Prior to Johnson, Jeremy Frost served as head coach of the Nordic skiing team.  (Tr. Vol. III at 12-13.)  Frost never had any additional coaching support in terms of adjunct or full-time coaching staff.  (*Id.* at 50.)  Frost would have been able to have a larger roster had there been more financial and institutional support from SCSU.  (*Id.* at 48-50.)  After Johnson left, the head coach position was filled by an SCSU school advisor who did not have any Nordic ski coaching experience and another with more technical skill.  (Tr. Vol. III at 65-66; Tr. Vol. V at 76.)

71.    The team does not have a designated practice facility.  Instead, the team practiced at golf courses and a park across from SCSU.  (Tr. Vol. II at 224.)  In the past, the team practiced on Graystone ski trail.  (Tr. Vol. III at 53.)  Graystone, however, was not always available for the team because it was on land owned by a Minnesota correctional facility.  (*Id.*)  Portions of the trail were closed off and unusable several days a week because the correctional facility used a shooting range located on that land.  (*Id.* at 53-54.)  The trails were not maintained by SCSU.  (*See id.* at 54.)  Instead, volunteers from local Nordic ski clubs groomed the ski trails.  (*Id.*)  This posed problems because the frequency of grooming was inconsistent.  (*Id.* at 55.)

72.    Meets occurred in Duluth, MN; Houghton, MI; Anchorage, AK; Cable, WI; Rhinelander, WI; and Ishpeming, WI.  (Tr. Vol. II at 243-44.)  Johnson drove the team to some meets in an SCSU van.  (*Id.* at 260)  The van got stuck in snow multiple times and often slid when going around corners.  (*Id.* at 260; Tr. Vol. III at 20.)  Sometimes the athletes had to get out of the vehicle and push.  (Tr. Vol. III at 21.)  SCSU did not pay for

NCAA qualifier races when there was not enough money. (Tr. Vol. II at 267.) Kaitlyn Babich, one of the players, personally paid to go to Alaska one year to race in a qualifier. (*Id.*) The team generally did not have enough funds to attend all the meets in their season, especially those that were further away. (Tr. Vol. III at 52-53.)

73. The Nordic ski team has a team room that is an old handball court. (Tr. Vol. II at 229-32; Pls.' Ex. 173 at 77.) The room has individual storage spaces for players to store their personal items. (Tr. Vol. II at 232; Pls.' Ex. 173 at 78.) The room contains training equipment and ski waxing equipment. (Tr. Vol. II at 231-33; Pls.' Ex. 173 at 77, 81.) The room has insufficient ventilation for waxing, so Johnson taped a filter onto a box fan to act as a makeshift filter to help filter out particulates from the waxing process. (Tr. Vol. II at 233-35; Pls.' Ex. 173 at 81.) SCSU provided a separate room for the ski team to use for waxing skis, but it was too difficult to use so the team did not use it. (Tr. Vol. II at 249.) At one point, an SCSU safety administrator recommended the purchase of a respirator for the team's use; however, Weems denied a request to purchase the respirator. (Tr. Vol. III at 39-40.) The team room also had a small window that allowed passersby to look into the room. (Tr. Vol. II at 261.) To get privacy for changing, players either changed in specific corners or in the hallway to avoid anyone looking in while they changed. (*Id.* at 261-62.) In 2016 the window was partially covered with stickers. (*Id.*; Pls.' Ex. 173 at 75.) The team room also had water damage on the wall and ceiling. (Tr. Vol. III at 35.)

74. The team room does not have any showers or toilet facilities. (Tr. Vol. II at 264-65.) To access those facilities, players have to go down a long hallway to the women's

locker room, or up three flights of stairs to find the closest bathroom. (*Id.* at 265.) The team was given space in a general women's locker room that they shared with other athletic teams including visiting teams. (Tr. Vol. III at 42-43.)

75.     The team's uniforms and practice gear were replaced roughly every eight years. (*Id.*at 52.)

76.     SCSU does not provide much publicity for the team. (*Id.*at 61.)

## F.  Ice Hockey

77.     SCSU spends approximately $50,000 more on equipment for men's ice hockey than for women's ice hockey. (Tr. Vol. V at 79.) The difference results from the need to purchase more hockey sticks for men than for women. (*Id.*) On average, a male hockey player goes through thirty-three sticks annually, while the average women's hockey player goes through nine sticks annually. (*Id.*)

78.     The men's and women's teams use the same competitive facility. (*Id.* at 123.)

79.     The men's and women's locker rooms are housed in the Hockey Center. (*Id.*at 106.) They are roughly equivalent in terms of space and amenities. (*Id.* at 106-07.) However, the men's team locker room has a sauna while the women's team locker room does not have one. (*Id.* at 107.) There is space for a sauna in the women's locker room and there has been discussion about finishing it, but the coaches have not yet done so because they do not believe the women players will use it. (*Id.*)

80. Men's hockey recruits nationally due to the larger national footprint of men's hockey. (*Id.* at 131-32.) Women's hockey, on the other hand, is more regional, so coaches are not recruiting as broadly. (*Id.*) SCSU, with USA Hockey, hosts a women's hockey camp during the summer so that SCSU women's hockey coaches have access to the best recruits without having to travel. (*Id.* at 132.) SCSU, with Minnesota Hockey, also hosts a hockey camp for boys. (*Id.* at 153-54.)

**G. Soccer**

81. The women's soccer team had 27 players during the 2018-19 season. (*Id.* at 148-49.)

82. The women's soccer team's locker room is housed in the Husky Dome where the football team's locker room is also housed. (*Id.* at 107.) The locker rooms are of similar quality, but the women's locker room has "extra space since the roster is smaller and there are fewer women using it. (*Id.*) The women's locker room has a lounge area with a couch and big screen television. (*Id.* at 107-08.) The women's locker room also has separate stalls for showering. (*Id.* at 108.) No other SCSU sports teams have individual showers. (*Id.*)

83. The women's soccer team plays games on Fridays and Sundays at 1:00 p.m. (*Id.* at 86.) This schedule was instituted for the 2018-19 academic year as a result of a vote by NSIC member institutions. (*Id.*) This new schedule allows for a longer recovery period after the Friday game—something research has shown is important in women's soccer. (*Id.*) One drawback of this new schedule is that it is more costly because teams pay for

more overnight stays to play a Friday-Sunday series as opposed to the old Saturday-Sunday series. (*Id.* at 87.) Friday games also suffer from attendance decline. (*Id.*)

84.     The women's soccer team practices in Husky Stadium at 6:30 a.m. or 7:00 a.m. (*Id.*at 117.) This practice time was requested by the coach. (*Id.*) Women's soccer shares its practice facility with football. (*Id.*)

## H. Football

85.     The football team had 92 players in the 2018-19 season. (*Id*. at 148.)

86.     The men's football team's locker room is also housed in Husky Dome. (*Id.* at 107.) The football locker room is more crowded than the soccer room because the football roster is much larger. (*Id.*) The football locker room has a community shower. (*Id.* at 108.)

