# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| ALEXIE PORTZ, JILL KEDROWSKI, ABIGAIL KANTOR, MARILIA ROQUE DIVERSI, FERNANDA QUINTINO DOS SANTOS, MARIA HAUER, HALEY BOCK, KAITLYN BABICH, ANNA LINDELL, and KIERSTEN ROHDE, *individually and on behalf of all those similarly situated*,<br><br>                                    Plaintiffs,<br><br>    v.<br><br>ST.   CLOUD   STATE   UNIVERSITY   and MINNESOTA   STATE   COLLEGES   AND UNIVERSITIES,<br><br>                                    Defendants. | Civil No. 16-1115 (JRT/LIB)<br><br><br>**MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFFS' FIRST MOTION FOR CONTEMPT AND DENYING PLAINTIFFS' SECOND MOTION FOR CONTEMPT** |

Sharon L. Van Dyck, **VAN DYCK LAW FIRM, PLLC**, 310 Fourth Avenue South, Suite 5010, Minneapolis, MN 55415, and Donald C. Mark, Jr., **FAFINSKI MARK & JOHNSON, P.A.**, 775 Prairie Center Drive, Suite 400, Eden Prairie, MN 55344, for plaintiffs.

Jason Marisam, Assistant Attorney General, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Suite 1100, Saint Paul, MN 55101, for defendants.

Plaintiffs bring two Motions for Contempt, arguing that Defendants St. Cloud State University ("SCSU") and Minnesota State Colleges and Universities ("MNSCU") violated the Preliminary and Permanent Injunctions issued by the Court. Specifically, Plaintiffs assert that SCSU failed to appropriately support the women's tennis and Nordic ski teams

during the time the Preliminary Injunction was in effect, and that SCSU improperly eliminated the women's golf team once the Permanent Injunction was in effect. Because SCSU failed to provide appropriate coaching, training, competition opportunities, and recruiting for the women's tennis and Nordic ski teams, the Court will grant Plaintiffs' First Motion for Contempt. However, because SCSU was free to eliminate the women's golf team as part of an overall restructuring to bring itself into compliance with Title IX, this action did not violate the Permanent Injunction, and the Court will deny Plaintiffs' Second Motion for Contempt.

## BACKGROUND

Plaintiffs are female student-athletes who attend or recently attended SCSU and were members of SCSU's varsity intercollegiate women's tennis or women's Nordic skiing teams. (Findings of Fact, Conclusions of Law, and Order for Judgment ("Order") at 3–4, Aug. 1, 2019, Docket No. 380.) Plaintiffs represent a certified class representing "all present, prospective, and future female students at [SCSU] who are harmed by and want to end [SCSU's] sex discrimination in: (1) the allocation of athletic participation opportunities . . . and (3) the allocation of benefits provided to varsity athletes." (*Id*. at 4.) SCSU is a university in the MNSCU system. (*Id*. at 3.)

## I.  THE PRELIMINARY INJUNCTIONS

On July 25, 2016, the Court preliminarily enjoined Defendants from:

a.  Eliminating SCSU's interscholastic women's tennis team;
b.  Involuntarily terminating the employment of the coaches of SCSU's interscholastic women's tennis team;

  c. Reducing support for SCSU's interscholastic women's tennis team; and

  d. Restricting or denying SCSU's interscholastic women's tennis team's access to facilities, coaching, training, or competitive opportunities.

(Order Granting Preliminary Injunction at 27, Docket No. 38.)

On August 23, 2016, upon the parties' joint stipulation, the Court amended its July injunction with respect to the Nordic ski team as follows:

1. Until further order of the Court, Defendants are preliminarily enjoined from eliminating St. Cloud State University's interscholastic women's Nordic skiing team;

2. Until further order of the Court, Defendants are preliminarily enjoined from reducing support for St. Cloud State University's interscholastic women's Nordic skiing team;

3. Until further order of the Court, Defendants are preliminarily enjoined from restricting or denying St. Cloud State University's interscholastic women's Nordic skiing team's access to facilities, coaching, training, or competitive opportunities; and

4. St. Cloud State University may make lawful employment decisions concerning its Nordic skiing coaches.

(Order Amending Prelim. Inj. at 2, Docket No. 43.)  Collectively, these orders constitute the Preliminary Injunction.

