**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

ALEXIE PORTZ, JILL KEDROWSKI, ABIGAIL
KANTOR, MARILIA ROQUE DIVERSI,
FERNANDA QUINTINO DOS SANTOS,
MARIA HAUER, HALEY BOCK, KAITLYN
BABICH, ANNA LINDELL, AND KIERSTEN
ROHDE, *individually and on behalf of all*
*those similarly situated,*

Civil No.  16-1115 (JRT/LIB)

**MEMORANDUM OPINION AND ORDER**

Plaintiffs,

v.

ST. CLOUD STATE UNIVERSITY and
MINNESOTA STATE COLLEGES AND
UNIVERSITIES

Defendants.

---

Cody Blades, Donald Chance Mark, Jr., and Tyler P. Brimmer, **FAFINSKI MARK & JOHNSON PA,** 775 Prairie Center Drive, Suite 400, Eden Prairie, MN 55344; Sharon L. Van Dyck, **VAN DYCK LAW FIRM, PLLC**, 5775 Wayzata Boulevard, Suite 700, Saint Louis Park, MN 55416, for plaintiffs.

Elizabeth C. Kramer and Kevin A. Finnerty, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Suite 1100, Saint Paul, MN 55101, for defendants.

Plaintiffs Alexie Portz, Jill Kedrowski, Abigail Kantor, Marilia Roque Diversi, Fernanda Quintino dos Santos, Maria Hauer, Haley Bock, Kaitlyn Babich, Anna Lindell, and Kiersten Rohde brought this class action against Defendants St. Cloud State University ("SCSU") and Minnesota State Colleges and Universities ("MNSCU"), alleging gender discrimination in SCSU's past and present allocation of athletic opportunities and in

SCSU's treatment and allocation of benefits for its female student-athletes in violation of Title IX of the Education Amendments Act of 1972 ("Title IX").

In late 2018, the Court conducted a bench trial and subsequently issued Findings of Fact, Conclusions of Law, and an Order for Judgment ("Order").  The Court entered judgment for Plaintiffs against Defendants, finding that SCSU was in violation of Title IX in its allocation of athletic participation opportunities and treatment and benefits in the past, from at least 2014.  The Court also held that SCSU failed to provide equitable treatment and distribution of benefits among the tiers of its programs.  The Court issued a permanent injunction requiring SCSU to come into compliance with Title IX on a program-wide basis, noting that equity among tiers was also required.  SCSU appealed and the Eighth Circuit found that the Court's use of tiers in its analysis and its failure to dedicate a section in the Order to the women's volleyball team constituted error.  *Portz v. St. Cloud State Univ.*, 16 F.4th 577, 583–85 (8th Cir. 2021).  As a result, the Eighth Circuit reversed the Court's conclusion regarding treatment and benefits and remanded for further proceedings.  *Id.*  The Eighth Circuit vacated the injunction as it relates to treatment and benefits and attorney fees and costs.  *Id.*

The case is now before the Court on Defendants' Motion to Dissolve the Injunction and Plaintiffs' Motion to Modify the Injunction.  Because SCSU is in full compliance with Title IX in its provision of athletic participation opportunities, the Court will grant in part Defendants' motion and dissolve that portion of the injunction.  Because SCSU has failed

to show it is in full compliance with Title IX in its provision of treatment and benefits, specifically in its travel/per diem policies, the Court will reinstate the permanent injunction with the modifications mandated by the Eighth Circuit.  Lastly, Plaintiffs are instructed to file a Motion for Attorney Fees and Costs seeking an award for fees and costs incurred during the trial, on appeal, and during these pending motions.

## BACKGROUND

Plaintiffs are female student-athletes who attend or recently attended SCSU and were members of SCSU's varsity intercollegiate women's tennis or women's Nordic skiing teams.  (Order at 3–4, Aug. 1, 2019, Docket No. 380.)  Plaintiffs represent a class certified as "all present, prospective, and future female students at [SCSU] who are harmed by and want to end [SCSU's] sex discrimination in: (1) the allocation of athletic participation opportunities . . . and (3) the allocation of benefits provided to varsity athletes."  (*Id*. at 4.)  SCSU is a university in the MNSCU system.  (*Id*. at 3.)