87.     The men's football team plays games at 6:00 p.m. on Saturdays in September, and at 1:00 p.m. after September due to cold and shortened daylight hours. (*Id.* at 87-88.)

88.     The football team practices from 3:00 p.m. to 5:00 p.m. or 5:30 p.m. (*Id.* at 117.)

89.     The football team generally does not travel outside of the region. (*Id.* at 136.)

## I. Track and Field

90.     Outdoor track and field practices in the Halenbeck Hall Fieldhouse or South Junior High School. (*Id.* at 114.) The Fieldhouse is shared with volleyball and basketball. (*Id.* at 114-15.) Priority for practice times is based on which team has a championship

season at a given time.  (*Id.* at 115.)  Volleyball has priority in the fall, and basketball—both men's and women's—have priority in the spring.  (*Id.*)

## J.  Swimming and Diving

91.     Men's and women's swimming and diving generally has one head coach, one full time graduate assistant, and one diving coach.  (Tr. Vol. VI at 6.)  During the 2018-19 academic year, they also had two volunteer coaches.

92.     Both men's and women's teams use the same pools for practice and meets.  (*See* Tr. Vol. V at 123; Tr. Vol. VI at 13.)  The teams use a six-lane pool.  (Tr. Vol. VI at 6.)  The men's and women's teams practice and compete together.  (*Id.* at 11.)

93.     Four practice times are offered throughout the day: 6:00-8:00 a.m., 8:00-10:00 a.m., 2:00-4:00 p.m., and 4:00-6:00 p.m.  (*Id.* at 5-6.)  Practices are offered throughout the day so that each practice can be smaller and allow coaches more opportunity to work with the players.  (*Id.*)

94.     The men's and women's teams travel together for meets.  (*Id.* at 12.)  The team travels on a bus and two vans.  (*Id.*)

95.     The men's and women's teams lift separately because separate lifting has helped the women increase their strength dramatically.  (*Id.* at 12.)

## K. Golf

96.     Both men's and women's teams use the same courses for practice.  (*See* Tr. Vol. V at 123.)

**L. Program-Wide**

97.    Women's varsity athletes in track and field, swimming and diving, softball, basketball, and volleyball have a separate locker room space from the general women's locker room.  (Tr. Vol. V at 108.)  The space has a lounge with a big-screen television, couch, chair, and dining area.  (*Id.*)  Some men's varsity athletes share a locker room with the general male student population.  (*Id.*)  Others, such as hockey and football, have separate locker rooms for their exclusive use.

98.    SCSU provides medical services to its varsity athletes in two training rooms.  (*Id.* at 127.)  One training room, primarily for NCAA Division II programs, is housed in Halenbeck Hall and the other training room is in the Hockey Center.  (*Id.*)  Services provided by trainers are prioritized by collision, contact, and noncontact sport determinations of safety and risk.  (*Id.*)  The trainers in Halenbeck Hall are housed within the men's locker room.  (Tr. Vol. II at 52.)

99.    SCSU provides a strength training and conditioning facility for use by varsity athletes.  (Tr. Vol. V at 128.)  This facility is housed in Halenbeck Hall.  (*Id.*)  SCSU provides another strength training and conditioning facility in the Hockey Center.  (*Id.*)  While it is available to all varsity athletes, it is used primarily by the hockey teams.  (*Id.*)

100.    SCSU provides media services to all nineteen of its sports teams.  (*Id.* at 129.)  SCSU has a marketing director who coordinates the media for the sports programs.  (*Id.*)  The director is supported by a staff that promotes all sports teams.  (*Id.*)  The ice hockey teams have more media coverage than other varsity teams.  (Tr. Vol. VI at 89-90.)  Men's

hockey receives more television coverage than women's hockey due to market demands. (*Id.*)

101.    SCSU has generally equal coach to athlete ratios for men and women. (*Id.* at 56.) Further, SCSU's coaching staff are generally of similar quality, in terms of their experiences and qualifications, for men and women. (*Id.*)

## CONCLUSIONS OF LAW

1.    Plaintiffs allege that SCSU violated Title IX in the past (academic year 2015-16 and earlier). Plaintiffs also allege that SCSU is violating Title IX in the present (academic year 2016-17 to the present).

2.    Plaintiffs seek two types of relief: (1) declaratory relief that SCSU did not comply with Title IX in the past, and (2) injunctive relief to bring SCSU into compliance with Title IX going forward.

## I.    TITLE IX COMPLIANCE

3.    Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). SCSU is an educational institution that receives federal assistance and is subject to Title IX.

4.    The Court will apply the policy interpretation and clarifications promulgated by the Department of Education ("DOE") and its predecessor, the Department of Health,

Education and Welfare ("HEW").  *See Chalenor v. Univ. of North Dakota*, 291 F.3d 1042, 1046-47 (8th Cir. 2002).

5.    Although Title IX does not explicitly mention athletic programs, HEW and the DOE have interpreted Title IX to extend to "interscholastic, intercollegiate, club or intramural athletics."  34 C.F.R. § 106.41(c).  SCSU's varsity sports program is one such program and is subject to the anti-discrimination provisions of Title IX.

6.    Title IX challenges generally come in the form of effective accommodation, equal treatment and benefits, or equal financial aid claims.  At issue here are effective accommodation and equal treatment and benefits.

7.    Title IX regulation § 106.41(c) provides a list of factors relevant to determining compliance with Title IX's anti-discrimination provisions.  The first factor focuses on effective accommodation: "[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." 34 C.F.R. § 106.41(c)(1).  This factor has been interpreted by HEW to require that institutions meet one of three tests and the "levels of competition" test.  1979 Policy Interpretation 44 Fed. Reg. 71,413, 71,417-18 (Dec. 11, 1979).

8.    The three tests are referred to as "Prong One," "Prong Two," and "Prong Three."  Prong One requires institutions to provide athletic participation opportunities "in numbers substantially proportionate to their respective enrollments."  *Id.* at 71,418.  Prong Two requires an institution to "show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities" of the sex that has been and is underrepresented among intercollegiate athletes.  *Id.*  Prong Three

requires an institution to "demonstrate[] that the interests and abilities of the members of [the underrepresented] sex" are "fully and effectively accommodated by the present program." *Id.*

9.    The levels of competition test can be met in one of two ways.  An institution must either (1)  provide "competitive schedules for men's and women's teams . . .[that] afford proportionally similar numbers of male and female athletes equivalently advanced competitive opportunities," or (2)   "demonstrate a history and continuing practice of upgrading the competitive opportunities available to the historically disadvantaged sex as warranted by developing abilities among the athletes of that sex." *Id.*

10.    The other nine factors under § 106.41(c) are commonly referred to as the "Laundry List" and focus on whether equal treatment and benefits are conferred to male and female athletes.  The Laundry List factors include:

> (2) The provision of equipment and supplies;
> (3) Scheduling of games and practice time;
> (4) Travel and per diem allowance;
> (5) Opportunity to receive coaching and academic tutoring;
> (6) Assignment and compensation of coaches and tutors;
> (7)  Provision of locker rooms, practice and competitive
>      facilities;
> (8) Provision of medical and training facilities and services;
> (9) Provision of housing and dining facilities and services;
> (10) Publicity.