## II.  THE PERMANENT INJUNCTION

After a bench trial in November and December 2018, the Court entered its Order in August 2019 finding that SCSU had not complied with Title IX in its allocation of athletic participation opportunities and treatments and benefits, dating back to at least 2014. (Order at 63, Docket No. 380.)  The Court entered a Permanent Injunction, requiring that:

a. SCSU must take immediate steps to provide its female students with an equitable opportunity to participate in varsity intercollegiate athletics. SCSU must:

     i.    Maintain the women's tennis and Nordic skiing teams at a level of support comparable to other SCSU teams within the same tier of support, as long as there is sufficient interest and ability to maintain the women's tennis and Nordic skiing teams, and take other immediate steps to narrow the participation gap; or

    ii.    Otherwise take other steps to narrow the participation gap if the women's tennis and/or Nordic skiing teams are no longer viable varsity teams.

b.    SCSU must take immediate steps to provide its female athletes with equitable athletic-related treatment and benefits at every tier of its athletic department. SCSU must:

     i.    Take immediate steps to permanently improve the practice and competitive facilities of its women's sports teams to create equity between SCSU's women's and men's teams, specifically, by promptly completing renovations on Selke Field and the women's Nordic ski team room, among other improvements to the women's facilities;

    ii.    Take immediate steps toward eliminating the inequity stemming from the unequal distribution of women and men's participation opportunities among the tiers of support; and

    iii.    Take immediate steps toward eliminating other inequities between the male and female teams' locker rooms.

c.    SCSU's actions must be reasonably calculated to achieve full compliance with Title IX in a reasonable period of time.

(Order at 63–65.)

## III. ALLEGED VIOLATIONS

### A. Tennis (Preliminary Injunction)

SCSU eliminated the women's tennis team on March 2, 2016, and reinstated it after the Preliminary Injunction in July 2016.  (Order at 5, n.2.)  SCSU eliminated the men's

tennis team in March 2016 as well, but did not reinstate it.  (*Id.*)  However, SCSU maintained the same levels of coaching staff, so the women's team had additional attention until fall of 2018.  (Trial Tr. Vol. 5, 1137–38, Dec. 27, 2018, Docket No. 361.)  The women's tennis coach died unexpectedly in September 2018, in the middle of the season. (Decl. of Berit Merrill ("Merrill Decl.") ¶ 1, Oct. 4, 2019, Docket No. 412.)  SCSU did not hire the new women's tennis coach until January 2019; about four months later.  (*Id.* ¶ 2.) In a footnote in their Opposition brief, SCSU notes that they felt it was "appropriate to proceed with sensitivity in seeking a replacement following his passing" because of the close relationships he had with the players.  (Opp'n. to 1st Mot. for Contempt at 14 n.4, Oct. 25, 2019, Docket No. 421.)

The new coach, Ms. Merrill, had been an assistant tennis coach at the College of St. Benedict before she was hired by SCSU.  (Declaration of Heather Weems in Opp'n. to 1st Mot. for Contempt ("1st Weems Decl.") ¶ 12, Oct. 25, 2019, Docket No. 422.)  The SCSU athletic department provided Merrill with a schedule of 11 tennis matches, and she was only able to add 6 more, for a total of 17.  (Merrill Decl. ¶ 2.)  In prior years, the tennis team had 27–29 matches.  (1st Weems Decl. ¶17; Declaration of Larry Sundby ("Sundby Decl.") ¶ 3(c), Oct. 4, 2019, Docket No. 413.)

In the spring of 2019, Merrill had difficulty scheduling matches for fall 2019 because her contract for that year was not finalized and SCSU did not grant her authority to schedule matches.  (Merrill Decl. ¶ 3.)  Her contract was not finalized until late August

2019.  (1st Weems Decl. ¶ 13.)  SCSU notes that contract negotiations were complicated because Merrill was also an academic advisor at SCSU, and the advisor position and coaching position were covered by separate collective bargaining agreements.  (*Id*.)  SCSU notes that Merrill is now paid more than the prior tennis coach.  (*Id.*)

In addition to the declining number of matches, Plaintiffs note that SCSU has been unable to recruit new members to the team.  (Sundby Decl. ¶ 3(a).)  Potential recruits that the tennis team had contacted in 2015 and 2016 were no longer interested in the program once it had been cancelled.  (Trial Tr. Vol. 1 at 38-38, Dec. 27, 2018 Docket No 357.)  Nor did the team recruit a single new player during the 2017–2018 and 2018–2019 academic years.  (Sundby Decl. ¶ 3(a).)  A former tennis coach asserted that this was because it was unclear whether the team would be eliminated.  (*Id.* ¶ 3(b).)  One woman with strong family ties to SCSU and its tennis program asserted that she had considered attending SCSU to play tennis, but did not "because of the elimination of the team and the lack of support for the team since its reinstatement" and instead enrolled elsewhere.  (Decl. of Anne Bowe, ¶¶ 1–3, Oct. 4, 2019, Docket No. 415.)  Plaintiffs also note that there is less scholarship money than was available in the past, but SCSU notes that scholarship levels have been constant for more than ten years (Sundby Decl. ¶¶ 2–3; 1st Weems Decl. ¶ 14).