After a bench trial in November and December 2018, the Court entered its Order in August 2019 finding that SCSU had not complied with Title IX in its allocation of athletic participation opportunities and treatment and benefits, dating back to at least 2014.  (*Id.* at 63.)  The Court entered a permanent injunction, requiring that:

    a.    SCSU must take immediate steps to provide its female students with an equitable opportunity to participate in varsity intercollegiate athletics.  SCSU must:

        i.    Maintain the women's tennis and Nordic skiing teams at a level of support comparable to other SCSU teams within the same tier of support, as long as there is sufficient interest and ability to maintain the

3

women's tennis and Nordic skiing teams, and take other immediate
steps to narrow the participation gap; or

ii.   Otherwise take other steps to narrow the participation gap if the
women's tennis and/or Nordic skiing teams are no longer viable varsity
teams.

b.   SCSU must take immediate steps to provide its female athletes with
equitable athletic-related treatment and benefits at every tier of its athletic
department. SCSU must:

i.   Take immediate steps to permanently improve the practice and
competitive facilities of its women's sports teams to create equity
between SCSU's women's and men's teams, specifically, by promptly
completing renovations on Selke Field and the women's Nordic ski team
room, among other improvements to the women's facilities;

ii.   Take immediate steps toward eliminating the inequity stemming from
the unequal distribution of women and men's participation
opportunities among the tiers of support; and

iii.  Take immediate steps toward eliminating other inequities between the
male and female teams' locker rooms.

c.  SCSU's actions must be reasonably calculated to achieve full compliance with Title
IX in a reasonable period of time.

(*Id.* at 63-65.)  SCSU was then required to file six-month reports updating the Court on its

progress.

SCSU appealed the Court's issuance of a permanent injunction and the Eighth

Circuit issued its opinion on October 28, 2021 affirming in part, vacating in part, reversing

in part, and remanding.  *Portz*, 16 F.4th at 585.  The Circuit held that there was no clear

error in the Court's factual finding that SCSU athletics uses a tier system nor did the Court

err in holding that SCSU violated Title IX by failing to provide equal participation

opportunities. *Id.* at 582.  The Circuit found that the Court did err, however, in two meaningful ways in its treatment and benefits analysis. *Id.* at 583.  First, the Circuit held that the Court incorrectly relied upon SCSU's tiering system in its conclusion that SCSU failed to allocate equitable benefits and treatments in its athletic program. *Id.* at 583–84. Specifically, the Eighth Circuit stated that Title IX requires a "holistic examination" of treatment and benefits across the entire program, not just the allocation of those benefits among the tiers. *Id.*  Second, the Circuit held that the Court erred by not sufficiently reviewing the evidence related to the women's volleyball team, specifically that the volleyball team travelled by plane. *Id.* at 584.  The Circuit affirmed in part and reversed in part the Court's Order, reversing the Court's conclusion regarding treatment and benefits and remanding for further proceedings not inconsistent with its opinion. *Id.* at 585.  The Circuit vacated the injunction as it related to treatment and benefits and to the extent it required equity in participation opportunities among tiers. *Id.*  The Circuit vacated the award of attorney fees and costs as well. *Id.*

Upon issuance of the opinion, SCSU has filed with this Court a Motion to Dissolve the Permanent Injunction.  (Mot. Dissolve Inj. End Court's Ongoing Jurisdiction, Nov. 19, 2021, Docket No. 532.)  Plaintiffs have also filed a motion, seeking to modify the injunction in light of the Eighth Circuit's opinion.  (Mot. Alter/Amend/Correct Findings Fact Concl. L., Jan. 14, 2022, Docket No. 541.)

During its appeal, SCSU filed six updates on its compliance with the Court's permanent injunction.  (Ltr. Dist. Judge ("First Report"), Feb. 3, 2020, Docket No. 445); (Ltr. Dist. Judge ("Second Report"), Aug. 5, 2020, Docket No. 484); (Ltr. Dist. Judge ("Third Report"), Feb. 5, 2021, Docket No. 511); (Ltr. Dist. Judge ("Fourth Report"), Aug. 5, 2021, Docket no. 524); (Ltr. Dist. Judge ("Fifth Report"), Feb. 5, 2022, Docket No. 550); (Ltr. Dist. J., ("Sixth Report"), July 25, 2022, Docket No. 573.)  Each report includes information about SCSU's efforts to comply with the Court's permanent injunction, with particular focus on: (1) allocation of participation opportunities; (2) allocation of treatment and benefits; and (3) inequity related to tiering.

The Fourth report[1] asserts that SCSU is in compliance with the Court Order and Title IX in both its participation opportunities and the allocation of treatment and benefits.  In the report, SCSU detailed how its enrollment decline led to impacts on SCSU's athletic budget.  (Fourth Report at 2.)  As a result of the diminished athletic budget, SCSU eliminated men's football and men's/women's golf after the 2019-20 academic year.  (*Id.*)  SCSU added a men's soccer team to begin in the 2020-21 academic year.  (*Id.*)

In the Court's Order, it found that there was a participation gap of 28 opportunities in the 2017-18 academic year.  (Order 49–50.)  The elimination of football and men's and women's golf resulted in the reduction of 105 participation opportunities for men and 7

---

[1] The Fifth and Sixth Reports make no additional arguments other than updating the enrollment and participation opportunities numbers.