34 C.F.R. § 106.41(c)(2)-(10).  Courts weigh these factors on a program-wide basis for all men's athletic teams against all women's athletic teams to determine if treatment and benefits are equitably conferred. *See* 1979 Policy Interpretation at 71,417.  "Institutions will be in compliance if the compared program components are equivalent, that is, equal

or equal in effect." *Id.* at 71,415. Benefits, opportunities, or treatments need not be identical "provided the overall effect of any differences is negligible." *Id.* Further, if treatment and benefits are not equal, an institution can still be in compliance if "the differences are the result of nondiscriminatory factors" such as "unique aspects of particular sports," or "legitimately sex-neutral factors related to special circumstances of a temporary nature." *Id.* at 71,415-16.

## A.    Prong One

11.    An analysis under Prong One requires that a court first determine "the number of participation opportunities afforded to male and female athletes in the intercollegiate athletic program."   OCR, U.S. DOE, *Clarification of Intercollegiate Athletics Policy Guidance: The Three–Part Test* (Jan. 15, 1996) ("1996 Clarification").[4]

12.    The 1979 Policy Interpretation defines participants as those athletes:

> a. Who are receiving the institutionally-sponsored support normally provided to athletes competing at the institution involved, e.g., coaching, equipment, medical and training room services, on a regular basis during a sport's season; and
> b. Who are participating in organized practice sessions and other team meetings and activities on a regular basis during a sport's season; and
> c. Who are listed on the eligibility or squad lists maintained for each sport, or
> d. Who, because of injury, cannot meet a, b, or c above but continue to receive financial aid on the basis of athletic ability.

---

[4] Available at https://www2.ed.gov/about/offices/list/ocr/docs/clarific.html#skipnav2 (last visited May 29, 2019).

44 Fed. Reg. at 71,415.

13.     Generally, "all athletes who are listed on a team's squad or eligibility list and are on the team as of the team's first competitive event are counted as participants." 1996 Clarification. Athletes will be counted as receiving one participation opportunity for each sport they participate in. *Id.* Athletes need not compete so long as they are receiving other benefits of participation. *Id.*

14.     After determining the number of participation opportunities afforded to each sex, a court will then determine whether the numbers are substantially proportional to the enrollment numbers of each sex. *See id.* OCR will consider substantial proportionality achieved where the number of additional participants necessary for exact proportionality "would not be sufficient to sustain a viable team." *Id.* A "viable team" is defined as "a team for which there is a sufficient number of interested and able students and enough available competition to sustain an intercollegiate team." *Id.*

**B. Prong Two**

15.     Under Prong Two, an institution must show that it has both a history and a continuing practice of program expansion that is demonstrably responsive to the developing interests and abilities of the underrepresented sex. *Id.*

16.     For a history of program expansion, the OCR has identified three factors to evaluate: (1) "an institution's record of adding intercollegiate teams, or upgrading teams to intercollegiate status, for the underrepresented sex;" (2) "an institution's record of increasing the numbers of participants in intercollegiate athletics who are members of the

underrepresented sex; and" (3) "an institution's affirmative responses to requests by students or others for addition or elevation of sports." *Id.*

17.     For a continuing practice of program expansion, the OCR has identified two factors to evaluate: (1) "an institution's current implementation of a nondiscriminatory policy or procedure for requesting the addition of sports (including the elevation of club or intramural teams) and the effective communication of the policy or procedure to students; and" (2) "an institution's current implementation of a plan of program expansion that is responsive to developing interests and abilities." *Id.*

18.     In conducting either of these analyses the court "will review the entire history of the athletic program, focusing on the participation opportunities provided for the underrepresented sex." *Id.*

## C. Prong Three

19.     Under Prong Three OCR considers "whether there is (a) unmet interest in a particular sport; (b) sufficient ability to sustain a team in the sport; and (c) a reasonable expectation of competition for the team." *Id.* Where all three conditions are met then the institution fails to comply with Prong Three. *Id.* "If an institution has recently eliminated a viable team from the intercollegiate program, OCR will find that there is sufficient interest, ability, and available competition to sustain an intercollegiate team in that sport unless an institution can provide strong evidence that interest, ability, or available competition no longer exists." *Id.*

20.    To determine if unmet need exists, the Court evaluates five indicators including: "whether an institution uses nondiscriminatory methods of assessment when determining the athletic interests and abilities of its students; whether a viable team for the underrepresented sex recently was eliminated; multiple indicators of interest; multiple indicators of ability; and frequency of conducting assessments." Letter from Russlynn Ali, Assistant Sec'y for Civil Rights, OCR, U.S. DOE, to Colleagues, at 4 (Apr. 20, 2010) ("2010 OCR Letter").[5]

21.    An institution may use nondiscriminatory methods of assessment of student interests and abilities of their choosing, as long as:

> a. The processes take into account the nationally increasing levels of women's interests and abilities;
> b. The methods of determining interest and ability do not disadvantage the members of an underrepresented sex;
> c. The methods of determining ability take into account team performance records; and
> d. The methods are responsive to the expressed interests of students capable of intercollegiate competition who are members of an underrepresented sex.

*Id.* at 5.  An institution should also document its assessments.  *Id.*

22.    Where an institution has recently eliminated a viable team for the underrepresented sex from its intercollegiate athletics program, the Court will find that sufficient interest, ability, and available competition to sustain an intercollegiate team in that sport.  2010 OCR Letter at 5.  This creates a presumption that the institution is not in

---

[5] Available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-20100420.pdf (last visited June 13, 2019).

compliance with Prong Three that the institution can rebut through strong evidence that interest, ability, or competition no longer exists.  *Id.*

23.    Indicators of student interest in a sport include, but are not limited to:

- requests by students and admitted students that a particular sport be added;
- requests for the elevation of an existing club sport to intercollegiate status;
- participation in club or intramural sports;
- interviews with students, admitted students, coaches, administrators and other regarding interests in particular sports;
- results of surveys or questionnaires of students and admitted students regarding interests in particular sports;
- participation in interscholastic sports by admitted students; and
- participation rates in sports in high schools amateur athletic associations, and community sports leagues that operate in areas from which the institution draws its students.

*Id.* at 6.