Finally, Plaintiffs note that in June 2019 the SCSU athletic department withdrew all of the funds from the tennis foundation account—a total of $8169—as well as an

additional $1000 donated by a former tennis coach in memory of the recently deceased head coach.  (Merrill Decl. ¶ 5, Sundby Decl. ¶ 3(d).)  Previously, these monies were used by the team.  (Merrill Decl. ¶ 5.)  SCSU explains that because the university and the athletic department are under financial stress, every sports program had to use foundation money to cover the deficit.  (1st Weems Decl. ¶ 15.)  SCSU says that "[a] consistent formula was used across all sport programs to determine the foundation funds utilized to cover expenses."[1]  (*Id.*)

In the 2018-2019 season, the team regularly slept five to a hotel room, with one person sleeping on the floor on an inflatable mattress.  (Merrill Decl. ¶ 4.)  SCSU explains that it did not decrease the tennis team's operational budget after the Preliminary Injunction issued, and that the number of athletes to a room is a decision made by the coach, not SCSU.  (1st Weems Decl. ¶ 19.)

**B. Nordic Skiing (Preliminary Injunction)**

On March 2, 2016, SCSU announced the elimination of the women's Nordic ski team.  (Order at 5.)  Six days later, SCSU notified the ski team coach that his contract would not be renewed.  The team was reinstated with the Court's August 23, 2016,

---

[1] SCSU also argues that players' conditions have improved because the tennis facilities have been upgraded.  (Trial Tr. Vol 1 at 34:8-10.)  While this is true, Plaintiffs note that these upgrades were done by the private company which owns the tennis facility and that SCSU had no role in the upgrades.  (Reply to 1st Mot. for Contempt at 16, Nov. 8, 2019, Docket No. 423.))

Preliminary Injunction.  (*Id.*)  When the ski team was eliminated, there had been seven high-school recruits who had committed to ski at SCSU for the upcoming year.  (Trial Tr. Vol. 2 at 510, Dec 27, 2018, Docket No. 358.)  Most of those athletes went to other programs, but two came to SCSU and joined the ski team when it was reinstated.  (*Id.*) That year there were five women on the team.  (Decl. of Anna Lindell Forberg ("Forberg Decl.") ¶ 2, Oct. 4, 2019, Docket No. 411.)

When the team was reinstated in 2016, SCSU hired a new coach.  (Trial Tr. Vol. 2 at 510; Vol 3 at 585.)  As coach, he trained the team and attended their competitions— approximately six or seven meets.  (Forberg Decl. ¶ 2.)  He was not in a full-time position, but instead was considered an adjunct.   (Trial Tr. Vol. 2 at 510.)   He was paid approximately $14,000 per year; the previous coach (who had been full time) had been paid approximately $30,000 for the coaching portion of his duties.  (*Id.*)  That coach left voluntarily after finishing the 2017–2018 season.  (Trial Tr. Vol. 5, 1109–10, Dec. 27, 2018, Docket No. 361.)  He explained that the job was a lot of work and that he "didn't feel that [he] had the resources" to make the job worthwhile.  (Trial Tr. Vol. 2 at 517.)

By the 2017–2018 season, the team had three skiers; in 2018–2019 it had two. (Decl. of Jamie Herridge ("Herridge Decl.") ¶ 1, Oct. 4, 2019, Docket No. 414.)  Because five skiers are needed to qualify as a team, the athletes were unable to compete as a team and instead skied as individuals.  (*Id.*)  The number of ski meets declined as well.  (*Id.*)

In 2018, the two skiers registered for the U.S. Nationals/NCAA qualifying meet in

Anchorage, Alaska.  In prior years, SCSU had paid for the ski coach and the athletes to attend this meet.  (Decl. of Jeremy Frost ¶ 7, Nov. 8, 2019, Docket No 424.)  This meet was important for recruiting new skiers to the team, because it provided high school athletes with a view of the SCSU team.  (*Id.* ¶ 6.)  In 2018 SCSU did not pay for the athletes to attend the meet, and instead they had to pay their own way.[2]  SCSU did pay for the coach to attend, calling it a recruiting trip.  (Trial Tr. Vol. 3 at 744, Dec. 27, 2018, Docket No. 359.)  He did not successfully recruit any skiers.  (*Id.*)

For the 2018–2019 season, SCSU hired two part-time coaches.  (Herridge Decl. ¶ 1.)  One coach was an SCSU administrator with no ski-coaching experience.  (*Id.*)  The other was an owner of a local bike/ski shop who had previously been an assistant coach for high-school teams.  (*Id.*)  Only one coach at a time would travel with the team to competitions; this was an issue because the administrator coach did not know how to wax skis and did not know to come early to test wax combinations.  (*Id.* ¶ 4.)  On multiple occasions, the skiers had to rely on other teams' coaches or, in one case, an athlete's father, to take care of the necessary wax preparations.  (*Id.*)  Sometimes neither coach would attend ski practice.  (*Id.* ¶ 5.)