6

for women. (Fourth Report at 7.) The addition of the men's soccer team added 36 opportunities for men. (*Id.*)

The Fourth Report states that for the 2020-21 school year, the male athletes had 186 actual participants and the female athletes had 210 actual participants, for a total of 396 participation opportunities. (Fourth Report at 7–8.)[2] The female athletes, therefore, filled 53% of all participation opportunities and the male athletes filled 47% of those opportunities. (*Id.*) Full-time undergraduate enrollment for the 2020-21 year was 51.5% female and 48.5% male. (*Id.*) SCSU has provided the Court with its actual numbers for the 2021-22 school year. For the 2021-22 school year, the male athletes had 194 actual participants and the female athletes had 208 actual participants, for a total of 402 participation opportunities. (Ltr. Dist. J., June 7, 2022, Docket No. 567.) The female athletes, therefore, filled 51.74% of all participation opportunities, and the male athletes filled 48.26%. (*Id.*) Full-time undergraduate enrollment for the 2021-22 year was 51.28% female and 48.72% male. (*Id.*)

SCSU's reports also address the improvements it has made to the allocation of treatment and benefits. As for locker rooms, SCSU has improved the women's tennis locker rooms, repurposed space and enhanced locker rooms for women's basketball and softball, moved the Nordic ski team lockers to the women's varsity locker room, and

---

[2] The Plaintiffs challenge the veracity of these numbers. The Plaintiffs have presented no actual evidence which would call into question SCSU's numbers. Therefore, the Court will rely on the numbers provided by SCSU throughout its reports.

added a sauna to the women's hockey locker room.  (Second Report at 6, 9.)  Specifically, in response to the Court's concerns with women's basketball pre-game and half-time meeting space and access to restrooms, SCSU repurposed a men's faculty locker room as a private locker room for the women's basketball team closer to the basketball court.  (*Id.* at 6.)

For competitive facilities, SCSU has made improvements to Selke Field including enhancements to the dug-outs, replacing the in-field playing surface, addressing the lip to the outfield, and taking care of any holes or dips in the outfield.  (First Report at 10; Second Report at 8.)  For equipment and supplies, SCSU provides a base allocation of $100 per student-athlete.  (First Report at 11.)  SCSU also installed a ventilation hood and air filtration system in the new Nordic Ski room.  (*Id.* at 8–9.)  As for the provision of medical and training facilities, SCSU requires all athletes to enter the training room through a common door, with only one exception.  (*Id.* at 11–12.)  Lastly, as to travel/per diem, SCSU updated the Court that the male athletes traveled a total of 69 times in the 2021-22 athletic year and the female athletes travelled a total of 109 times.  (Ltr. Dist. J., July 11, 2022, Docket No. 571.)  Out of the 69 trips, the male athletes travelled eight times by plane and out of the 109 trips the female athletes travelled 10 times by plane.  (*Id.*)  SCSU represented that given their financial situation, all hotel stays and meals for the 2021-22 year were "frugal in nature" without any disparities between genders.  (*Id.*)  Lastly, SCSU stated that all athletic teams other than Division I hockey are expected to engage in

fundraising to alleviate the costs of travel.  (*Id.*)  SCSU has not presented to the Court any updated travel/per diem policies.

**ANALYSIS**

I.    **STANDARD OF REVIEW**

Whether to issue a permanent injunction is a decision committed to the discretion of the district court.  *Wigg v. Sioux Falls Sch. Dist. 49-5*, 382 F.3d 807, 812 (8th Cir. 2004). "According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief."  *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  A plaintiff must show "(1) that it has suffered an irreparable injury; (2) that remedies available at law . . . are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved."  *Id.*

The determination of whether to dissolve or modify the injunction rests primarily with the district court that issued it in the first place.  *United States v. Northshore Mining, Co.*, 576 F.3d 840, 849 (8th Cir. 2009).  "The district court may exercise this power when it realizes that injunctive relief is no longer needed due to intervening circumstances."  *Id.* A permanent injunction should not be extended beyond the time required to remedy the legal violations.  *Tyler v. Murphy*, 135 F.3d 594, 597 (8th Cir. 1998).

II.    **DISCUSSION**

Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Title IX applies to athletic programs.  *See* 34 C.F.R. § 106.41(c).  The two main challenges to SCSU's athletic program deal with effective accommodation, also known as participation opportunities, and equal treatment and benefits.

Though the parties filed two separate motions, the issues in each motion are intertwined.  As such, the Court will address each issue, rather than each motion, in turn.