24.    Indicators of student ability to participate in a sport include, but are not limited to:

- the athletic experience and accomplishments—in interscholastic, club or intramural competition—of underrepresented students and admitted students interested in playing the sport;
- opinions of coaches, administrators, and athletes at the institution regarding whether interested students and admitted students have the potential to sustain an intercollegiate team; . . .
- if the team has previously competed at the club or intramural level, whether the competitive experience of the team indicates that it has the potential to sustain an intercollegiate team[;] . . .
- participation in other sports, intercollegiate, interscholastic or otherwise, that may demonstrate skills or abilities that

are fundamental to the particular sport being considered; and

- tryouts or other direct observations of participation in the particular sport in which there is interest.

*Id.* at 6-7.

25.     Assessments must be done frequently enough that institutions "can identify in a timely and responsive manner any developing interests and abilities of the underrepresented sex." *Id.* at 7.  In conducting this inquiry the Court will evaluate to what extent the institution's previous assessments captured the interests and abilities of its students and admitted students of the underrepresented sex; demographic or student population changes at the institution; and whether the underrepresented sex has complained of lack of athletic opportunities, or requested the addition of new teams.  *Id.*

26.     In evaluating whether a reasonable expectation of competition exists, the Court will look at available competitive opportunities offered by schools in the institution's geographic area whether or not the institution normally competes against those schools in other intercollegiate sports.  1996 Clarification; 2010 OCR Letter at 13.  The absence of a conference or league, for a sport, however, is insufficient to show that a reasonable expectation of competition does not exist.  Institutions "may also be required to actively encourage the development of intercollegiate competition for a sport for members of the underrepresented sex when overall athletic opportunities within its competitive region have been historically limited for members of that sex."  1996 Clarification.

## II.  SCSU'S PAST COMPLIANCE WITH TITLE IX

27.     Plaintiffs' class was defined in relevant part as "[a]ll present, prospective, and future female students at St. Cloud State University who are harmed by and want to end St. Cloud State University's sex discrimination in . . . the allocation of athletic participation opportunities," *Portz I*, 297 F. Supp. 3d at 935,  which includes female students who attended SCSU and did not participate in athletics that could have been denied an athletic participation opportunity.  The Plaintiffs have standing to challenge SCSU's Title IX compliance going back to at least the 2012-13 academic year because a senior during the 2015-16 academic year, when the case was filed, would have been a freshman during the 2012-13 academic year and could have been denied an athletic participation opportunity.  Furthermore, Jill Kedrowski, a named plaintiff, played three sports in high school prior to attending SCSU, tennis, basketball, and lacrosse.  When she chose to attend SCSU, she was only able to play tennis and basketball.  Kedrowski was recruited to play all three sports at various colleges and universities.  In attending SCSU Kedrowski lost the opportunity to play lacrosse because SCSU did not offer it despite there being interest in the sport, and ability on behalf of students.  The Court finds that Kedrowski was denied the opportunity to participate in lacrosse in the past.[6]  Moreover, class representatives attended SCSU prior to the 2015-16 academic year and were potentially harmed through unequal treatment and benefits conferred by SCSU.  Thus, the Court has

_____

[6] Additionally, the Court notes that it is extremely difficult for any plaintiff to show he or she was denied an opportunity that did not exist.  Thus, the Court finds sufficient evidence was presented to show that it was likely Kedrowski was denied a participation opportunity.

jurisdiction to determine whether SCSU complied with Title IX from 2012-13 going forward.

28.     The Court finds that SCSU failed to comply with Title IX prior to the 2016-17 academic year.  SCSU did not effectively accommodate female students under any of the three prongs of compliance.[7]

### A.     Prong One Compliance

29.     The participation opportunities that SCSU reports for male and female athletes show discrepancies between the rate of female enrollment and rate of female participation of at least one hundred participation opportunities during the years beginning in 2003 and ending in 2016.  This would have been sufficient to field several intercollegiate teams and is much greater than any then-existing women's team roster sizes.  As such, SCSU did not comply with Prong One.

### B.     Prong Two Compliance

30.     In evaluating SCSU's past compliance with Prongs Two and Three, the Court will evaluate SCSU's entire history with Title IX compliance as by the 1996 Clarification.

31.     SCSU has added six women's intercollegiate teams since the inception of Title IX.  SCSU added women's track and field in 1973, women's golf and women's cross country in 1975, women's soccer in 1994, women's Nordic skiing in 1997, and women's

---

[7] The Court will consider SCSU's past compliance related to treatment and benefits jointly with SCSU present compliance related to treatment and benefits in a later section.

ice hockey in 1998. For nearly two decades—1999 to the present—SCSU has not added any intercollegiate women's team to is sports program. It has also not elevated any women's intramural or club sport to intercollegiate level. Additionally, SCSU eliminated its women's varsity gymnastics team during the 1980-81 academic year. While this fact alone does not preclude SCSU from complying under Prong Two, it makes it exponentially harder. SCSU did not eliminate the women's gymnastics team due to lack of interest or ability on the part of its students. Instead, it eliminated the team due to lack of financial resources and did not expand opportunities for women again until 1994 when it added women's soccer.

32.    SCSU has not shown a history of increasing participation opportunities for women. Since 2003, women's participation opportunities have fluctuated between 196 and 250. Female participation was as low as 208, 196, 201, and 200 during the academic years beginning in 2004, 2006, 2007, and 2011 respectively. Female participation numbers also rose as high as 229, 250, 228, 228, and 248 during the academic years beginning in 2005, 2008, 2012, 2013, and 2014 respectively. No consistent pattern or record of increasing the numbers of participants for the underrepresented sex is discernable.

33.    In the late 1990s and early 2000s, SCSU received informal requests to add women's teams in bowling, rugby, and rowing. SCSU faculty also discussed the possibility of adding women's bowling at least twice. All requests were denied due to lack of financial resources, not due to lack of interest or ability.