---

[2] Plaintiffs provided no citation for this fact and merely assert it in their Reply.  (Reply to 1st Mot. for Contempt at 19.)

Neither coach attended the final ski meet of the 2018–2019 season.  (*Id.* ¶ 7.)  The coach who had been scheduled to go declined to drive there given the weather forecast. (1st Weems Decl. ¶ 6.)  Weems encouraged him to drive anyway.  (*Id.*)  Additionally one of the athletes declined to attend, also expressing concerns about the weather, an injury, and the fact that her coaches would not be attending.  (*Id.* ¶ 8; Herridge Decl. ¶ 7.) Weems encouraged her to participate anyway "so that SCSU could provide a competition opportunity to its ski athletes," but the athlete declined.  (Herridge Decl. ¶ 7, 1st Weems Decl. ¶ 8.)  Weems drove the remaining student to the meet, although she had never driven another team to a competition.  (1st Weems Decl. ¶ 6.)  Coaches from another team assisted the SCSU skier with ski waxing because Weems did not have experience with Nordic skiing.  (*Id.* ¶ 7, Herridge Decl. ¶ 7.)

During the 2016–2017 season, the ski team continued using the handball court that had been their "team room."  (Forberg Decl. ¶ 3.)  Over the course of that year, the physical condition of that room continued to deteriorate.  (*Id.*)  In the 2017–2018 and 2018–2019 seasons, the room had mold growth over an entire wall.  (Herridge Decl. ¶ 6.) The air was contaminated due to wax fumes.  (*Id.*)  In spring 2019, the room flooded, which contributed to mold growth and unsanitary conditions, and the floor buckled and bowed.  (*Id.*).  At some point since spring 2019, the ski team was provided a new training room and lockers in the women's locker room.  (1st Weems Decl. ¶ 11.)

### C.  Golf (Permanent Injunction)

On December 10, 2019, SCSU announced that they were eliminating the women's golf team.  (Decl. of Heather Weems in Opp'n to 2nd Mot. for Contempt ("2nd Weems Decl.") ¶ 6, Jan. 31, 2020, Docket No. 442.)  The cut was a part of SCSU's "comprehensive plan" which also eliminated the men's football and golf teams and added a men's soccer team.  (*Id.* ¶¶ 6–7.)  SCSU explains that these shifts, along with changes in roster sizes, will help with SCSU's budget issues, provide a better experience for female student-athletes, and will address with participation gap identified in the Court's Order.  (*Id.* ¶¶ 6–11.)  No women's sports were added as part of this comprehensive plan.

### D. Six-Month Update

While not formally part of the Motions for Contempt, the Court will also briefly summarize SCSU's six-month update, submitted on February 3, 2020 as part of the Court's ongoing monitoring of SCSU's compliance with the Permanent Injunction.  (1st Report, Docket No. 445.)

SCSU explained that its enrollment has continued to drop and was at 7,482 students in 2018–2019.  (*Id.* at 2.)  Accordingly, SCSU's financial situation has also declined, and SCSU had a deficit of approximately $5.1 million for 2020, including an athletic-department shortfall of approximately $1.6 million.  (*Id.* at 2-3)  SCSU laid off eight faculty to help address this issue. [3]  (*Id.* at 2.)

---

[3] In the cited news article, SCSU announced the layoffs in September 2019, becoming effective in May 2020.  However, in the same article, SCSU is quoted as saying that they are not making "across-the-board cuts" and are in fact "hiring about 30 faculty in

In December 2019, SCSU announced a comprehensive plan intended to address SCSU's budget issue as well as the Court's Order.  (*Id.* at 3.)  SCSU is eliminating its men's football and golf teams and its women's golf team, and is adding a men's soccer team. (*Id.* at 3.)  The football program alone accounted for an annual net loss of approximately $1.035 million to the athletics department.  (*Id.* at 4.)  Elimination of the golf teams saves another $110,000 per year.  (*Id.*)  SCSU notes that the golf teams had limited coaching staff and inconsistent access to golf courses for practice given the weather.  (*Id.*)  Adding men's soccer fulfills SCSU's NCAA Division II requirement that it sponsor a men's or co-ed and a women's sport in each of the three school seasons.  (*Id.* at 5.)