### A.  Participation Opportunities

Title IX regulation provides for a list of factors relevant in determining compliance with Title IX's anti-discrimination provisions.  34 C.F.R. § 106.41(c).  The first factor relevant to determining compliance focuses on effective accommodation: "[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes."  34 C.F.R. § 106.41(c)(1).  This factor has been interpreted by the Department of Health, Education and Welfare to require that institutions meet one of three tests and the "levels of competition" test.   1979 Interpretation, 44 Fed. Reg. 71,413, 71,417–18 (Dec. 11, 1979).  The tests are referred to as Prong One, Prong Two, and Prong Three.  Relevant here is Prong One which requires

institutions to provide athletic participation opportunities "in numbers substantially proportionate to their respective enrollments." *Id.* at 714,418.

An analysis under Prong One requires the Court to determine the number of participation opportunities afforded to male and female athletes. OCR, U.S. DOE, *Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test* (Jan. 15, 1996) ("1996 Clarification"). Generally, athletes who are listed on a team's squad or eligibility list and are on the team as of the team's first competitive event are counted as participants. *Id.* Athletes need not compete so long as they receive other benefits of participation. *Id.*

As this Court has already held, athletes will be counted as receiving one participation opportunity for each sport they participate in. *Id.*; (Order at 37.) "[A]n athlete who participates in more than one sport will be counted as a participant in each sport in which he or she participates." *Id.* Plaintiffs ask the Court to revisit its conclusion adopting this counting method because, as they argue, SCSU employs duplicate counting methods in a discriminatory manner. In particular, the issue arises most prominently in counting participation opportunities for women's indoor track and field, outdoor track and field, and cross-country as many of the same female athletes compete in all three sports. There is no similar issue for male athletes as these male running sports have been eliminated at SCSU. Plaintiffs argue, therefore, that the choice to maintain the female running sports was an impermissible sex-based decision as it was made so that more

participation opportunities can count towards female sports even though several of the same female athletes occupy more than one participation opportunity.  Dissimilarly, most participation opportunities for male athletes are rarely filled by the same athlete.

While Plaintiffs do raise some concerning issues regarding SCSU's use of the duplicate counting method, two reasons inform the Court's determination that it will continue to employ the method.  First, the law of the case strongly favors retaining the Court's adoption of the OCR guidance.  The doctrine of the law of the case "prevents relitigation of settled issues in an action, thus protecting the expectation of the parties, ensuring uniformity of decisions and promoting judicial efficiency."  *UniGroup, Inc. v. Winokur*, 45 F.3d 1208, 1211 (8th Cir. 1995).  This doctrine is a law of discretion, so the Court is not bound by it.  *Id.*  However, it is appropriate to implement here.  The Court clearly adopted the OCR guidance on counting participation opportunities.  Plaintiffs' argument that the use of the word "generally" in the Court's Findings of Fact and Conclusions of Law undermines the Court's adoption of the OCR Guidance is unpersuasive.  The word "generally" appears in the sentence prior to the statement explicitly adopting the OCR guidance on duplicate counting methods.  And not only did the Court clearly adopt the rule for duplicate counting, but the Court also employed this method when calculating participation numbers and ordering SCSU to come into compliance with Title IX.  To hold now that SCSU's efforts to build an athletic portfolio

that utilizes duplicate counting is improper would undercut the expectation of the parties and be counter to uniformity in the Court's decisions.

Second, the permanent injunction did not appoint the Court to the role of SCSU's athletic director. SCSU is free to structure its programs however it wishes, so long as the program is within the confines of the law and the permanent injunction. The law allows for duplicate counting. Furthermore, the permanent injunction does not prohibit SCSU from implementing this method when determining participation opportunities. Absent clear evidence showing that SCSU's use of the duplicate counting method somehow violates Title IX, SCSU's use of this method is appropriate.

SCSU is in compliance with Prong One. For the 2020-21 school year, the male athletes had 186 actual participants and the female athletes had 210 actual participants, for a total of 396 participation opportunities. (Fourth Report at 7–8.) The female athletes, therefore, filled 53% of all participation opportunities and the male athletes filled 47% of those opportunities. (*Id.*) Full-time undergraduate enrollment for the 2020-21 year was 51.5% female and 48.5% male. (*Id.*) There was a participation gap of 12 in favor of female athletes.[3] Thus, the requirements of Prong One were met for the 2020-21 school year.

_____

[3] The Court employed the following equation to determine the participation gap number: [186 (total # of male participation opportunities) / .485 (% of male students)] – 186 (total # of male participation opportunities) – 210 (total # of female participation opportunities = -12

The Plaintiffs argue that the participation gap for this year was 24.5 in favor of males, but this equation erroneously looked to the number of actual athletes rather than the total participation opportunities. As the Court has already established, this is incorrect.