34.    The Court finds that SCSU has failed to show a history of program expansion for the underrepresented sex. First, SCSU eliminated women's gymnastics even though

there was sufficient ability and interest from students.  This weighs heavily against a history of program expansion.  Second, women's participation opportunities have not consistently increased in more than a decade.  Although participation numbers fluctuate and may increase during specific years, this increase is neither sustained nor consistent.  Women's participation opportunities decrease as much as they increase.  Third, SCSU has denied requests to add or elevate women's teams in the past.  Although SCSU added women's teams two decades ago, SCSU had a continuing obligation to expand opportunities for women under Prong Two.  Although SCSU supported all sports within its conference, it was obligated to continue expanding its sports program until participation opportunities for men and women were substantially proportional to their enrollment numbers.  For these reasons, SCSU failed to comply with Prong Two.  Where compliance under Prong Two is impossible, SCSU should have moved to Prong One or Three Compliance. [8]

## C.    Prong Three Compliance

35.    Unmet need exists at SCSU.  First, SCSU failed to show that it had a method of assessment of athletic interests and abilities of its students, much less one that is nondiscriminatory.  In its history, SCSU has conducted two surveys of student interest in

---

[8] Because SCSU failed to show a history of program expansion for the underrepresented sex, the Court need not address whether SCSU has a continuing practice of program expansion. The Court notes, however, that SCSU also failed to show a continuing practice of program expansion.  SCSU has no formal policy or procedure for students to request addition or elevation of sports teams.  Because it does not have such a policy, no effective communication of the policy to students is even possible.  Moreover, SCSU does not have a plan to implement and is not currently implementing a plan of program expansion responsive to developing interests and abilities.  As noted above, SCSU has not added a women's team in nearly two decades.

athletics.  The most recent—the 2015 Survey—did not take into account any nationally increasing levels of women's interests and abilities.  It merely asked whether students were "interested in future participation, [were] currently participating in or [had] prior experience in" a list of sports.  (Pls.' Ex. 48 at 3.)

36.     Second, the results of the 2015 Survey show that there is student athletic interest.  For example, twenty-four female students expressed an interest in Nordic skiing, 111 female students were interested in tennis, and ninety-three female students were interested in bowling.  Although SCSU did not act on the results of the 2015 Survey because it decided to move to Prong One compliance, it is highly unlikely that similar interest did not exist prior to this survey.  SCSU's failure to conduct surveys more often cannot be used to show that no interest existed.  Doing so would incentive institutions to never find out if students had interest in adding sports teams.  Lastly, SCSU conducted just two surveys of student interest since the passage of Title IX.  This fact, coupled with SCSU's lack of policies and procedures to receive student requests to add teams, makes the absence of evidence of interest suspect.  SCSU also failed to document any assessments of student interest and ability beyond the 1997 and 2015 Surveys.  The evidence shows that SCSU has largely ignored its obligation to assess student interests and abilities, much less on a regular basis.

37.     Third, SCSU has received multiple requests to add women's teams to SCSU's intercollegiate sports program but has denied these requests.  The denials were not due to lack of interest or ability on the part of students, but due to lack of financial resources.  Indeed, the results of the 2015 Survey showed that students had myriad interests

and experience in many sports that SCSU did not currently offer. SCSU also carried several club teams that even more clearly showed student interest in those sports.

38.     Fourth, SCSU failed to show that students and admitted students lack sufficient ability to sustain a team. The 2015 Survey indicated that fifty-one students were interested in women's lacrosse, and SCSU currently has a club team. There is also ample evidence that students have interest in other sports, such as bowling, which was requested to be added on multiple occasions. On at least two occasions SCSU faculty discussed the possibility of adding a bowling team with the Athletic Director, showing that the faculty believed there was sufficient potential to sustain an intercollegiate team.

39.     SCSU has also failed to show that there is no reasonable expectation of competition for a team. The Court recognizes that proving a negative is difficult, but the bar is not high here. SCSU failed to show any evidence that it attempted to encourage the development of intercollegiate competition in its competitive region or that it even discussed the topic with its peer institutions. Although no evidence has been provided to show that overall athletic opportunities within SCSU's competitive region have been historically limited for the underrepresented sex, Weems testified that interest in women's lacrosse had been rising in SCSU's competitive region. Despite this rising interest, SCSU never attempted to investigate the possibility of adding lacrosse, nor did it encourage the conference or region to explore adding lacrosse as an intercollegiate sport. SCSU simply rested on the assumption that it was not reasonable to add women's lacrosse because it already supported all women's sports in its conference. SCSU was obligated to do more than make assumptions if it wished to comply with Title IX under Prong Three.

40.     The Court finds that SCSU failed to fully and effectively accommodate the interests and abilities of female students.  First, there was clear unmet need at SCSU.  SCSU received multiple requests to add women's teams.  Survey results showed great interest in athletic participation from female students.  SCSU was aware of the growing interest in women's lacrosse.  And SCSU failed to sufficiently assess students' interests and abilities.  Second, SCSU failed to show that students did not have sufficient ability to sustain an intercollegiate team.  SCSU had a women's lacrosse club team, yet it chose not to explore whether there was potential in those players to sustain a varsity team.  Lastly, SCSU made no efforts to determine whether competition exists or could exist for any new women's sports team.  While institutions need not engage in fruitless exercises to drum up support for adding a new team within a region or conference, they are required to do more than wait for competition develop on its own, especially when an institution is aware of growing region-wide interest in specific women's sports.  For these reasons, SCSU failed to comply with Prong Three.

## III.     SCSU'S PRESENT COMPLIANCE WITH TITLE IX

41.     The Court also finds that SCSU fails to comply with Title IX in the present—defined as the 2016-17 academic year to the present.  SCSU's allocation of athletic participation opportunities is not substantially proportional to its male and female enrollment.  Indeed, SCSU recently tried to eliminate women's athletic teams—an action that would have happened but for an order of this Court.

## A.    Allocation of Athletic Opportunities

42.    The Court finds that SCSU fails to comply with Title IX in its allocation of athletic participation opportunities.  The Court further finds that the number of additional athletic participation opportunities required to bring SCSU in exact proportionality is sufficient to field a viable varsity team.

43.    Plaintiffs make two challenges to SCSU's count of athletic participation opportunities.  First, Plaintiffs argue that several female athletes did not receive genuine participation opportunities and thus should not be counted.  Second, Plaintiffs argue that some uncounted male athletes participated and received the benefits of participation and should be counted.  The Court need not resolve this issue.[9]    Even if SCSU's count were correct, SCSU does not presently comply with Title IX's effective accommodation requirement.  The violation would be especially egregious absent the Court's preliminary injunction.

44.    The participation opportunity gap—the number of additional participation opportunities needed to bring SCSU into exact proportionality—during the 2016-17 academic year was 26.  The participation opportunity gap during the 2017-18 academic year was 28.  In both years the gap would have been sufficient to field two varsity teams—

---

[9] The Court heard significant testimony concerning SCSU's practice of managing the teams' rosters in order to maximize the number of women participating and minimize the number of men participating.  Plaintiffs claim this is nothing more than roster manipulation to try to make it appear that SCSU is closer to Title IX compliance than it really is.  Given the reported actual numbers of men and women participating, the Court finds it unnecessary to issue a ruling on SCSU's roster management practices.  But the Court finds the practice to be devious at best, and surely not in keeping with the important goals of Title IX.

women's tennis and Nordic skiing. Most SCSU women's intercollegiate teams have rosters smaller than 26 and 28. Further, if the tennis and Nordic skiing teams are not counted, the participation gap would be 41 for 2016-17 and 42 for 2017-18. It is difficult to predict with certainty whether the gap would in fact have been larger or smaller had the Court not issued the preliminary injunction. The Court concludes that the gap likely would have been larger because no women on the tennis or Nordic skiing teams would have received participation opportunities. It is possible that, had the Court not issued the preliminary injunction, SCSU may have elected to increase the minimum roster numbers for women's teams or decrease the maximum for men's teams. However, the Court finds this outcome unlikely as the roster minimums for SCSU's women's teams are already generally higher than average NCAA team sizes, and the roster maximums for SCSU's men's teams are already below their normal averages. Additionally, had SCSU further increased roster minimums for women's teams, SCSU may very well have created non-genuine participation opportunities.