SCSU explained that the elimination of these three teams, plus the addition of men's soccer, results in the net reduction of about 73 men's participation opportunities and about 7 women's participation opportunities.  (*Id.* at 7.)  At trial, the Court found that SCSU had a participation gap of 28 opportunities (which would have been 42 opportunities without tennis and skiing).  (*Id.*)  SCSU explains that the changes will fully address this participation gap on a permanent and on-going basis. (*Id.*)  Additionally, SCSU is planning to work with coaches over the next two years to reduce roster sizes to better align with coaches preferred team numbers.  (*Id.* at 8.)   After all adjustments, SCSU plans

---

departments and programs with stable or growing enrollment." https://www.mprnews.org/story/2019/09/18/budget-challenges-prompt-st-cloud-state-university-to-lay-off-eight-faculty

to reduce men's participation opportunities by 56 spots and women's by 22 spots.  (*Id.*)

As a result, SCSU believes it will achieve substantial proportionality with SCSU's full-time

undergraduate student body.  (*Id.*)

> Additionally SCSU notes that it has:
>
> 1. Provided the Nordic ski team with a new team room which includes ventilation and air filtration, and that athletes have lockers in the women's varsity locker room.
> 2. Provided space in the women's varsity locker room for the women's tennis team as well.
> 3. Provided a white board in the women's varsity lounge that allows the women's basketball team to use the space and its private restrooms.  SCSU notes that the lounge is equidistant from the men's basketball team room to the team bench.
> 4. Plans to provide an updated locker room to the softball team, including new flooring, paint, lockers, and private restrooms and shower stalls in fall 2020.
> 5. Made improvements to the softball field, including repairing dugouts and repainting.
> 6. Provided a base-allocation of $100/student for equipment and apparel.
> 7. Fundraised to add a sauna to the women's hockey locker room.

(*Id.* at 8–11.)

SCSU also notes that it has addressed its disparities regarding its tiering of sports.

First, by eliminating the football team, it has eliminated the 74 participation-spot disparity

for tier-one sports.  (*Id.* at 12–13.)  Men's soccer will be a lower-tier sport.  (*Id.* at 13.)

SCSU is applying for a grant for an additional coach to move women's soccer to a higher

tier of support.  (*Id.*)

Plaintiffs submitted objections to the six-month report on February 18, 2020.

(Docket No. 462.)  On the whole, Plaintiffs object to the fact that SCSU did not attach

detailed internal documentation and financials.  (*Id.* at 4–13.)  Plaintiffs question the

accuracy of SCSU's assertions, financial calculations, and the efficacy of its planning.  (*Id.*)

Plaintiffs assert that SCSU has not determined whether their athletic cuts are "the **only**

reasonably calculated means to address financial sustainability and achieve compliance

with Title IX" or that "it has taken the **best** actions to meet its obligations under the

Permanent Injunction."  (*Id.* at 6, 8.)  Plaintiffs also note their concerns that SCSU may

take steps to reduce the rosters of several women's sports, per the coaches' requests

expressed at trial.  (*Id.* 13–15.)  Finally, Plaintiffs generally assert that the progress and

improvements noted by SCSU are insufficient and not reasonably compliant.  (*Id.* 15–20.)

## ANALYSIS

### I.      JURISDICTION AND PROCEDURAL DEFECTS

SCSU challenges whether the Court has jurisdiction to hear these Motions at all.

#### A.  First Motion for Contempt from Preliminary Injunction

SCSU argues that because it timely appealed the Court's Order, including the

Permanent Injunction, the Court may not consider its past compliance with the

Preliminary Injunctions.

First, once a party has appealed a final order, the district court has no jurisdiction

to hear matters related to the appeal.  *See, e.g.*, *State ex rel. Nixon v. Coeur D'Alene Tribe*,

164 F.3d 1102, 1106 (8th Cir. 1999) ("Once a notice of appeal is filed, the district court is

divested of jurisdiction over matters on appeal . . . [and] may not reexamine or

supplement the order being appealed.")

Second, as general rule, a final judgment on the merits extinguishes a preliminary injunction. *See, e.g.*, *Burniac v. Wells Fargo Bank, N.A.*, 810 F.3d 429, 435 (6th Cir. 2016) (collecting cases). As a result, Plaintiffs are limited in the type of contempt they may seek. "A court cannot impose a coercive civil contempt sanction if the underlying injunction is no longer in effect." *Klett v. Pim*, 965 F.2d 587, 590 (8th Cir. 1992). Such a limitation is reasonable, because if there is no longer an injunction, there is no particular behavior for the court to coerce. However, a motion for "compensatory civil contempt" may be brought even after the underlying injunction is no longer in force.[4] *Id.* Compensatory contempt exists to remedy an injury from a violation of an injunction; the injury from the violation of the order remains, even if the injunction itself is no longer exists.

Here, Plaintiffs seek a finding of compensatory civil contempt, and the fact that the Preliminary Injunction has merged into the Permanent Injunction does not prohibit the Court from considering whether SCSU violated the Preliminary Injunction during the time it was in effect, or whether any such violation injured Plaintiffs. Nor does that fact that SCSU has appealed the trial Order prevent the Court from considering SCSU's compliance with the Preliminary Injunction; SCSU's compliance with that Injunction is not a matter on appeal and the Court is not divested of jurisdiction. *Coeur D'Alene Tribe*, 164 F.3d at 1106. Accordingly, the Court declines to dismiss the First Motion for lack of jurisdiction.