For the 2021-22 school year, the male athletes had 194 actual participants and the female athletes had 208 actual participants, for a total of 402 participation opportunities. (June 7 Ltr. Dist. J.)  The female athletes, therefore, filled 51.74% of all participation opportunities, and the male athletes filled 48.26%.  (*Id.*)  Full-time undergraduate enrollment for the 2021-22 year was 51.28% female and 48.72% male.  (*Id.*)  There was a participation gap of 4 in favor of female athletes.[4]  Thus, though the participation gap is smaller than the 2020-21 school year, Prong One requirements were also met in the 2021-22 school year.

SCSU has demonstrated that its current athletic portfolio can produce equal participation opportunities, in compliance with Title IX, on an ongoing basis.  The Plaintiffs argue that the injunction should not be dissolved because SCSU has failed to demonstrate it will continue to monitor and ensure compliance with Title IX.  First, the permanent injunction does not require SCSU to set up any types of procedures for monitoring compliance.  And second, Title IX remains the law, the Court presumes that SCSU, like any law-abiding entity, will comply with the law in the future.

---

[4] The Court employed the same equation discussed *supra*.  Plaintiffs appear to challenge the participation gap, arguing that it should be 2 rather than 4.  (Obj. Letter Dist. J. at Fig. 3, Aug. 12, 2022, Docket No. 579).  Notwithstanding the fact that a participation gap of 2 in favor of women is compliant with Prong 1, Plaintiffs' math appears to be inaccurate.  Plaintiff asserts that, in Figure 3, they use the numbers provided by SCSU for the 2021-22 school year, which are 194 male athletes and 208 female athletes.  (June 7 Letter Dist. J., at 1.)  But in Figure 3, the Plaintiffs use 207 female athletes and 198 male athletes, of course resulting in a smaller participation gap. The Court is unclear where Plaintiff has found those numbers and will therefore use the numbers provided by SCSU.

A permanent injunction should not be extended beyond the time required to remedy the legal violations. *Tyler*, 135 F.3d at 597. SCSU's legal violation of Title IX's participation opportunities requirement has been remedied. There is no reason to continue to extend the permanent injunction as to participation opportunities. The Court, therefore, will dissolve the permanent injunction as it relates to participation opportunities.

### B. Treatment and Benefits

In assessing whether equal treatment and benefits are conferred to male and female athletes, Section 106.41(c) of the federal regulations lays out what has been commonly referred to as the "Laundry List" factors to assist in the Court's assessment. The Laundry List factors include:

> (2) The provision of equipment and supplies;
> (3) Scheduling of games and practice time;
> (4) Travel and per diem allowance;
> (5) Opportunity to receive coaching and academic tutoring;
> (6) Assignment and compensation of coaches and tutors;
> (7) Provision of locker rooms, practice and competitive facilities;
> (8) Provision of medical and training facilities and services;
> (9) Provision of housing and dining facilities and services;
> (10) Publicity

34 C.F. R. § 106.41(c)(2)–(10). As the Court has stated before, courts must weigh these factors on a program-wide basis for all men's and women's athletic teams. 1979 Policy Interpretation at 71,417; (Order at 35); *see also Portz*, 16 F.4th at 583. The institution will be in compliance if the "compared program components are equivalent, that is, equal or

equal in effect."  1979 Policy Interpretation at 71,415.  Benefit and treatments need not be identical provided the "overall effect of any differences is negligible."  *Id.*  If the treatment and benefits are not equal, an institution can still be in compliance if "the differences are the result of nondiscriminatory factors" such as "unique aspects of particular sports," or "legitimately sex-neutral factors related to special circumstances of a temporary nature."  *Id.* at 71,415–16.

The Eighth Circuit reversed the Court's original conclusions regarding treatment and benefits and remanded for further proceedings.  In doing so, the Eighth Circuit vacated the injunction as it relates to treatment and benefits.  The Eighth Circuit's general mandate allows the Court "broad leeway to proceed, subject only to the requirement of adhering to the ruling on the particular issue actually decided by the Eighth Circuit." *ProGrowth Bank, Inc. v. Wells Fargo Bank, N.A.*, No. 7-1577, 2009 WL 2982939 at *6 (D. Minn. Sept. 14, 2009).   The Court must determine whether a permanent injunction on treatment and benefits, under the analysis required by the Eighth Circuit, is appropriate. In particular, the Court must take a holistic approach in examining the treatment and benefits offered to the SCSU athletes, not consider SCSU's tiering system, and ensure to include the women's volleyball team in its overall analysis.