## B. Levels of Competition

45.     Plaintiffs failed to present evidence that SCSU failed to provide equivalent levels of competition for its male and female sports teams. "[T]he levels-of-competition test is seldom used today and rarely if ever litigated" because "the NCAA imposes strict procedures governing the competitive schedules of men's and women's NCAA-championship sports." *Biediger v. Quinnipiac Univ.,* 928 F. Supp. 2d 414, 446 (D. Conn. 2013). "As a result, modern NCAA rules have all but eliminated the problem that the

levels-of-competition test was designed to address—at least among schools that offer both sexes the full panoply of NCAA-championship sports." *Id.* at 446-47. Here, SCSU offers two levels of competition—NCAA Division I for men's and women's hockey, and NCAA Division II for all other sports. There is no indication that NCAA division rules do not provide similar levels of competition for each sport within each division. Because SCSU has substantially equivalent numbers of men and women competing at the Division I level—25 and 27 respectively—and all other teams compete at the Division II level, SCSU is substantially in compliance with Title IX's levels-of-competition requirement. Although SCSU meets this test, it still fails to comply with Title IX because it must meet at least one of the three prongs of compliance in addition to the levels of competition test.

## IV.    TREATMENT AND BENEFITS

46.    The Court considers SCSU's past and present compliance with Title IX's treatment and benefits requirement together in this section. No evidence was provided that SCSU substantially changed or overhauled its treatment and benefits between the years preceding 2016-17 and the present. The photographs and other evidence that the Court relies on portrays the condition of SCSU's treatment of and benefits for athletes in the past and the present. The Court finds that SCSU did not equitably treat its male and female students and did not equitably confer benefits on them. Significant disparities exist in SCSU's treatment of men's and women's athletic teams and its allocation of benefits between them.

47.     SCSU has three tiers of support for its sports programs.  On a global level, treatment and benefits are not equitable because substantially fewer women benefited from the Tier 1 level of support than men.  Tier 1 teams generally have adequate or better equipment, supplies, locker rooms, practice and competitive facilities, and medical and training facilities.

48.     The substantial inequity results from a disproportionate number of male athletes benefiting from the better treatment and benefits conferred on Tier 1 teams over Tier 2 and 3 teams.  As with Tier 1, women are underrepresented in Tier 2.  In Tier 3, where teams received the lowest level of support, women are overrepresented.  For an institution to meet Title IX's treatment and benefits requirement when it creates different tiers of support for its teams, a substantially equivalent number of men and women should be in each tier and receive the same quality of benefits and treatment.

49.     In a factor by factor analysis, SCSU also conferred more and better benefits to male athletes than female athletes.

50.     The provision of housing and dining facilities and services is equal overall for all sports and tiers because SCSU does not provide specialized housing for athletes separate from housing provided to the general student population.  The opportunity for athletes to receive academic tutoring is, likewise, equal across all sports and tiers because SCSU does not provide specialized tutoring services for athletes separate from what it provides to the general student population.  Furthermore, men and women had equitable opportunities with respect to coaching.  Generally, coach-to-athlete ratios are similar for the different sports, coaches are of generally similar experience or quality, and numbers of

full-time and part time coaches were similar for both sexes. Not enough information was provided to allow the Court to determine whether the compensation of coaches is equitable.

51. SCSU's provision of equipment and supplies substantially favors men. Men's hockey has a higher budget for hockey sticks; however, this difference results from nondiscriminatory factors—that men have more need for hockey sticks because they break more sticks than women do. As such, the Court did not credit this difference in its analysis. Both teams' budgets for equipment are sufficient. The women's basketball team has one set of travel gear that they use for multiple years that must be returned at the end of each season. New gear is only ordered when there are sufficient funds in the team's budget. The men's basketball team orders new gear each year and players are allowed to keep the gear. The men's baseball team replaces six to eight uniform pants each year, and overhauls jerseys roughly every four to five years. Nordic skiing team uniforms and practice gear are replaced roughly every eight years. Wrestling mats were recently replaced due to safety concerns. The Nordic skiing team room had insufficient ventilation for waxing skis, so SCSU designated a room with a hood for the team's use; however, the room was unusable. SCSU also declined to purchase a respirator for the Nordic skiing team despite safety concerns. Overall, the equipment and gear provided to men's teams are replaced more often, despite the women's teams' need to replace their equipment and gear more often too. The men's basketball team also enjoyed the benefit of keeping their gear at the close of their season. When the wrestling team needed new equipment due to safety concerns, mats were replaced; yet Nordic skiing's safety concerns were not similarly addressed. Overall, an analysis of this factor shows slightly better treatment of and benefits for men's teams.

52.     Overall, the scheduling of practice times and games do not favor one sex over the other.  The women's basketball practice time is inadequate because many students are still in class when they have access to their practice facility, so it is difficult to hold a full practice.  Likewise, the women's basketball game time is inadequate because games begin at 5:30 p.m. so it is more difficult for fans to attend games.  Men's basketball plays games directly after women's basketball at 7:30 p.m., the preferred time because fans can more easily attend.  The women's soccer team plays their games at 1:00 p.m. on Fridays and Sundays—a weekend series that allows players to rest between games.  The women's soccer team practices at 6:30 or 7:00 a.m.  The men's football team plays games at 6:00 p.m. on Saturdays, and after September the team plays at 1:00 p.m. due to weather.  The swimming and diving teams, both men's and women's, are offered four practice times throughout the day to minimize the number of players at each practice so players can have more individualized attention from coaches.  Most teams have opportunity for pre- and post-season play.  Overall this factor is substantially balanced and does not favor one sex over the other because many disadvantages that one team may experience are offset by advantages to other teams of the same sex.

53.     Travel funds and per diem allowance substantially favor men.  The women's basketball team generally does not travel out of the SCSU region, although through fundraising they were able to travel to Washington in 2018.  During overnight travel, three to four female players sleep in a room.  The men's basketball team travels out of state every two years.  During overnight travel, two male players sleep in a room.  The baseball team travels by chartered bus and rooms four players to a room during overnight travel.  Every

three or four years the baseball team flies to Texas to play at the Houston Minutemaid Stadium. The trips range from a weekend to nine days. The softball team travels once per year to Florida, but the team must raise its own funds for the trip. The Nordic skiing team's coach drives the team to meets in SCSU vehicles, but many meets are not funded by SCSU, and players have had to pay for their own travel and meet entry fees. The women's tennis team travels to Florida during spring break, but they contribute personal funds to attend the trip. The men's and women's swimming and diving teams travel together by combination of bus and vans. On balance, this factor favors men because men's teams are able to travel more frequently, more comfortably, and for longer periods of time, and SCSU funds more of the men's teams' expenses.