---

[4] With certain exceptions not relevant here. *See Klett*, 965 F.2d at 590.

**B. Second Motion for Contempt from Permanent Injunction: Pending Appeal:**

SCSU similarly argues that the Court lacks jurisdiction to hear Plaintiffs' Second Motion for Contempt, in part because Plaintiffs request that the Court modify the Permanent Injunction.

In addition to the general rules stated above, Federal Rule of Civil Procedure 62(d), titled Injunction Pending an Appeal, states that: "While an appeal is pending from an interlocutory order or final judgment that grants, continues, modifies, refuses, dissolves, or refuses to dissolve or modify an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." Fed. R. Civ. P. 62(d).

The plain text of the rule indicates that the Court may modify an injunction pending appeal. The Ninth Circuit helpfully clarified this issue, noting that although it is generally the rule that "when an appeal is perfected the district court loses jurisdiction to take further action in the cause" but that Rule 62(d) "is an exception to that general rule and a recognition of the long established right of the trial court, after an appeal, to make orders appropriate to preserve the status quo while the case is pending in the appellate court." *United States v. El-O-Pathic Pharmacy*, 192 F.2d 62, 79 (9th Cir. 1951) (citing *Newton v. Consolidated Gas Co. of New York*, 258 U.S. 165 (1922)).[5]

_____

[5] The opinion refers to "subdivision (c) of Rule 62," but Rule 62 was amended in 2018 with "[t]he provisions for staying an injunction" being "reorganized . . . in new subdivision[] . . .

Accordingly, the Court declines to dismiss the Second Motion for lack of jurisdiction due to the appeal.

### C. Second Motion for Contempt from Permanent Injunction: Sovereign Immunity

SCSU also argues that the Court may not grant Plaintiffs' Second Motion for Contempt because SCSU has sovereign immunity. SCSU argues that Minnesota has not waived sovereign immunity for civil contempt claims, and that the federal contempt statute, 18 U.S.C § 401, did not abrogate Minnesota's sovereign immunity.

SCSU is a state entity, and as state entity, it is entitled to sovereign immunity under the Eleventh Amendment. *See, e.g.*, *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997) ("It has long been settled that the reference to actions 'against one of the United States' [in the Eleventh Amendment] encompasses not only actions in which a State is actually named as the defendant, but also certain actions against state agents and state instrumentalities.").

In similar actions, the Eighth Circuit has held that the federal government had not waived sovereign immunity under the federal contempt statute, 18 U.S.C. § 401. *See, e.g., Coleman v. Espy*, 986 F.2d 1184, 1190 (8th Cir. 1993) ("For purposes of determining whether these actions may proceed, we must determine whether there has been an

---

(d)."  Fed. R. Civ. P. 62 Committee Notes on Rules – 2018 Amendment.  "There [was] no change in meaning" because of the reorganization.  *Id.*

explicit, unequivocal waiver of sovereign immunity to proceed for an action alleging compensatory civil contempt of such a judge-made order.  We find that there is no such waiver.").

That case involved a similar posture to this one: plaintiffs filed motions for contempt, alleging that the federal government had previously violated a then-expired preliminary injunction.  *Id.*  The Eighth Circuit concluded there had not "been an explicit, unequivocal waiver" of sovereign immunity and explained that the heart of the motion was that "[t]he appellants . . . were consequently damaged by the officials' failure to adhere to the appropriate standard of care.  They seek sanctions from the government to place them in the position they would be in if the standard of care had not been breached."  *Id.* at 1192.  Therefore, the motion was "essentially a tort action" and "recovery . . . must be sought through the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671–80, and not through contempt proceedings."  *Id.*

Here, however, Plaintiffs claim compensatory civil contempt against the state, not federal, government, and thus *Coleman* is not binding.  Furthermore, SCSU, having accepted federal funds, has waived its Eleventh Amendment immunity for violations of Title IX.  *See Fryberger v. Univ. of Arkansas*, 889 F.3d 471, 474 (8th Cir. 2018).  Such a waiver is not limited to actions seeking injunctive relief, but also extends to actions seeking damages.  *See id*. at 475 ("Thus, the only "plausible interpretation" [of Title IX

precedent] is that compensatory damages—remedies at law available against non-states—are available against states to the same extent.")