Plaintiffs argue that, based on the evidence presented at trial, they have clearly shown program-wide evidence of disparities in the treatment and benefits between male and female athletes.  Plaintiffs ask, based upon the trial evidence, to reinstate the

permanent injunction.  But the Court is required to look at the most recent evidence of SCSU's programs to determine whether a permanent injunction is appropriate. Permanent injunctions are meant to address future and existing harms, not remedy harms from the past.  *Miller v. Honkamp Krueger Fin. Servs., Inc.*, 9 F.4th 1011, 1015 (8th Cir. 2021); *Minneapolis & St. L. Ry. Co. v. Pac. Gamble Robinson Co.*, 181 F.2d 812, 814 (8th Cir. 1950).  Therefore, the Court can only consider the evidence of SCSU's athletic program as it exists in 2022 to determine whether a permanent injunction would still be proper.

SCSU argues that a permanent injunction is not necessary because there are no longer any disparities between male and female athletes as to any of the relevant Laundry List factors.  In its original Order, the Court found that there was inequality in treatment and benefits based on the following Laundry List factors: (1) the provision of equipment and supplies substantially favored male athletes; (2) travel funds and per diem allowance substantially favored male athletes; (3) provision of medical services favored male athletes; and (4) provision of locker rooms, practice facilities, and competitive facilities substantially favored male athletes.[5]  SCSU has documented the changes it has made on these Laundry List factors over the last several years via its six-month reports.  In reviewing whether a permanent injunction as to treatment and benefits is warranted, the Court will rely upon the most updated information contained in the record.

---

[5] The Court found that there was no inequity as it related to the other Laundry List factors. Plaintiffs did not challenge this finding on appeal and therefore it is the law of the case.  As such, the Court will not consider any additional Laundry List factors in its analysis.

SCSU has shown that it now provides equipment and supplies equally to both male and female athletes.  In its Order, the Court noted that it was concerned with the provision of travel gear and uniforms.  (Order at 53.)  SCSU has resolved this issue by entering into a multi-year contract with an official equipment and apparel provider.  (First Report at 11.)  As a result of the contract, SCSU provides each sports program a base allocation of $100 per student-athlete (based upon the previous year's roster numbers) to be used as credit for equipment and apparel purchases.  (*Id.*)  The Court also expressed concern over the equipment provided to the Nordic ski team, specifically the lack of proper ventilation and respirators.  (Order at 53.)  SCSU, in response, moved the Nordic ski team to a different training room where it installed a new ventilation hood and filtration system.  (First Report at 8.)  SCSU has addressed all the Court's previous concerns and Plaintiffs have not presented any evidence that inequity still exists in 2022.  Thus, an analysis of this factor based on SCSU's athletic program as it stands in 2022 shows that provision of equipment and supplies is equal across all sports.

In its Order, the Court found that SCSU inequitably provided medical services to male and female athletes.  (Order at 55.)  Specifically, the Court found that housing the athletic trainer in the male locker room disadvantaged female athletes because the male athletes had quicker and easier access to trainers over female athletes.  (*Id.*)  SCSU altered

its policies and now requires all male athletes, with one exception[6], to enter the athletic training room through the same door as female athletes. (First Report at 11–12.) SCSU has addressed all the Court's previous concerns and Plaintiffs have not presented any evidence that inequity still exists in 2022. Thus, an analysis of this factor based on SCSU's athletic program as it stands in 2022 shows that provision of medical services is equal across all sports.

Next, in its Order, the Court found that SCSU's provision of locker rooms, practice facilities, and competitive facilities substantially and inequitably favored male athletes. (Order at 56.) As for locker rooms, the Court took issue with the small size of the women's basketball team locker room, its metal lockers, and the fact that the locker room was so far from the basketball court that the female athletes had to use a public restroom during home games. (*Id.*) The Court went on to point out the inadequacy of the softball team locker room and the Nordic ski team locker room. (*Id.*) SCSU has taken substantial steps to address these inequities. First, SCSU repurposed a men's faculty locker room into a private locker room for women's basketball with custom lockers, showers, and room to meet as a team. (Second Report at 7.) This locker room is equi-distant from the basketball

---

[6] The door between the athletic trainer's room and the men's locker room is still open to allow wrestlers to get skin checks prior to meets. (First Report at 11.) Wrestlers are allowed access via this door to prevent them from having to walk out of the locker room and through the main entrance in their underwear. (*Id.*) Though this is a disparity, it results from a unique characteristic of the sport, is not discriminatory in nature, and does not alter the Court's analysis of this factor.

court as the men's locker room to address the issue of restrooms during games.  (*Id.*)
Softball was given a former football locker room close to the team's practice and
competitive facilities which was enhanced with new lockers, has its own private entrance,
restrooms and showers, and has a space for the team to gather.  (*Id.*)  The women's tennis
team, as a result of moving the women's basketball team, was provided a private team
room with individual locker stalls.  (*Id.*)  The Nordic ski team athletes were provided
lockers in the women's varsity locker room.  (First Report at 8–9.)