54.     SCSU equitably provides training facilities and services to its male and female athletes; however, it inequitably provides medical services. All male and female athletes share all training facilities, so the quality of the facilities are not an issue. The weight room and training facilities are located in Halenbeck Hall and the Hockey Center. All athletes have access to them, although some athletes appear to have higher priority access than others. As for medical services, all athletes share the same trainers, so the quality of trainers is not an issue. However, trainers are housed inside the men's locker room. Female athletes are disadvantaged because male athletes have quicker and easier access to trainers over female athletes. The Court finds this arrangement to be substantially inequitable, especially in a situation where there are limited trainer services available and students have to compete for the attention and time of trainers.

55.     SCSU's provision of locker rooms, practice facilities, and competitive facilities substantially and inequitably favors male athletes.  Outside of football and men's hockey players, male athletes share a men's locker room with the general student population.  Most female athletes, however, have exclusive access to locker rooms for varsity athletes.  Despite this benefit, female athletes overall have lower quality locker rooms.  The women's basketball team locker room is not large enough for the team to meet inside; they have to utilize a nearby classroom.  Although women's basketball is a Tier 1 sport, the team's metal lockers are of lower quality than the wood lockers enjoyed by other Tier 1 teams.  Furthermore, the women's basketball team's locker room is so far from where they play home games that they have to use the public bathroom during home games.  The softball team sometimes has an insufficient number of lockers for all players, and team equipment must be stored in the locker room.  The Nordic ski team room falls far short of adequate.  It does not have any place for the players to change privately, and the closest facilities for doing so are a long walk away or up several flights of stairs.  The Nordic ski team shares a general women's locker room apart from their team room.  The women's soccer locker room has individual shower stalls, while no other team locker room has individual shower stalls.  It also has enough space for a sitting area, with a couch and television.  The lockers are made of quality wood.  The men's basketball locker room is large and spacious enough to include a white board and couches in a sitting area where the team can meet.  The baseball locker room has enough lockers for all players and is large enough to hold two couches among other beneficial items.  The wrestling locker room, although on the smaller side, has a white board.  The men's hockey locker room is the only

locker room with a sauna. The football locker room is of similar quality to the women's soccer locker room. Overall, the men's locker rooms tend to have higher quality facilities and more amenities.

56. For competitive and practice facilities, most similar sports teams (e.g. men's and women's basketball) play or practice in the same facility. Only baseball, softball, wrestling, and Nordic skiing do not. Baseball's competitive facility at Faber and Putz is far superior to softball's Selke. Baseball's practice fields at Sauk Rapids High School and other municipal locations are also equal to or better than Selke in quality. Even though softball has exclusive use of Selke, while baseball shares its practice and competitive facilities, baseball's facilities are significantly better. Selke is not only inadequate to start with, it is insufficiently maintained. The softball coach and players maintain their own field with limited help from SCSU. Offering one team exclusive use of an inadequate field and requiring maintenance of that field by the team is not equal to use of shared fields that are far superior in quality and maintenance. Furthermore, both teams practice in Husky Stadium during certain portions of the year. Although Husky Stadium is slightly better for softball practice than baseball practice, the better benefit stems from a nondiscriminatory reason—that the nature of softball play allows for fuller practice in a general use stadium. Nordic skiing does not have any designated practice facilities. In the past, the team has practiced on public trails inconsistently maintained by public volunteers not associated with SCSU. The Court cannot evaluate the quality of competitive facilities for Nordic skiing because the team does not compete at SCSU. The wrestling team has adequate practice and competitive facilities. The team has some exercise equipment in the wrestling

room. The team also has exclusive use of the wrestling room. The wrestling team's exclusive use of the wrestling room offsets the softball team's exclusive use of Selke. Thus, men's teams are overall favored in receiving superior quality practice and competitive facilities.

57. Plaintiffs produced insufficient evidence to show that SCSU inequitably allocated publicity. Although one tennis player complained that the women's tennis team had been left out of a flyer promoting SCSU sports games, that player also noted that the men's tennis team had been excluded as well. Plaintiffs failed to provide evidence to show that male sports teams received more or better forms of publicity. The local news covers certain sports more often than others, but this coverage is outside the control of SCSU and does not show that it inequitably allocated publicity to male athletes or teams.

58. Overall the Laundry List factors are either balanced or favor men. Male players receive better treatment and benefits with respect to provision of locker rooms, practice and competitive facilities; provision of equipment and supplies; travel; and provision of medical services. No factor favors women. The effects of the unbalanced factors are not negligible, especially when considered in total and comparing all men's teams to all women's teams. On balance, male athletes accrue substantially more and better treatment and benefits from SCSU. Thus, SCSU is presently in violation of Title IX's equitable treatment and benefits requirements and has been in violation going back to at least 2014.

## V.    REMEDIES

### A.    Declaratory Relief

59.    The Declaratory Judgment Act provides that in cases of "actual controversy," federal courts "may declare the rights and other legal relations" of "interested part[ies]." 28 U.S.C. § 2201; *see also* Fed. R. Civ. P. 57.  Plaintiffs seek a declaration that SCSU was in violation of Title IX in the past.  The burden of proof for declaratory relief "rests upon the party who, as determined by the pleadings, asserts the affirmative of an issue[,] and it remains there until the termination of the action." *Am. Eagle Ins. Co. v. Thompson*, 85 F.3d 327, 331 (8th Cir. 1996) (quoting *Reliance Life Ins. Co. v. Burgess*, 112 F.2d 234, 238 (8th Cir. 1940)).  Thus, Plaintiffs bear the burden of proof.

60.    Under the Declaratory Judgment Act, a "case of actual controversy" refers to any case or and controversy justiciable under Article III of the United States Constitution. *Maytag Corp. v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 687 F.3d 1076, 1081 (8th Cir. 2012).  "There must be a concrete dispute between parties having adverse legal interests, and the declaratory judgment plaintiff must seek 'specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *Id.* (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937)).

61.    Declaratory relief, like all remedies, is not appropriate in every case and generally should not be awarded when it "will not be effective in settling the controversy." Fed. R. Civ. P. 57, 1937 Advisory Comm. notes.  But the decision to award

or not award declaratory relief must be made on its own accord. "The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Fed. R. Civ. P. 57. And "the fact that another remedy would be equally effective affords no ground for declining declaratory relief." *Id.* 1937 Advisory Comm. notes; *see also* Restatement (Second) of Contracts § 345, cmt. d.