The Supreme Court's opinion in *Hutto v. Finney*, 437 U.S. 678 (1978), is illuminating here. Although the Court was there addressing the propriety of federal courts awarding attorney's fees against states, the Court explained that the basis for such awards was the federal court's inherent enforcement powers: "[F]ederal courts are not reduced to issuing injunctions against state officers and hoping for compliance. Once issued, an injunction may be enforced." *Hutto*, 437 U.S. at 690. The Court notes that effective enforcement might include financial penalties, and that "[c]ivil contempt may also be punished by a remedial fine, which compensates the party who won the injunction for the effects of his opponent's noncompliance." *Id*. at 691. The Court specifically disclaims any Eleventh Amendment immunity, writing that "[t]he principles of federalism that inform Eleventh Amendment doctrine surely do not require federal courts to enforce their decrees only by sending high state officials to jail. The less intrusive power to impose a fine is properly treated as ancillary to the federal court's power to impose injunctive relief." *Id.* (footnote omitted).

SCSU argues that although the Court may issue an injunction against the school, it may not enforce it—and in fact, that no Title IX injunction could ever be enforced against a state university. The Court disagrees. The Court is not limited to "hoping for compliance" in Title IX matters, and has the ability to enforce its orders by holding those

who would defy those orders in contempt.  The Court will decline to find sovereign immunity for SCSU and declines to dismiss the Motions on that ground.

### D.  Second Motion for Contempt from Permanent Injunction – Local Rule 7.1

Finally, SCSU argues that even if the Court has jurisdiction to hear the Second Motion for Contempt, the Court should refuse to do so because Plaintiffs failed to meet and confer as required by Local Rule 7.1.

Local Rule 7.1 requires that "Before filing a motion other than a motion for a temporary restraining order or a motion under Fed.R.Civ.P. 56, the moving party must, if possible, meet and confer with the opposing party in a good-faith effort to resolve the issues raised by the motion.  The moving and opposing parties need not meet in person." D. Minn. Local R. 7.1(a).  Courts in this District have warned parties who have failed to meet and confer and threatened consequences.  *See, e.g.*, *Holaway v. Stratasys, Inc.*, No. 12-998 (PAM/JSM), 2013 WL 12142647, at *5 (D. Minn. June 17, 2013) (warning parties that the Court will not hear future motions unless they comply with Local Rule 7.1); *Damgaard v. Avera Health*, No. 13-2192 (RHK/JSM), 2015 WL 1608209, at *9 (D. Minn. Apr. 10, 2015) (denying a motion due to failure to meet and confer, although also denying the motion on the merits.)

The Court agrees that Plaintiffs failed to meet and confer, and that this failure was not Plaintiffs' first.  (*See, e.g.*, Amended Order on Fees at 6, Jan. 21, 2020, Docket No. 433 (denying fees for unnecessary motion in limine that could have been prevented by meeting and conferring)).  The Local Rules are intended to improve the efficiency of

litigation for the Court and the parties, and the Court advises Plaintiffs to review these Rules more carefully in advance of future filings.  However, in this case, SCSU has suffered no prejudice from the lack of compliance with Local Rule 7.1, and there is no reason to think that compliance would have improved the efficiency of the Court.  Accordingly, the Court will decline to dismiss Plaintiffs' Motions on this ground.

## II.  CONTEMPT

"A party seeking civil contempt bears the initial burden of proving, by clear and convincing evidence, that the alleged contemnors violated a court order."  *Chi. Truck Drivers v. Bhd. Labor Leasing*, 207 F.3d 500, 505 (8th Cir. 2000).  If the moving party demonstrates a violation, the burden shifts to the violator to show an "inability to comply."  *Id.*[6]

### A.  Tennis

---

[6] SCSU cites to several cases involving consent orders for the proposition that the Court is limited to the "four corners" of the injunction.  *See, e.g.*, *Mahers v. Hedgepeth*, 32 F.3d 1273, 1275 (8th Cir. 1994).  However, a consent decree is not the same as a court-issued injunction.  The distinction is relevant as courts narrowly review consent decrees because such a decree is essentially a contract between hostile litigants, and is inherently a compromise, such that "the resultant decree embodies as much as the respective parties have the bargaining power and skill to achieve.  For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it."  *Id*. (*quoting United States v. Armour & Co.*, 402 U.S. 673, 681–82, (1971).  While common sense dictates that a party cannot violate an injunction with actions outside the injunction's scope, SCSU has not explained why the Court should use the heightened caution appropriate for a consent decree when reviewing the language of the Injunctions.

Plaintiffs argue that during the time the Preliminary Injunction was in force, SCSU violated the Preliminary Injunction due to the:

- 4-month delay in replacing the tennis coach, along with accompanying issues with her contract and her ability to schedule matches;
- overall reduction in number of matches; and
- total lack of successful recruiting—no new players in 2017–2018 or 2018–2019; and
- taking of approximately $9000 from the tennis account.

SCSU responded that the death of the tennis coach was beyond their control, and that potential student-athletes chose not to come to SCSU of their own free will. Essentially, SCSU argued that the conditions of the tennis team indicated that there was not sufficient interest and ability to maintain the team.  Instead, SCSU argued that Plaintiffs seek relief "beyond the four corners" of the Preliminary Injunction, and that the school's only obligation was to not "treat[] them worse that they were prior to the injunction."  (Opp'n to 1st Mot. at 13.)