As for competitive and practice facilities, the Court noted that the baseball team's
competitive facility was far superior to the softball team's Selke Field.  (Order at 57–58.)
The Court also stated that the baseball team's practice fields were better than Selke
because Selke Field was insufficiently maintained.  (*Id.*)  Since the Court's Order, SCSU has
made significant improvements to Selke Field.  Improvements have been made to the
dugouts and netting.  (Second Report at 8.)  In addition, SCSU replaced the in-field playing
surface, addressed the lip in the outfield, and fixed any holes or dips in the outfield.  (Third
Report at 11–12.)  SCSU has represented that it will pursue playing outdoor softball at
Husky Stadium after the dome is removed.  (Fourth Report at 9.)  Husky Stadium includes
permanent restrooms and concessions, a press box, and is adjacent to the softball team's
locker rooms.  (*Id.*)  SCSU has addressed all the Court's previous concerns and Plaintiffs
have not presented any evidence that inequity still exists in 2022.  In sum, an analysis of

this factor based on SCSU's athletic program as it stands in 2022 shows that provision of locker rooms, practice facilities, and competitive facilities is equitable.

Lastly, and most informative to the Court's overall decision to reinstate the permanent injunction regarding treatment and benefits with required modifications is that SCSU has failed to demonstrate that travel and per diem allowances are equitable in 2022. The Court, in its Order, held that this factor favors men because men's teams are able to travel more frequently, more comfortably, for longer periods of time, and their travel is more often funded by SCSU. (Order at 54–55.)

First, SCSU argues that because the Eighth Circuit found it was error for the Court to not consider volleyball in its treatment and benefits analysis, when considering volleyball's travel history, travel/per diem policies are equitable. The Court does not agree. Even when considering that the women's volleyball team did travel by plane **once**, this does not alter the conclusion that in 2018, the men's teams had better travel accommodations, travelled on longer trips, and had more of their travel funded by SCSU. These factors, when taken together with mode of transportation, show that travel/per diem benefits were distributed inequitably.

Furthermore, SCSU has provided the Court with no details of its travel and per diem policies as they exist in 2022 other than representing that it will review its travel/per diem policies and will adjust them. (Second Report at 11; Fourth Report at 13.) Even when asked to specifically provide those policies to the Court, SCSU responded to the Court's

order by simply listing the number of times the men's and women's teams travelled in the 2021-22 school year and the mode of transportation taken. (Ltr. Dist. J., July 11, 2022, Docket No. 571.) Then SCSU went on to state broadly, with no particulars, that some trips may have included hotel travel, but others did not, and that all hotel stays, and meals provided to student-athletes were "frugal in nature" without any significant disparities between either gender. (*Id.*) SCSU concluded that all SCSU teams are expected to engage in fundraising to alleviate the costs associated with travel in their program. (*Id.*)

SCSU has been warned before that the "Court must have more than conclusory statements about SCSU's progress." (Mem. Opinion Order Denying Pls.' Mot. Modify Perm. Inj., May 3, 2021, Docket No. 515.) SCSU's July 11, 2022 letter to the Court demonstrates nothing more than the fact that in the 2021-22 school year, the men's teams and women's teams travelled an equitable number of times and that their modes of transportation were equitable. SCSU's letter provides no additional evidence to assure the Court that several of its concerns raised in the Order have actually been addressed. And as Plaintiffs pointed out in their response letter, SCSU listed the amount each team travelled, but did not discuss how many athletes actually travelled. This is significant because it is not hard to imagine that disparity persists if male athletes were provided more travel opportunities than female athletes.

Because SCSU has provided only minimal evidence of its travel/per diem policies as they exist in 2022, the Court must look to the most recent evidence in the record—the

evidence presented at the 2018 trial.  Based upon that evidence, and including an analysis of the volleyball team's one-time travel by plane, this factor still favors men.  In particular, the Court remains concerned with the accommodations provided to men's teams versus women's teams when they travel, how many travel opportunities each individual athlete has, and the amount that SCSU funds the men's travel in comparison to the women's travel.

The four-factor test to issue a permanent injunction is met here.  A plaintiff must show "(1) that it has suffered an irreparable injury; (2) that remedies available at law . . . are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved."  *eBay, Inc.*, 547 U.S. at 391.  The first factor is met because college students suffer irreparable injury by receiving inequitable treatment and benefits.  The second factor is met because Title IX does not provide for money damages, so Plaintiffs are limited to an injunction as their sole remedy.  The third factor is met because, though it may be difficult for SCSU to make these changes to its program, female athletes should not be required to endure discrimination due to budget constraints on their university.  Finally, the fourth factor weighs in favor of an injunction because it is firmly in the public's interest to enforce antidiscrimination laws such as Title IX.