62. Here, Plaintiffs satisfy the case or controversy requirement. The facts Plaintiffs allege are not hypothetical but have already occurred. Plaintiffs were injured by SCSU's actions. Plaintiffs seek a conclusive declaration stating their rights under Title IX, and the legal responsibilities of SCSU to them under Title IX. The parties disagree on what those rights and responsibilities are, thus there is an actual controversy.

63. The Court also finds, that declaratory relief is warranted. Awarding declaratory relief would be effective in settling the controversy. The Court will determine the legal rights and responsibilities of both parties with a declaration and make clear SCSU's responsibilities to its students going forward. Public policy also favors granting declaratory relief to further the anti-discrimination goals of Title IX.

## B.    Permanent Injunction

64. The Court concludes that Plaintiffs are entitled to a permanent injunction. "According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006). A plaintiff must show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law . . .

are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved." *Id.* In this case, all four relevant factors favor granting an injunction for Plaintiffs.

65. First, Plaintiffs, and all those similarly situated, have or will suffer an irreparable injury and will continue to suffer an irreparable injury absent an injunction. College students suffer irreparable harm when they are denied the opportunity to play sports. *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 302 n. 25 (2d Cir.2004) (collecting cases). Many witnesses testified to the benefits of participating in collegiate athletics. Coaches also testified to the support they provide to athletes, both on and off the field. Where SCSU failed to provide sufficient athletic opportunities for female students, those students were denied these benefits. If SCSU follows through with its plan to eliminate the women's tennis and Nordic skiing teams, those student-athletes will also lose these benefits. And where some female students were afforded a participation opportunity, many still received inequitable treatment and benefits. The injuries suffered by female students constitute irreparable harms.

66. Second, no other remedy would be adequate to compensate for the injury because there is no other remedy at law. Title IX does not provide for any monetary damages; thus, Plaintiffs can receive either an injunction or nothing at all. The fact that Congress only provided for an injunction as a remedy further underscores the importance of the benefits conferred by Title IX and the inadequacy of other remedies. The Court finds that Plaintiffs have satisfied this element.

67.     Third, the balance of the hardship also favors an injunction.  SCSU argues that the balance of hardships favors it because declining enrollments have placed significant constraints on its budget and continuing to offer women's tennis and Nordic skiing is a significant financial burden.  Although issuing a permanent injunction would place a burden on SCSU, and the Court clearly understands the impact of declining enrollment, the Court finds that SCSU has cost containment options other than eliminating women's tennis and Nordic skiing.  Painful as it may be, SCSU may choose to lower financial support to all programs or to implement a cost saving plan that does not discriminate against women.  The balance of the hardship is decidedly in favor of female students and athletes who should not be required to endure discrimination due to budget constraints at their university.

68.     Fourth and finally, the public interest would not be disserved by an injunction.  It is firmly in the public's interest to enforce antidiscrimination laws such as Title IX.  As the Court noted in a previous order, SCSU is a public institution established by the Minnesota State Legislature and administered by public servants, and so based on the premise that its aims are to serve the public good, SCSU's decisions about its own self-government must not be disregarded by the Court.  *Portz v. St. Cloud State University*, 196 F. Supp. 3d 963, 977-78 (D. Minn. 2016).  SCSU's self-government interest in eliminating women's sports teams to meet its financial goals is overridden by the public interest in combating sex discrimination.  This decision, however, does not disregard SCSU's self-government entirely because SCSU is still free to implement other cost containment strategies that do not discriminate against women.

69.    All four factors weigh in favor of Plaintiffs; thus, the Court will issue a permanent injunction.

## VI.    CONCLUSION

The Court is not unmindful of the difficulties a public university faces in providing equal opportunities for its male and female athletes.  This is especially the case when enrollment is decreasing and pressure exists to cut budgets across the board, including athletics.  But if the promise of Title IX is to be fully realized—that women receive the same opportunities as men to participate in collegiate athletics—there can be no exceptions for financial challenges.  However well-meaning SCSU's efforts have been to achieve compliance with Title IX, the record in this case shows that these efforts have been insufficient for a substantial period of time, well before current administrators were hired.  Elimination of women's tennis and Nordic skiing, in the face of substantial interest in the sports, and the overall participation numbers, clearly violated federal law.  Now there is much work to be done to achieve full compliance with Title IX.

## ORDER FOR JUDGMENT

Based on the Court's Findings of Fact and Conclusions of Law, **IT IS HEREBY ORDERED AND DECLARED** that:

1. Judgment be entered for Plaintiffs and against Defendants.

2. SCSU did not comply with Title IX in its allocation of athletic participation opportunities and treatment and benefits in the past, from at least 2014.

3. An injunction be entered that:

a. SCSU must take immediate steps to provide its female students with an equitable opportunity to participate in varsity intercollegiate athletics. SCSU must:

    i. Maintain the women's tennis and Nordic skiing teams at a level of support comparable to other SCSU teams within the same tier of support, as long as there is sufficient interest and ability to maintain the women's tennis and Nordic skiing teams, and take other immediate steps to narrow the participation gap; or

    ii. Otherwise take other steps to narrow the participation gap if the women's tennis and/or Nordic skiing teams are no longer viable varsity teams.

b. SCSU must take immediate steps to provide its female athletes with equitable athletic-related treatment and benefits at every tier of its athletic department.  SCSU must:

    i. Take immediate steps to permanently improve the practice and competitive facilities of its women's sports teams to create equity between SCSU's women's and men's teams, specifically, by promptly completing renovations on Selke Field and the women's Nordic ski team room, among other improvements to the women's facilities;

      ii. Take immediate steps toward eliminating the inequity stemming from the unequal distribution of women and men's participation opportunities among the tiers of support; and

      iii. Take immediate steps toward eliminating other inequities between the male and female teams' locker rooms.

  c. SCSU's actions must be reasonably calculated to achieve full compliance with Title IX in a reasonable period of time.

  d. This Court shall maintain jurisdiction over this action to monitor Defendants' compliance with the Court's orders. Defendants shall make reports to the Court every six months to monitor compliance with the Court's orders and with Title IX. The Court will consider appointment of an independent monitor if sufficient progress is not made within a reasonable period of time.

4. If Plaintiffs wish to pursue a civil contempt finding, they must make a separate motion so that Defendants may have a full opportunity to respond.

5. Upon application to the Court, reasonable attorneys' fees and costs will be awarded to Plaintiffs' counsel. Attorneys' fees and costs must be related to claims on which Plaintiffs prevailed.

6. Plaintiffs' Motion in Limine to Limit Testimony of Expert Witness Timothy O'Brien [Docket No. 311] is **DENIED** as moot.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  August 1, 2019
at Minneapolis, Minnesota.

_____
JOHN R. TUNHEIM
Chief Judge
United States District Court