SCSU's position is unavailing.  The Preliminary Injunction clearly requires more of SCSU than to merely not treat the tennis team with less care than was already the case. Not only was SCSU prohibited from reducing support for the tennis team, the Preliminary Injunction also prohibited SCSU from "[r]estricting or denying" the team "access to facilities, coaching, training, or competitive opportunities."  SCSU had no control over the death of the tennis coach, but had full control over the delay in hiring a new coach and thus the drop in tennis matches.  And while SCSU cannot force students to attend and to play tennis, it can provide support and resources to give confidence to would-be players

that the team will continue to exist.  There appears no real question that SCSU denied or restricted the team's access to coaching staff, competitive opportunities, and the basic ability to maintain a team while the Preliminary Injunction was in effect.  Such actions violated the Preliminary Injunction.

Accordingly, the Court will grant Plaintiffs' First Motion for Contempt as to the SCSU women's tennis team, and the Court will award Plaintiffs $10,000 in compensatory damages.

### B.  Nordic Skiing

Plaintiffs argue that during the time the Preliminary Injunction was in force, SCSU violated the Preliminary Injunction due to the:

- lack of maintenance and continued degradation of the ski team room through at least Spring 2019;
- reduction in number of competitions;
- total lack of successful recruiting—no new skiers in 2017–2018 or 2018–2019; and
- inadequate coaching staff.

As with tennis, SCSU argues that the fact that one ski coach voluntarily left the team was beyond their control, and that that potential student-athletes chose not to come to SCSU of their own free will.  Again, SCSU argues that the conditions of the ski team indicate that there is not sufficient interest and ability to maintain the team.  SCSU had no explanation for the decrepit team room.

As with tennis, SCSU's arguments are unconvincing.  SCSU was enjoined from reducing support from the team, as well as from restricting or denying the team's access

to facilities, coaching, training, or competitive opportunities.  Here, SCSU provided inadequate coaching and training; the coaches did not always attend practices or races, and one could not perform the waxing duties normally undertaken by coaches.  The lack of recruiting caused fewer competitive opportunities because the skiers could no longer formally participate as a team.  Finally, SCSU allowed the "team room" to continue to deteriorate through 2019.  SCSU argues that the program is naturally dying out on its own; however, the seeming popularity of the program immediately prior to its elimination (with seven new committed recruits) indicates otherwise.

Accordingly, the Court will GRANT Plaintiffs' First Motion for Contempt as to the SCSU women's Nordic ski team, and the Court will award Plaintiffs $10,000 in compensatory damages.

### C. Golf

Finally, Plaintiffs argue that SCSU violated the Permanent Injunction by eliminating the women's golf team.  Plaintiffs argue, essentially, that SCSU may not eliminate *any* women's team until they have achieved full compliance with Title IX, and that the elimination of the golf team is a per se violation of the Permanent Injunction.  Plaintiffs argue that SCSU may not eliminate women's teams even when the athletics restructuring eliminates  significantly more men's participation opportunities.

The Permanent Injunction contains no such restriction.  As relevant here, SCSU is required to "[t]ake immediate steps toward eliminating the inequity stemming from the

unequal distribution of women and men's participation opportunities among the tiers of support."  SCSU chose to approach this requirement by, among other things, altering the sports offered at the University, which was not required but is well within its prerogative. The Permanent Injunction specifically protects women's tennis and Nordic skiing from elimination, but contains no such protections for women's golf.  It appears to the Court that with this restructuring, SCSU has greatly, if not completely, reduced this unequal distribution of participation opportunities between men and women.

Plaintiffs may disagree whether this restructuring was the best choice for the student-athletes or for SCSU or for its budget.  However, such a disagreement is not a ground for contempt of court.  The Permanent Injunction does not make the Court SCSU's athletic director, and SCSU remains free to structure its programs however it wishes— within the confines of the law and the Permanent Injunction.  The elimination of the women's golf team, along with men's football and golf, and the addition of men's soccer, appears to the Court to be a good-faith effort to comply with the requirements of Title IX and the Permanent Injunction while also managing SCSU's significant budgetary issues.[7]

Accordingly, the Court will deny Plaintiffs' Second Motion for Contempt.

---

[7] Such a finding does not, of course, prohibit future actions for contempt should SCSU fail to comply with the Permanent Injunction.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that

1) Plaintiffs' First Motion for Contempt  [Docket No. 409] is **GRANTED** and

    Defendants are ordered to pay $20,000 in compensatory damages.

2) Plaintiffs' Second Motion for Contempt [Docket No. 436] is **DENIED**.


DATED:  July 6, 2020
at Minneapolis, Minnesota.

_____

JOHN R. TUNHEIM
Chief Judge
United States District Court