As such, the Court will reinstate the permanent injunction on treatment and benefits with the required modifications related to tiering and with specific tailoring to the travel/per diem factor. The permanent injunction will require SCSU to make reports on its progress every six months. The Court's hope is that in its next sixth-month report, SCSU is able to address the issues discussed herein regarding its failure to provide updated travel/per diem policies and evidence of equity in its travel/per diem allocations. Once SCSU has provided enough evidence of its compliance, the Court can once again consider a motion to dissolve.

### C. Attorney Fees and Costs

Without any analysis, the Eighth Circuit vacated the Court's prior award of attorney fees and costs. *Portz*, 16 F4th at 585. The Court understands the Circuit's ruling to be in response to SCSU's appeal of the Court's Order on Attorney Fees and Costs which determined the **amount** Plaintiffs were owed, not whether they were, in fact, entitled to those fees and costs. Entitlement to those fees was determined in the Court's Order. (Order at 65.) As the Court understands the Circuit's opinion, the vacation of attorney fees and costs was done in light of the Circuit vacating a portion of the permanent injunction. The Court's original Order on Attorney Fees and Costs took into account Plaintiffs' success on both participation opportunities and treatment and benefits. As a result of the remand, the Eighth Circuit anticipated that the Court's determination on treatment and benefits may change, and thus the amount of attorney fees and costs may

also change.  Vacation of that award of fees and costs allows the Court the discretion it needs to award the appropriate amount.  Therefore, SCSU's challenge that Plaintiffs' request for any attorney fees and costs is untimely because they failed to comply with the filing requirements of the Eighth Circuit Local Rules is unpersuasive as there was no need for such a motion.  Attorney fees and costs were already awarded, it is simply the amount that needs to be determined.

Next, Plaintiffs assert that they are entitled to additional attorney fees and costs incurred on the appeal.  Because the award of attorney fees and costs on appeal deals not only with the amount of those fees and costs but Plaintiffs' entitlement to them, Plaintiff should have complied with the Eighth Circuit's Local Rules on filing deadlines. "The usual practice for awarding fees and costs under 42 U.S.C. § 1988 is for [the Eighth Circuit] to fix the compensation for services rendered before it, and for the District Court to do so for the services rendered before it."  *Little Rock Sch. Dist. v. Arkansas*, 127 F.3d 693, 696 (8th Cir. 1997).  But the Eighth Circuit has been clear that Rule 47C is a "rule of procedure" and by its own language it is "not a rigid jurisdictional rule."  *Id.* at 697. Despite the local rule, the district courts retain jurisdiction to decide attorney fees issues the Eighth Circuit has not decided itself.  *Id.*  Therefore, although Plaintiffs should have filed a motion for attorney fees and costs associated with their appeal in accordance with the Eighth Circuit's local rules, this Court is not precluded from granting an award of attorney fees and costs if such an award would be fair.

25

Therefore, if Plaintiffs want to pursue an award of attorney fees and costs, they should file a motion asking for fees and costs associated with the trial, their appeal and the pending motions.  After full briefing by the parties, the Court can then determine what amount of attorney fees and costs, if any, would be reasonable.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion to Dissolve Injunction and End the Court's Ongoing Jurisdiction [Docket No. 532] is **GRANTED in part and DENIED in part** as follows:

    a. The permanent injunction on allocation of athletic participation opportunities, Section 3 of the Court's Findings of Fact, Conclusions of Law, and Order for Judgment is **DISSOLVED.**

2. Plaintiffs' Motion to Modify the Injunction to Be Consistent with the Eighth Circuit Court of Appeals Mandate [Docket No. 541] is **GRANTED in part and DENIED in part** as follows:

    a.  SCSU is not in compliance with Title IX in its allocation of treatment and benefits, from at least 2014.

    b. A permanent injunction shall be reinstated as follows:

        i. SCSU must take immediate steps to provide its female athletes with equitable athletic-related treatment and benefits on a

program-wide basis.  SCSU must take immediate steps to update its travel/per diem policies to create equity between SCSU's women's and men's teams, specifically by ensuring equity in how frequently the athletes travel, the level of comfort during travel, the length of travel, and the funding of that travel by SCSU.

c.  SCSU's actions must be reasonably calculated to achieve full compliance with Title IX in a reasonable period of time.

d.  The Court shall maintain jurisdiction over this action to monitor Defendants' compliance with the Court's order.  Defendants shall make reports to the Court every six months to monitor compliance with the Court's order and with Title IX.  The Court will consider appointment of an independent monitor if sufficient progress is not made within a reasonable period of time.

3.  Plaintiffs' Motion to Strike Pleading [Docket No. 555] is **DENIED.**

4.  Plaintiffs are instructed to file a Motion for Attorney Fees and Costs.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  September 7, 2022
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge